**No. 25-8085**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**Cher**

*Plaintiff and Appellee*

**Mary Bono**

*Defendant and Appellant*

On Appeal from the United States District Court
for the Central District of California
No. 2:21-CV-08157 JAK (RAOx)
Hon. John A. Kronstadt

## APPELLANT'S EXCERPTS OF RECORD

Volume 1 of 1

**DONAHUE FITZGERALD LLP**
Attorneys at Law
Daniel J. Schacht
dschacht@donahue.com
Andrew S. MacKay
amackay@donahue.com
Hayley M. Lenahan
hlenahan@donahue.com
Padmini Cheruvu
pcheruvu@donahue.com
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
(510) 451-3300

Attorneys for Appellant MARY BONO

**Cher v. Mary Bono**

**U.S. DISTRICT COURT DOCUMENTS**
**25-8085**

**Appellant's Excerpts of Record**
Filed Concurrently With Appellant's Opening Brief
[Volume 1 of 1; Pages: 192]


| Dkt | Description | Date | Page |
|---|---|---|---|
| 168 | Judgment | 11/26/2025 | 4 |
| 141 | Direct Testimony Declaration of Custodian of Records Jeremy Blietz (excerpt) | 03/14/2025 | 8 |
| 107 | In Chambers Order Regarding Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment | 05/29/2024 | 26 |
| — | Reporter's Transcript of February 26, 2024 Hearing on Cross-Motions for Summary Judgment (excerpt) | 02/26/2024 | 41 |
| 64-3 | Declaration of Mary Bono in Support of Motion for Summary Judgment | 11/20/2023 | 48 |
| 64-5 | Exhibit 1 to Declaration of Daniel J. Schacht - August 10, 1978 Marriage Settlement Agreement (excerpt) | 11/20/2023 | 52 |
| 64-15 | Exhibit 11 to Declaration of Daniel J. Schacht - Order Approving Final Account and Distribution of Sonny Bono Estate (excerpt) | 11/20/2023 | 75 |
| 64-7 | Exhibit 3 to Declaration of Daniel J. Schacht - September 5, 2023 Deposition of Cher (Volume I) (excerpt) | 09/05/2023 | 78 |
| 49 | Plaintiff Cher's Answer to Defendant's Counterclaim; Demand for Jury Trial | 05/02/2023 | 82 |

| Dkt | Description | Date | Page |
|---|---|---|---|
| 47 | Defendant Mary Bono’s Answer to First Amended Complaint for Declaratory Relief and Breach of Contract; Restatement of Counterclaims | 04/11/2023 | 98 |
| 45 | Plaintiff Cher’s First Amended Complaint for Declaratory Relief and Breach of Contract | 03/28/2023 | 127 |
| 43 | (In Chambers) Order re Defendant’s Motion to Dismiss (Dkt. 18) and First Stipulation to Extend Deadlines (Dkt. 40) | 03/14/2023 | 149 |
| 35 | Reporter's Transcript of April 25, 2022 Hearing on Motion to Dismiss (excerpt) | 04/25/2022 | 159 |
| 171 | Defendant Mary Bono’s Notice of Appeal | 12/22/2025 | 165 |
| — | District Court Docket Report – Cher v. Mary Bono (Case No. 2:21-cv-08157-JAK-RAO) | | 171 |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHER,<br>Plaintiff,<br>v.<br>MARY BONO, et al.,<br>Defendants. | No. 2:21-cv-08157-JAK (RAOx)<br>**JUDGMENT**<br>**[JS-6: CASE TERMINATED]** |
| AND RELATED CLAIMS | |

The Court having ruled on the Motion for Summary Judgment filed by Plaintiff and Counterdefendant Cher ("Plaintiff") and the Motion for Summary Judgment filed by Defendant and Counterclaimant Mary Bono ("Defendant"), having considered the parties' Stipulation to Certain Facts, and having determined that no issues remain preventing the entry of Judgment, **IT IS ORDERED AND ADJUDGED** that:

1. As to Plaintiff's first claim for relief, it is hereby declared that:
   a. The September 30, 2016, Notice of Termination (the "Notice of Termination") served on behalf of Defendant and others under Section 304(c) of the Copyright Act did not terminate or otherwise have any effect on the August 10, 1978, Marriage Settlement Agreement ("MSA") between Plaintiff and Sonny Bono, the MSA's recognition and confirmation of Plaintiff's community property, or the MSA's assignment of the following to Plaintiff as her sole and separate property in perpetuity and throughout the world:
      i. fifty percent of all contingent receipts received by Sonny Bono, his successors in interest, assigns, and his other businesses, after July 14, 1978, from all sources perpetually and throughout the world from musical compositions and interests in musical compositions written or composed, in whole or part, by Sonny Bono or others, and/or acquired by Sonny Bono or his other business (as that term is defined in the MSA), prior to February 1, 1974 less certain costs and the administration fee as set forth in the MSA (the "Composition Royalties");
      ii. fifty percent of all contingent receipts after July 14, 1978, pursuant to recording contracts entered into prior to the separation of Plaintiff and Sonny Bono (as set forth in the MSA), with the following record companies: Atlantic Recording Corporation; York Records; Imperial

Records; Liberty Records, Inc. and MCA Records, Inc. (the "Record Royalties");

b. the Notice of Termination did not terminate or otherwise have any effect on the following rights of Plaintiff, individually or as the Trustee of the Veritas Trust, and/or her successors and assigns:

i. ownership in perpetuity and throughout the world of an undivided fifty percent of all Composition Royalties and Record Royalties, including without limitation any Composition Royalties due and payable on or after July 1, 2022, regardless of when paid; and

ii. the approval rights as to any and all third party contracts with respect to the Musical Compositions granted to Plaintiff under paragraph 10(d) of the MSA.

2. As to Plaintiff's second claim for relief, Plaintiff is awarded damages against Defendant in the amount of the $187,534.91 in Composition Royalties that Defendant received and retained in breach of the MSA, plus prejudgment interest at the rate of seven percent per annum, from February 1, 2022, to the date of entry of Judgment.

3. As to Defendant's first counterclaim for relief, it is hereby declared that Defendant, subject to the rights of Sonny Bono's four children (the four children and Defendant referred to as the "Bono Heirs"), has the sole discretion to decide whom to appoint as the royalty administrator pursuant to the MSA, including an entity owned and controlled by the Bono Heirs; provided, however, Plaintiff may raise reasonable objections to the terms of any such agreement entered into with such a royalty administrator, including as to the reasonableness of the administration fee and as to the administrator's credentials and qualifications.

4. As to Defendant's second counterclaim for relief, no relief is granted.

5. Except as expressly provided herein, Judgment is entered in favor of Plaintiff on Plaintiff's First Claim for Relief, Plaintiff's Second Claim for Relief, and Defendant's Second Counterclaim for Relief; and Judgment is entered in favor of Defendant in part on Defendant's First Counterclaim for Relief.
6. Plaintiff is awarded costs incurred, in an amount to be determined by the Court, as to Plaintiff's First Claim for Relief, Plaintiff's Second Claim of Relief, and Defendant's Second Counterclaim for Relief; and Defendant is awarded costs incurred, in an amount to be determined by the Court, as to Defendant's First Counterclaim for Relief.

**IT IS SO ORDERED.**

Dated: 11/26/2025

John A. Kronstadt
United States District Judge

Case: 25-8085, 11/23/2026, DktEntry: 15.1, (8 of 192)

## DECLARATION OF CUSTODIAN OF RECORDS

I, Jeremy Blietz, certify and declare as follows:

1. I am over the age of eighteen (18) and not a party to the action captioned *Cher, individually and as Trustee of the Veritas Trust v. Mary Bono, individually and as Trustee of the Bono Collection Trust*, Case No. 2:21-CV-08157-JAK (RAOx) in the United States District Court, Central District of California, Western Division (the "**Action**").

2. I am the duly authorized custodian of records for Warner Chappell Music, Inc. f/k/a Warner/Chappell Music, Inc. and Cotillion Music, Inc. (collectively referred to hereafter as "**WCM**"), and have authority to make this certification.

3. WCM has been requested by Mary Bono to provide the following agreements in connection with the Action: (1) the agreement dated 1966 between Atlantic Recording Corporation and Cotillion Music, on the one hand, and Salvatore Bono (a/k/a Sonny Bono) and Cher Bono (p/k/a Cher), individually and d/b/a Chris-Marc Music, on the other hand (the "**1966 Agreement**"); (2) the Settlement Agreement and General Release dated January 1, 2006 by and between Christy Bono, Chaz Bono, Mary Bono, Chianna Bono, Chesare Bono, and Cher, on the one hand, and WCM, on the other hand (the "**Settlement Agreement**"); and (3) the amendment to the 1966 Agreement and the Settlement Agreement dated December 21, 2017 by and between Chris-Marc Music, Christy Bono, Chaz Bono, Mary Bono, Chianna Bono, Chesare Bono and Cher, on the one hand, and WCM, on the other hand (the "**Amendment**"). The 1966 Agreement, Settlement Agreement and Amendment are referred to collectively hereafter as the "**Agreement**".

4. The royalty accounts maintained by WCM in connection with the Agreement are in a recouped position. Pursuant to the Agreement, Schedule "B" to the 1966 Agreement in the column labeled "Share of Income after Recoupment" sets forth the respective publisher's share of income of Cotillion Music, Ten East Music and Chris-Marc Music relating to musical compositions subject to the Agreement.

5. After a reasonably diligent search, I hereby certify that, to the best of my knowledge, the accompanying records are true and correct copies of business records that were prepared by the personnel of the business, in the ordinary course of business, at or near the time of the acts, conditions or events.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 13th day of March, 2025 at Los Angeles, California.

Jeremy Blietz
Jeremy Blietz
SVP, Administration
Warner Chappell Music, Inc.

AGREEMENT made this day of , 1966 by and between ATLANTIC RECORDING CORPORATION of 1841 Broadway, New York, N. Y., a New York corporation (hereinafter called "ATLANTIC") and COTILLION MUSIC, INC. of 1841 Broadway, New York, N. Y. a New York corporation (hereinafter called "COTILLION") and Salvatore Bono a/k/a Sonny Bono, of 16501 Academia Drive, Encino, California (hereinafter called "SONNY") and Cher Bono, p/k/a Cher of 16501 Academia Drive, Encino, California (hereinafter called "CHER") and Sonny Bono and Cher Bono d/b/a CHRIS-MARC MUSIC of 16501 Academia Drive, Encino, California (hereinafter called "CHRIS-MARC").

W I T N E S S E T H :

1 (a) Atlantic and Cotillion (hereinafter sometimes jointly called "THE ATLANTIC GROUP") have entered into two agreements of even date with Charles Greene (hereinafter called "GREENE"), Brian Stone (hereinafter called "STONE") and others. Said agreements are denominated as "Sale Agreement" and "Supplementary Agreement" and when hereinafter referred to jointly are referred to as the "YORK-ATLANTIC SETTLEMENT AGREEMENT". Sonny and Cher are parties to the Supplementary Agreement. The Atlantic Group has entered into the York-Atlantic Settlement Agreements and paid the considerations therein provided for at the joint and several request of Sonny and Cher, ~~and in further consideration of Sonny and Cher~~ entering into this agreement. This agreement shall be read in conjunction with the York-Atlantic Settlement Agreements. As between the parties to this agreement, in the event of any differences or inconsistencies between this agreement and the York-Atlantic Settlement Agreements, this agreement shall control.

Cher and York shall each bear a proportionate share of such costs as provided in Paragraph 14(f) of the Sale Agreement.

With respect to masters recorded pursuant to this agreement, for which monies are not payable or accruable to York pursuant to the York-Atlantic Settlement Agreements, said costs of recording shall be recouped by Atlantic out of all royalties payable hereunder.

16. Pursuant to the York-Atlantic Settlement Agreements, Cotillion has acquired from Five-West Music (as defined in said agreements), in addition to the interests provided for in the York-Atlantic Agreements, additional interests in the copyrights and monies in respect of the musical compositions listed on Schedule "A" annexed hereto and made a part hereof. Income based on said additional interests acquired by Cotillion shall be applied by Atlantic in recoupment of the monies paid by Atlantic and Cotillion pursuant to the York-Atlantic Settlement Agreements. After Recoupment From York, Chris-Marc as designee of Sonny and Cher or such other music publisher as they may designate shall have additional interests in and to income in respect of the musical compositions listed on Schedule "A" as follows:

A forty (40%) percent interest in the publisher's share of income in all of said compositions, except for "LAUGH AT ME", "LOVE DON'T COME", "THE REVOLUTION KIND" and "TONY", and in which compositions Chris-Marc will have a forty-five (45%) percent interest in the publisher's share of income and except for "IT'S GONNA RAIN" in which composition Chris-Marc will have a twenty (20%) percent interest in the publisher's share of income. ~~Payment of~~ ✓

Five-West's share of income in respect of the compositions listed on Schedule "A" as provided for in the York-Atlantic Settlement Agreements and of Chris-Marc's share of income in respect of the compositions listed on Schedule "A" as provided for in this agreement shall be made by Cotillion out of the publisher's share of income as defined in Paragraph 14(c)(iv) of the York-Atlantic Settlement Agreements. Schedule "B" annexed hereto and made a part hereof sets forth the respective interests of Cotillion, Five-West and Chris-Marc in said copyrights and in the publisher's share of income relating thereto. Sonny and Cher hereby confirm Cotillion's present interest (prior to the acquisition of said additional interests) in each of the compositions listed on Schedule "A" as therein provided. Schedule "A" shall be subject to revision for omissions of compositions therefrom, it being the intention of the parties that Cotillion shall share in each musical composition in which it would have been entitled to share as designee of Atlantic pursuant to the York-Atlantic Agreements, including, without limitation, compositions recorded by Cher pursuant to the York-Cher Agreement after August 18, 1965 and compositions embodied in the Original Sound Track Recording of the motion picture tentatively entitled "GOOD TIMES". Cotillion shall administer each composition listed on Schedule "A" subject to prior agreements as disclosed in the York-Atlantic Settlement Agreements. The general terms of Schedule "C" annexed hereto and made a part hereof shall apply, except for the percentages of copyright and income which shall be governed by this paragraph and as is set forth in Schedule "B". The term "Owner" as used in

Schedule "C" shall mean Chris-Marc and the term "Publisher" as used in Schedule "C" shall mean Cotillion.

17(a) The musical compositions which are the subject matter of this paragraph 17 are as follows:

i. Each and every theretofore unrecorded musical composition embodied in a master recording subject or becoming subject hereto, except for the compositions listed on Schedule "A", which is written, owned or controlled, in whole or in part, directly or indirectly by any individual, firm or corporation hereinafter described.

ii. Each and every other theretofore unrecorded musical composition which during the period of this agreement and all extensions, renewals and modifications thereof, is owned or controlled, in whole or in part, directly or indirectly, by any person, firm or corporation hereinafter described including, without limitation, all musical compositions initially recorded by Cher pursuant to the York-Cher Agreement and which recordings are or become subject to the York-Imperial Agreements or which compositions are otherwise recorded by Cher prior to January 6, 1971.

iii. The persons, firms and corporations referred to in "i" and "ii" above include Sonny, Cher, Chris-Marc or any shareholder in Chris-Marc or any firm or corporation affiliated with any of the foregoing persons, firms or corporations, directly or indirectly or in which any of the foregoing have a substantial interest or which acts as a nominee for any of the foregoing.

(b) Each musical composition described in (a) above shall be co-published with Atlantic or a music publisher designated by Atlantic. Sonny, Cher and Chris-Marc jointly and severally agree

to assign and cause to be assigned to Atlantic or its designee an undivided one-half (½) interest in and to each such composition, including the copyright and all rights therein throughout the world. The remaining one-half (½) interest shall be owned by a music publisher designated by Sonny and/or Cher as they may between them agree. Atlantic or its designee shall administer each such composition throughout the world on behalf of all parties. Anything to the contrary herein contained notwithstanding, Atlantic or its designee (and Cotillion in respect of the compositions listed in Schedule "A") agree that they shall not grant sub-publishing rights outside of the United States and Canada to any person, firm or corporation, on the basis of less than the 10-50-50 basis which is usual in the music publishing industry. It is agreed that copies of agreements in respect of such sub-publishing rights outside of the United States and Canada and statements in respect thereof will be made available to Chris-Marc and/or Sonny and Cher for inspection. Should any of the persons, firms or corporations described in Paragraph 17 (a) (iii) above have an interest in any composition described in Paragraphs 17(a) (i) and (ii) above which is acquired by them from another music publisher in which they have no interest, and such interest shall be less than one hundred (100%) percent, then they shall assign and cause to be assigned to Atlantic or Atlantic's designee one-half (½) of such interest. Sonny, Cher and Chris-Marc jointly and severally shall cause the appropriate parties to enter into an agreement with Atlantic or Atlantic's designee in the form annexed hereto as Schedule "C" and made a part hereof wich respect to each

24

composition subject hereto. The term "Publisher" as used on Schedule "C" shall mean Atlantic or Atlantic's designee. The writers of each composition subject hereto shall enter into a songwriter's agreement with the appropriate parties in a form annexed hereto as Schedule "D" and made a part hereof.

(c) In the event that The Atlantic Group or any music publisher owned or controlled by them or affiliated with them shall own or control in whole or in part, any original theretofore unrecorded musical composition embodied in a master recording subject to this agreement or subject to the York-Imperial Agreement, then The Atlantic Group shall assign or cause to be assigned to a music publisher designated by the artist performing such composition an undivided one-half (½) of its interest in such composition. The provisions of Schedule "C" shall apply to each such composition except that Atlantic or its designee shall administer each composition throughout the world on behalf of both parties. The Atlantic Group shall cause the appropriate parties to enter into agreements to effectuate the intent hereof.

(d) With respect to those compositions subject or becoming subject to this paragraph 17 with respect to which monies are payable to Greene, Stone, York and/or Five-West (excluding Sonny) pursuant to the York-Atlantic Settlement Agreements or with respect to which monies are to be used for recoupment purposes by Atlantic pursuant to the York-Atlantic Settlement Agreements, the share of monies payable to Chris-Marc or such other music publishers as Sonny and/or Cher may designate shall be reduced by the full amount of such monies payable or usable for recoupment

[illegible] poses pursuant to the York-Atlantic Settlement Agreements, except with respect to monies payable to Greene, Stone, York and/or Five-West (excluding Sonny) After Recoupment From York for those compositions which are initially recorded by Sonny individually, the cost of the monies payable to York pursuant to the York-Atlantic Settlement Agreements shall be divided equally between Atlantic's designee and Sonny's and Cher's designee so that with respect to such compositions initially recorded by Sonny individually, Sonny and Cher's designee and Atlantic's designee shall each bear fifty (50%) percent of the ~~one-hundred (100%)~~ percent of the publisher's share payable to Greene, Stone, York and/or Five-West (excluding Sonny). Schedule "C" shall be changed accordingly.

(e) Atlantic, or its designees, ~~shall~~ secure appropriate [illegible]ight in each musical composition subject to this paragraph and [illegible] undertakes to administer such compositions in accordance with Schedule "C".

18. Pursuant to the provisions of Paragraph 6 of the York-Atlantic Modification Agreement, Atlantic paid York the sum of Fifty Thousand ($50,000) Dollars. Sonny and ~~Cher~~ acknowledge that [illegible] have received one-half (½) of said payment; the other half (½) having been retained by York. Atlantic shall have the right to recoup said Twenty-Five Thousand ($25,000) Dollars received by Sonny and Cher as aforesaid out of the share of monies payable to [illegible] persons, firms and corporations described in Paragraph 17( ) of this agreement, as music publishers, including without [illegible]tion the share of monies payable to Chris-Marc or another [illegible] of Sonny and Cher in respect of the compositions listed on

Schedule "A", which monies are payable after the date hereof and except for monies earned from United States and Canadian performances and payable through Broadcast Music, Inc. (BMI). Anything to the contrary herein contained notwithstanding, and for the purposes of recoupment pursuant to this paragraph 18 only, the publisher's share of monies in respect of compositions initially recorded by Sonny which Atlantic is entitled to use for recoupment purposes hereunder shall be limited to thirty-three and one-third (33-1/3%) percent of the gross publisher's share of monies in respect of such compositions. Nothing herein contained shall authorize Atlantic to recoup said monies out of any monies payable to writers as such.

19. All disputes between the parties relating to the subject matter hereof shall be submitted to arbitration in the City of New York, State of New York, in accordance with the rules and regulations of the American Arbitration Association. The award of the arbitrator's shall be final and may be entered by any party in any Court having jurisdiction. Nothing herein contained shall, however, prevent any party from seeking and obtaining equitable relief including, but not limited to prohibitory or mandatory injunctions, specific performance, or extraordinary writs, in any Court of law or equity having jurisdiction nor prevent any party from joining any other party as defendant in any action brought by or against a third party. Each of the parties consents and agrees that service of notice or process to institute arbitration and/or legal proceedings may be made on any of the parties wherever each party may be found, provided such service complies with the

| TITLES | WRITERS | Cotillion Share of Copyright & Income prior to Date Hereof |
|---|---|---|
| 1. IT'S GONNA RAIN | Bono | 25% |
| 2. LAUGH AT ME | Bono | 33-1/3% |
| 3. LOVE DON'T COME | Bono | 33-1/3% |
| 4. REVOLUTION KIND, THE | Bono | 33-1/3% |
| 5. TONY | Bono, Greene, Stone | 33-1/3% |
| 6. BUT YOU'RE MINE | Bono | 50% |
| 7. I DON'T CARE | Lanigan, Philippet | 50% |
| 8. GEORGIA & JOHN QUETZAL | Bono, Greene, Stone | 50% |
| 9. GOT LOVE | Lanigan, Philippet | 50% |
| 10. I GOT YOU BABE | Bono | 50% |
| 11. HELLO | Bono, Greene, Stone | 50% |
| 12. JUST YOU | Bono | 50% |
| 13. I LOOK FOR YOU | Bono | 50% |
| 14. RED RIVER QUETZAL | Bono, Greene, Stone | 50% |
| 15. SING C'EST LA VIE | Bono, Greene, Stone | 50% |
| 16. WHERE DO YOU GO | Bono | 50% |
| 17. BANG BANG (My Baby Shot Me Down) | Bono | 50% |
| 18. HAVE I STAYED TOO LONG | Bono | 50% |
| 19. GOOD TIME | Bono | 50% |
| 20. TRUST ME | Bono | 50% |
| 21. JUST A NAME | Bono | 50% |
| 22. I CAN'T DANCE | Bono | 50% |
| 23. I FEEL SOMETHING IN THE AIR | Bono | 50% |
| 24. SHE'S NO BETTER THAN ME | Bono | 50% |

SCHEDULE "A"

| Title per Sched. "A" | Shares of Copyright On date hereof | | Share of Income before Recoupment | | | Share of Income after Recoupment | | |
|---|---|---|---|---|---|---|---|---|
| | Cot. | C-M | Cot. | 5-W | C-M | Cot. | 5-W | C-M |
| * 1 | 37½% | 12½% | 25% | 12½% | 12½% | 25% | 5% | 20% |
| 2 | 66-2/3% | 33-1/3% | 33-1/3% | 33-1/3% | 33-1/3% | 45% | 10% | 45% |
| 3 | 66-2/3% | 33-1/3% | 33-1/3% | 33-1/3% | 33-1/3% | 45% | 10% | 45% |
| 4 | 66-2/3% | 33-1/3% | 33-1/3% | 33-1/3% | 33-1/3% | 45% | 10% | 45% |
| 5 | 66-2/3% | 33-1/3% | 33-1/3% | 33-1/3% | 33-1/3% | 45% | 10% | 45% |
| 6 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 7 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 8. | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 9 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 10 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 11 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 12 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 13 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 14 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 15 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 16 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 17 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 18 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 19 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 20 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 21 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 22 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 23 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |
| 24 | 75% | 25% | 50% | 25% | 25% | 50% | 10% | 40% |

* 1 - IT'S GONNA RAIN: 50% of copyright and income owned by Laughter Music

SCHEDULE "B"

XERO COPY XERO COPY XERO COPY XERO COPY

Key:

C-. = Cotillion Music, Inc.

C-M = Chris-Marc Music

5-W = Five-West Music

SCHEDULE "B"

II.

Agreement made and entered into this day of 196
by and between of
(hereinafter referred to as "Owner") and
of
Atlantic's Designee (hereinafter referred to as "Publisher").

IN CONSIDERATION OF the sum of One ($1.00) Dollar in hand paid to Owner by Publisher, receipt whereof is hereby acknowledged and for other good and valuable considerations it is agreed:

1. Owner warrants that it is the sole owner of the music and lyrics constituting the musical composition(s) entitled:

| TITLE | COMPOSER | COPYRIGHT REG. NO. |
| --- | --- | --- |

(hereinafter referred to, in toto, as "musical composition") and all rights therein and thereto, including the copyright therein, throughout the world and that Owner has not in any way disposed of or encumbered the rights herein granted to Publisher.

2. Owner hereby does bargain, sell, assign, set over and transfer unto the said Publisher, its successor and assigns, an undivided one-half (1/2) interest in and to said musical composition and all copyrights therein throughout the world, including the right to obtain copyright therein in the joint names of Owner and Publisher throughout the world. Owner agrees to execute any documents necessary to perfect such interest in and to said musical composition in Publisher's name.

~~[illegible]~~

4. Publisher hereby agrees to pay the following monies with respect to the musical composition:

(a) to Authors and/or Composers - all royalties becoming due to said authors and/or composers pursuant to the agreement between Owner and said authors and/or composers, a copy of which agreement is annexed hereto as Schedule "A."

(b) to Owner fifty (50%) percent of all monies actually received and earned by Publisher by reason of the sale or other distribution of any printed editions of the musical composition after deduction of payments to authors and/or composers pursuant to sub Paragraph (a) above and of the cost of printing, processing and distributing said printed editions including charges of any/sales agents employed to sell said printed editions. unrelated third party

(c) to Owner - fifty (50%) percent of all monies actually received and earned by Publisher by virtue of the sale, lease, license or other disposition of mechanical rights and motion picture or television synchronization and electrical transcription rights after deduction of monies payable to authors and/or composers pursuant to sub Paragraph (a) above, and the costs of licensing and of collecting said monies through unrelated third parties.

SCHEDULE "C"

(d) to Owner - fifty (50%) percent of any and all other monies actually received and earned by Publisher (exclusing monies received by reason of public performance (which is provided for in Paragraph 5. below) from any and all sources not hereinabove specifically set forth after deduction of such monies as may be payable to authors and/or composers pursuant to sub Paragraph (a) above and the costs of collecting said monies. through unrelated third parties.

5. Broadcast Music, Inc. ~~(ASCAP)~~ shall be authorized and directed to pay all gross monies payable by reason of the public performance of the musical composition within the United States and Canada, as foll ws - fifty (50%) percent to Owner and fifty (50%) percent to Publisher. ~~Owner hereby agrees to forward to Broadcast Music Inc. (ASCAP) the letter annexed hereto as marked Schedule "B" within seven (7) days after execution hereof.~~

6. Publisher agrees that within forty-five (45) days after each ~~June 30th~~ calendar quarter ~~and December 31st~~ of each year it will prepare and furnish statements hereunder to Owner and shall mail each such statement to Owner accompanied by payment of all sums shown to be due thereby.

7. Publisher shall have the sole and exclusive rights to deal with said musical composition throughout the world as if it were sole publisher thereof, provided only that it inform third parties of the rights of Owner in the composition and secures to Owner those monies hereinabove provided for as payable to Owner.

8. This agreement shall be for the term of copyright in said musical composition and any renewals and extensions thereof throughout the world.

9. Publisher and Owner shall share equally all costs and expenses, damages, losses and attorneys' fees incurred in protecting said musical composition both as responding to claims of infringement brought against said composition and in bringing suit against any infringer of said composition.

IN WITNESS WHEREOF the parties have hereunto set their hands the day and year first above written.

By: ______________________________
Owner

By: ______________________________
~~Publisher~~ ATLANTIC'S DESIGNEE

Case: 25-8085, 11/23/2026, DktEntry: 15.1, (22 of 192)

STANDARD UNIFORM SONGWRITERS AGREEMENT

AGREEMENT made this day of , 196 between

(hereinafter called "Publisher"),

and

jointly and/or severally, (hereinafter called "Writer(s)"):

W I T N E S S E T H :

1. The Writer(s) hereby sell, assign, transfer and set over unto the Publisher, its successors and assigns, for the world, a certain heretofore unpublished original musical composition, written and/or composed by the above named Writer(s) and tentatively entitled:

including all musical and non-musical rights therein, the title, words and music thereof, (and all literary characters contained therein), the worldwide copyright thereof and the right to secure copyright therein throughout the entire world and to have and to hold the said copyright together with all of their right, title and interest, both legal and equitable therein, including but not limited to the sole and exclusive worldwide publication, mechanical reproducing and motion picture and television synchronization rights and the right of public performance by any means, and all other rights now known or hereafter to come into existence, subject to the terms of this agreement.

2. The Writer(s) warrant and represent that they are the sole authors and composers of the title, music and/or lyrics constituting the musical composition, which is a joint work; that said music, title and lyrics are their own original work and creation; and that neither said music, title or lyrics nor any part thereof are a copy of any other copyrighted work or infringe or violate any rights of any third party; and that no adverse claims exist thereon. The Writers further warrant and represent that they have not sold, assigned, leased, licensed or in any way disposed of or encumbered any of the rights herein granted to the Publisher and that they have the right to make this agreement.

3. In consideration for and in full payment of the aforesaid sale, the Publisher hereby agrees to pay jointly to the Writer(s) with respect to the musical composition as follows:

(a) Five (5¢) cents per copy for each and every regular pianoforte copy thereof, and five (5¢) cents per copy for each and every dance orchestration thereof, paid for to the Publisher in the United States.

(b) Ten (10%) percent of the retail selling price upon each and every printed copy of each and every other arrangement and edition thereof paid for to the Publisher in the United States, except that in the event that the said work shall be used or caused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer(s) shall be entitled to receive that proportion of said (10%) percent which the musical composition

Case: 25-8085, 11/23/2026, DktEntry: 15.1, (23 of 192)

shall bear to the total number of musical compositions contained in such folio or album.

(c) Fifty (50%) percent of any and all sums actually received by the Publisher from mechanical reproduction rights and motion picture and television synchronization rights in the United States.

(d) Fifty (50%) percent of any and all royalties actually earned by the musical composition in countries outside the United States and actually received by the Publisher. It is understood the Publisher may sub-publish the musical composition outside of the United States with its own affiliates on sub-publication royalty terms standard in the industry.

(e) Fifty (50%) percent of any and all other sums actually received and earned by the musical compositions and all subsidiary rights, versions thereof and from uses not herein otherwise specifically provided for.

(f) Writer(s) shall not be entitled to share in any sum or sums received by the Publisher from any performance rights organization which pays performance fees directly to songwriters.

(g) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are distributed to performing artists or orchestra leaders or for advertising or exploitation purposes.

4. The Publisher shall render the Writer(s), as above, quarter-annually, within forty-five (45) days after the end of each calendar quarter, royalty statements accompanied by remittance for any royalties due thereunder.

5. It is understood and agreed by and between all of the parties hereto that except as hereinafter set forth all sums hereunder payable shall be divided in even shares between the Writers.

____________________ ____________________

____________________ ____________________

____________________ ____________________

____________________ ____________________

5. The Writer(s) hereby consent to such changes, editing and arrangements of said composition (and Publisher shall have the right to copyright any such versions in its own name and retain all rights therein for the full term of protection therein, and renew and extend such copyright), and the setting of words (English and/or foreign) to the music, and of music to the words, and the change of title, as the Publisher deems desirable. The Writer(s) consent to the use of their names and likeness and the title of the said composition on or together with the music, folios, recordings, performances, player rolls, and in

Case: 25-8085, 11/23/2026, DktEntry: 15.1, (24 of 192)

connection with publicity and advertising concerning the Publisher, its successors, assigns and licensees and said composition, and agrees that the use of such name, likeness and title may commence prior to the publication and may continue so long as the Publisher shall own and/or exercise any rights in said composition or any versions thereof. In the event that another author and/or composer is, in accordance with the practice of the industry, paid by Publisher for foreign language lyrics or lyrics to an instrumental composition, then Writer(s) royalties hereunder shall be reduced pro rata; provided, however, that Publisher shall not authorize an English language lyric without first giving Writer(s) the right to supply such lyric within thirty (30) days after request therefor by Publisher.

7. The Writer(s) may at his own expense once a year upon written notice appoint a certified public accountant who shall upon written notice during business hours have access to all records of the Publisher relating to the said composition or any other of Writer(s) compositions with Publisher for the purpose of verifying royalty statements rendered.

8. Written demands and notices other than royalty statements provided for herein shall be sent by registered mail.

9. The Writer(s) hereby authorize and empower the Publisher to renew, or extend, pursuant to law for and in the name of the Writer(s) if living, any copyright of the said musical composition, and to execute and deliver, as attorney-in-fact of Writer(s) in the name of the Writer(s) a formal assignment of such renewal or extension copyright to the Publisher, for its own use and benefit subject to the payment of the same royalties as herein before provided, or pro rata royalties, if Publisher receives hereunder less than all of the Writer(s) rights therein.

10. The Writer(s) hereby consent to the assignment of this contract or the said musical composition or any copyright thereof or any and all of the rights therein secured by the Publisher to any person, firm or corporation whatsoever, subject, however, to the payment of the royalties herein specified. Writer(s) shall assign rights and benefits hereunder only with the prior written consent of Publisher, and any attempted agreement shall be void and transfer no rights to the purported assignee except that Writer(s) shall have the right to assign any monies payable hereunder subject to Publisher's rights hereunder.

11. Any legal action brought by the Publisher against any alleged infringer of said composition shall be initiated and prosecuted at its sole expense, and of any recovery made by it as a result thereof, after deduction of the expenses of the litigation, including reasonable attorney's fees, a sum equal to fifty (50%) percent shall be divided among the Writer(s) of the said composition.

(a) If a claim is presented against the Publisher alleging that the Composition is an infringement or invasion of the rights of others, he shall thereupon serve written notice upon the Writer(s) containing the substance of such claim and thereafter, until the claim has been

Case: 25-8085, 11/23/2026, DktEntry: 15.1, (25 of 192)

adjudicated or settled by Publisher, Publisher may pay any monies coming due the Writer(s) hereunder or under any other agreement with Writer(s) to any bank, to be held pending the outcome of such claim; provided, however, if no suit be filed within twelve (12) months after written notice to the Writer(s) by the Publisher of the adverse claim, the Publisher shall, unless Publisher has reasonable grounds to the contrary, pay to the Writer(s) all sums held as aforesaid. Such payment shall be without prejudice to the rights of the Publisher in the event of a subsequent adverse adjudication. Publisher's damages (including reasonable attorney's fees) shall not be limited to the monies retained hereunder.

(b) From and after the service of a summons in a suit brought against the Publisher in respect of the Composition, and which suit threatens the title or any right of the Publisher with respect to the Composition, any and all payments thereafter coming due to the Writer(s) under this or any other contract with Publisher, shall be held in abeyance until the suit has been finally adjudicated or settled by Publisher, unless the Writer(s) shall elect to file an acceptable bond in which event the sums due shall be paid to the said Writer(s). No such action shall be settled or compromised without Writer(s) consent being first obtained, which consent shall not be unreasonably withheld.

12. "Writer(s)" as used herein shall be deemed to include all authors and composers signing this agreement or counterparts thereof.

13. This agreement is binding upon the respective parties hereto, their respective successors in interest, legal representatives and assigns and represents the entire understanding between the parties and cannot be terminated, or amended except by a writing signed by all of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

WRITER ______________________________

ADDRESS ______________________________

By ______________________________

WRITER ______________________________

ADDRESS ______________________________

WRITER ______________________________

ADDRESS ______________________________

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-08157 JAK (RAO) | Date | May 29, 2024 |
| Title | Cher v. Mary Bono | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| T. Jackson | Not Present |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 64); PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 65)**

## I. Introduction

On October 13, 2021, Cher ("Plaintiff") brought this action against Mary Bono ("Defendant"), the widow of Salvatore Bono ("Sonny"). Dkt. 1. On March 28, 2023, Plaintiff filed the operative First Amended Complaint (the "FAC"). Dkt. 45. The FAC advances two causes of action arising from a dispute over royalties for musical compositions and recordings: (1) declaratory relief as to the effect of 17 U.S.C. § 304(c) termination on Plaintiff's rights; and (2) breach of contract. *Id.* ¶¶ 40–51. On April 11, 2023, Defendant brought counterclaims against Plaintiff seeking declaratory relief as to the following: (1) Plaintiff's rights and obligations concerning the selection of an administrator; and (2) Defendant's right to enter into new agreements for sound recording copyrights that she owns. Dkt. 47 ¶¶ 39–51.

On November 20, 2023, Defendant filed a Motion for Summary Judgment ("Defendant's Motion"). Dkt. 64. On the same day, Plaintiff also filed a Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment ("Plaintiff's Motion"). Dkt. 65. Plaintiff filed an opposition to Defendant's Motion ("Plaintiff's Opposition" (Dkt. 88)), and Defendant filed an opposition to Plaintiff's Motion ("Defendant's Opposition" (Dkt. 86)). Each party then filed a reply in support of its motion. ("Defendant's Reply" (Dkt. 94)); ("Plaintiff's Reply" (Dkt. 92)).

A hearing on the Motions was held on February 26, 2024, and they were taken under submission. For the reasons stated in this Order, Defendant's Motion is **DENIED** as to all issues presented except for her first counterclaim, which is **GRANTED IN PART**, and Plaintiff's Motion is **GRANTED** as to all remaining issues except for her second claim for breach of contract, which is **GRANTED IN PART**.

## II. Factual Background

### A. Musical Career of Plaintiff and Sonny

Plaintiff and Sonny married in 1967. Dkt. 94-1 at 9. Together, they performed and recorded several popular musical compositions, including some written or acquired by Sonny during their marriage. *Id.* Their marriage was dissolved in 1975. *Id.*

B. 1978 Marriage Settlement Agreement

On August 10, 1978, Plaintiff and Sonny entered a Marriage Settlement Agreement ("MSA"). Dkt. 64-5. The MSA is governed by California law and was approved by the Los Angeles Superior Court. *Id.* ¶ 20. Under its terms, Plaintiff is assigned an "undivided 50% interest" in the following:

- Any and all contingent receipts payable after July 14, 1978, "from Atlantic Recording Corporation under the agreement dated August 30, 1966, . . . from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 . . . [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971 [(collectively, the Recording Contracts)]" (the "Record Royalties" (*id.* ¶ 10(a)–(c)); and

- Any and all of Sonny's "right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest" in and to contingent receipts payable after July 14, 1978, "from musical compositions and interests therein, written and composed, in whole or in part, by [Sonny] or others prior to February 1, 1974, and/or acquired by [Sonny and certain other entities] prior to [the couple's separation]" (the "Composition Royalties" (*id.* ¶ 10(d))).

The MSA states that all such receipts "shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to [Sonny]'s sole discretion." *Id.* ¶ 10(d). This administration fee "shall be a sum equivalent to 10% of the gross income actually received . . . from all sources worldwide." *Id.* Moreover, "all agreements with third parties respecting the subject matter of this paragraph 10(d) are subject to the approval of [Plaintiff] or [Plaintiff]'s representatives which approval will not be unreasonably withheld." *Id.* The MSA further provides that all of Sonny's successors in interest, assigns and all third parties with whom he or any of his other businesses contracted are subject to Plaintiff's rights as set forth in paragraph 10(d). *Id.*

C. Sonny's Death

Following Sonny's death in 1998, a probate action was initiated in the Los Angeles Superior Court. Dkt. 92-1 ¶ 15. Plaintiff filed a creditor's claim in that action, in which she asserted Sonny's obligations to her under the MSA. Dkt. 94-1 at 13. Defendant, as Sonny's widow and administrator of his estate, reached an agreement with Plaintiff approving her claim and recognizing "her ongoing rights under the terms and conditions" of the MSA (the "Creditor Claim Agreement"). Dkt. 92-1 ¶ 21; Dkt. 94-1 at 14. Defendant subsequently honored Plaintiff's rights under the MSA, including her share of the Record Royalties and Composition Royalties. Dkt. 92-1 ¶ 28.

After Sonny's estate was closed, Plaintiff and Defendant agreed to engage Jay Glick as administrator to collect and disburse royalties. *Id.* ¶ 80. In 2011, Plaintiff and Defendant agreed to replace Glick with Wixen Music Publishing, Inc. ("Wixen"). *Id.* ¶ 82.

D. 2016 Notice of Termination of Sonny's Pre-1978 Music Publishing Grants

In 2016, Defendant issued a Notice of Termination (the "Notice") under 17 U.S.C. § 304(c) to various music publishers to which Sonny had granted a transfer or license of copyright in musical compositions that he had authored or co-authored. Dkt. 94-1 at 23. The effective dates of termination ranged from

2018 to 2026. *Id.* The Notice was issued without Plaintiff's knowledge or consent. Dkt. 92-1 ¶ 103. The Notice did not purport to terminate the MSA or the Recording Contracts. *Id.* ¶¶ 41, 51.

After the terminations detailed in the Notice became effective, Defendant stopped paying Plaintiff her 50% share of the U.S. Composition Royalties under the MSA. *Id.* ¶ 35. Beginning in September 2021, Defendant advised Plaintiff that she is no longer entitled to her 50% share of the Record Royalties or her approval rights under the MSA. *Id.* ¶¶ 33–34.

E. 2021 Termination of Wixen Agreements and 2023 General Assignment

In October 2021, Plaintiff elected to terminate the agreements with Wixen. *Id.* ¶ 94. In January 2023, Plaintiff executed a General Assignment of her rights under the MSA to a third party, excluding her share of the Composition Royalties due under the MSA prior to July 1, 2022. *Id.* ¶¶ 76–77.

## III. Evidentiary Issues

Plaintiff filed several objections to the evidence proffered in support of Defendant's Motion. Dkt. 89. Defendant responded to these objections. Dkt. 94-3. As to the declaration of Daniel J. Schacht, objection no. 2 is **OVERRULED**, because Defendant can authenticate the document. Objection no. 3 is **SUSTAINED**, because Randall Wixen did not authenticate the document in the portion of his deposition testimony cited by Defendant; provided, however, this is not a final determination as to whether this evidence may be admitted at trial if properly authenticated. Objection no. 4 is **SUSTAINED** because the statement is a legal argument.

As to the deposition testimony of Lindsay Scott, objection no. 10 is **SUSTAINED** for lack of foundation because Scott lacked personal knowledge of the matter at issue.

As to the deposition testimony of Defendant, objection no. 15 is **OVERRULED** as to lack of foundation because Defendant has personal knowledge of the matter, and her testimony is not conclusory.

As to the deposition testimony of Randall Wixen, objection no. 19 is **SUSTAINED** under the best evidence rule; provided, however, this is not a final determination as to whether this evidence may be admitted at trial, *e.g.*, if the underlying agreement is received into evidence.

As to the other exhibits to Schacht declaration, objection no. 29 is **OVERRULED** because the best evidence rule does not apply, and there is not a cognizable dispute as to authenticity. Objection no. 32 is **SUSTAINED** because Wixen did not authenticate the document in the portion of his deposition testimony cited by Defendant; provided, however, this is not a final determination as to whether this evidence may be admitted at trial if properly authenticated.

To the extent the evidentiary objections are sustained, that proffered evidence is not considered in deciding the matters addressed in this Order.

Plaintiff's remaining objections, nos. 1, 5–9, 11–14, 16–18, 20–28, 30–31, 33–36, are directed at Defendant's uncontroverted facts rather than the underlying evidence. Plaintiff argues that the facts mischaracterize the cited evidence. However, these are not cognizable evidentiary objections but are

arguments as to whether there are genuine issues of material facts. Accordingly, these objections overlap with the arguments in Plaintiff's Genuine Disputes of Material Fact (Dkt. 88-1). *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant."); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("[P]arties briefing summary judgment motions would be better served to 'simply argue' the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections."). Because these arguments are evaluated in the corresponding discussion of Defendant's Motion below, the objections are **MOOT**.

## IV. Analysis

### A. Legal Standards

A motion for summary judgment will be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 324. Where the nonmoving party will have the burden of proof on an issue, the movant need only demonstrate that there is an absence of evidence to support such claims. *Id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

With certain exceptions, only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(c). However, in considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. *Id.* All inferences are to be drawn in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). This means that "where the facts specifically averred by [the nonmoving] party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

A court is not required to assume that "general averments embrace the 'specific facts' needed to sustain the complaint." *Id.* "The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Id.* Thus, conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of material fact and defeat summary judgment. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009); *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "If the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial." *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998).

B. Application

1. Defendant's Affirmative Defenses

a) Standing and Mootness

Defendant argues that Plaintiff lacks standing to bring her claim for declaratory relief because she sold her catalog to a third party. Dkt. 64-1 at 15. Plaintiff responds that standing is determined at the time of filing, and even construing Defendant's argument as a mootness challenge, her claim for declaratory relief presents a live controversy because its resolution may affect the validity of the General Assignment. Dkt. 88 at 9–10.

(1) Legal Standards

"Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.' " *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S. at 569 n.4).

Mootness is another limit on federal court jurisdiction that also arises out of Article III. In contrast to standing, however, mootness requires "an actual controversy [to] be extant at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974). "The test for mootness in the context of a case, like this one, in which a plaintiff seeks declaratory relief . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (cleaned up). In other words, the "central question" is "whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief." *Id.* (quoting *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 n.4 (9th Cir. 2000)). "The party asserting mootness bears the heavy burden of establishing that there remains no effective relief a court can provide." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017).

(2) Analysis

Plaintiff has standing. It is undisputed that when she first filed the action, she was the sole owner of her rights under the MSA, including her share of the Record Royalties and Composition Royalties. Dkt. 94-1 at 5–6. Because the requested declaratory relief would have redressed her injury in fact at the time Plaintiff filed the initial complaint in this action, she has standing.

Even if Defendant's argument were characterized as a mootness challenge, Defendant has not shown that Plaintiff's claim for declaratory relief does not present ongoing issues. A declaratory judgment is "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion" insofar as it settles "some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Thus, declaratory relief must operate prospectively "to resolve uncertainties or disputes that may result in future litigation." *Screen Cap. Int'l. Corp. v. Lib. Asset Acquisition Co.*, 510 B.R. 248, 261 (C.D. Cal. 2014) (citation omitted); *see also Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1991) (the Declaratory Judgment Act "brings to the present a litigable controversy, which otherwise might only be tried in the future").

Plaintiff seeks a declaration as to the effect of the Notice of Termination to her rights under the MSA. *See, e.g.*, Dkt. 45 at 18–21 ("The Notice of Termination did not terminate, and could not have terminated, the Marriage Settlement Agreement or its recognition and confirmation of Plaintiff's community property, the Marriage Settlement Agreement's assignment to her of fifty percent of the Royalties as her sole and separate property in perpetuity and throughout the world, and Plaintiff's other rights under the Marriage Settlement Agreement, or any of the foregoing."). Plaintiff argues that such a determination affects whether her "rights to receive the Composition Royalties and Record Royalties could . . . have transferred to the buyer." Dkt. 92-1 ¶ 78; *see also* Dkt. 65-3 at 3 ("[T]his Court's determination of whether or not Ms. Bono terminated my rights to the Composition Royalties will affect the value of the property I assigned to the buyer and what I receive in exchange.").

Defendant responds that "the evidence shows that Cher no longer has any interest in Sonny's copyrights, regardless of the outcome of this action" because "no evidence was produced by Cher concerning the value of her assignment." Dkt. 94 at 3; Dkt. 92-1 ¶ 79. From this premise, Defendant concludes that "the controversy of whether [the third-party buyer] has the same rights is now a matter between Mary and [the buyer]." Dkt. 86 at 14. As the party asserting mootness, Defendant must show that there is no longer an actual controversy. Defendant has not proffered evidence showing that the requested declaration would not operate prospectively to affect the validity of Plaintiff's General Assignment of her rights under the MSA, just as it would have affected the validity of her rights before the sale. *See, e.g.*, *Lee v. Verimatrix, Inc.*, No. 19-cv-2054-W (BLM), 2020 WL 4747751, at *5 (S.D. Cal. Aug. 17, 2020) (declaratory judgment that would affect future rights after a sale was not moot).

Defendant does not "dispute the fact that Cher *once* had 'rights, title, and interest in and to' the assets." Dkt. 86 at 14. However, Defendant disputes that Plaintiff had rights to the assets at issue after the Notice of Termination and before the General Assignment. Whether Plaintiff had these rights initially presents a controversy that can only be resolved by the present litigation between Plaintiff and Defendant. As a result, there is an actual controversy with respect to the claim for declaratory relief. Therefore, Defendant's Motion is **DENIED** as to this affirmative defense.

b) Indispensable Parties and Joinder

Defendant next argues that the action should be dismissed because Plaintiff has not joined Sonny's four children as parties, and that all of them are indispensable parties under Fed. R. Civ. P. 19. Dkt. 64-1 at 20. Plaintiff responds that Defendant cannot show that Sonny's children are necessary parties or that the action cannot proceed without them. Dkt. 88 at 11.

(1) Legal Standards

A party may move to dismiss an action for failure to join an indispensable party under Fed. R. Civ. P. 19. *See* Fed. R. Civ. P. 12(b)(7). The moving party bears the burden of persuasion on this issue. *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). "The terms 'necessary' and 'indispensable' are terms of art in Rule 19 jurisprudence: 'Necessary' refers to a party who should be joined if feasible. 'Indispensable' refers to a party whose participation is so important to the resolution of the case that, if the joinder of the party is not feasible, the suit must be dismissed." *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 867 n.5 (9th Cir. 2004) (cleaned up).

The Ninth Circuit has identified "three successive inquiries" that apply in determining whether a case should be dismissed pursuant to Rule 12(b)(7). *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779–80 (9th Cir. 2005). *First*, the district court determines whether "the absent party is necessary to the suit," considering: (1) "if *complete relief* is possible among those already parties to the suit"; (2) "whether the absent party has a *legally protected interest* in the suit"; and (3) "whether that interest will be *impaired* or *impeded* by the suit." *Makah*, 910 F.3d at 558. "As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013). *Second*, if an absent party is necessary under Rule 19(a), the district court then determines whether it is feasible to order that the absent, necessary party be joined in the action. *Peabody*, 400 F.3d at 779. *Third*, if joinder of the absentee party is necessary, but not feasible, the district court must decide "whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Id.*

Ultimately, "[t]here is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a). . . . The determination is heavily influenced by the facts and circumstances of each case." *Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 970 (9th Cir. 2008).

(2) Analysis

Defendant could have presented this argument in a motion to dismiss under Rule 12(b)(7). Because it was not, "it is untimely and may be disregarded." *de la Hoya v. Top Rank, Inc.*, No. 00-10450-WMB, 2001 WL 34624886, at *14 (C.D. Cal. Feb. 6, 2001); *see also Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 896 (9th Cir. 1996) ("No case law from this or any other circuit supports [the] proposition that a court must hear and decide a 12(b)(7) motion before granting summary judgment. . . . [T]he district court has discretion to consider the timeliness of such a motion if it appears that the defendant is interposing that motion for its own defensive purposes, rather than to protect the absent party's interests." (citing Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment)).

Further, considering Defendant's joinder argument on the merits, Defendant cannot satisfy its burden of persuasion that Sonny's children are necessary parties to this action. Plaintiff is correct that complete relief can be accorded because the action "involves a narrow legal issue" and seeks "no judgment against the other Heirs." Dkt. 92 at 11–12. Defendant properly recognizes that Sonny's children nevertheless have a legally protected interest in the matters at issue because "*all* of the Bono Heirs will be directly affected by a ruling in Cher's favor in this case." Dkt. 94 at 3. This leaves one principal dispute between the parties: whether the children are adequately represented by Defendant in the

litigation. If they are, they are not indispensable parties.

Determining "whether an existing party may adequately represent an absent required party's interests" turns on another three-factor test: (1) "whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments"; (2) "whether the party is capable of and willing to make such arguments"; and (3) "whether the absent party would offer any necessary element to the proceedings that the present parties would neglect." *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 852 (9th Cir. 2019) (quoting *Alto*, 738 F.3d at 1127–28).

As to this issue, Plaintiff argues that Defendant has repeatedly taken responsibility for managing the interests of the children, communicated with Wixen on behalf of the children, shared the same counsel as the children with respect to their termination interests and recently, formed a limited liability corporation to manage the rights of the children. Dkt. 88 at 12; Dkt. 92 at 13. Defendant replies that while she has shared counsel with the children "in certain instances and on certain issues when they are all in agreement," there is 'no evidence that Mary's counsel represents Sonny's children *in this litigation*." Dkt. 94 at 5.

Defendant's argument is unpersuasive. Whether a party's counsel legally represents nonparties "has no import in a Rule 19 analysis." *Renteria v. Cuellar*, No. 16-CV-01685-MCE-AC, 2016 WL 7159233, at *4 (E.D. Cal. Dec. 8, 2016). Instead, the key issue is whether "the interests of absent parties . . . would be prejudiced if the court proceeded without them." *Id.* Defendant is well situated to represent any interest Sonny's children may have in this proceeding. Thus, she shares common interests with the children in presenting a response and defense to Plaintiff's claims and in seeking to prevail on her own counterclaims. Nor is there any showing that Sonny's children would offer any necessary element in litigating this action that Defendant cannot provide.

Furthermore, Sonny's children are aware of this action. *See* Dkt. 64-3 ¶ 13 (Defendant and Sonny's children decided "to put the royalties at issue in this lawsuit into an escrow account."); *see also* Dkt. 64-3 ¶ 10 ("[W]ith the support of Sonny's children," Defendant intends "to either continue to use Wixen as the royalty administrator for all of Sonny's publishing income, or designate an entity that I own as the royalty administrator to make sure that all Sonny's publishing royalties are properly accounted for to Cher and all of Sonny's heirs."). Notwithstanding this knowledge, Sonny's children have not sought to intervene in this action or bring a separate one against Plaintiff. Instead, they have agreed to deposit "Cher's portion of the US publishing fee . . . in an escrow account to be disbursed to the appropriate party upon resolution of the litigation." Dkt. 64-33 at 2. As a result, Sonny's children have not claimed "a legally protected interest relating to the subject matter of the action." *Altmann v. Rep. of Austria*, 317 F.3d 954, 971 (9th Cir. 2002); *see also id.* ("Where a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder was 'unnecessary.' " (citing *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999)).

For the foregoing reasons, Sonny's children are neither necessary nor indispensable parties under Rule 19, and joinder is not required. Defendant's Motion is **DENIED** as to this affirmative defense.

2. Plaintiff's Claims

a) First Cause of Action: Declaratory Relief

Both parties seek summary judgment as to Plaintiff's claim for declaratory relief. As noted, Plaintiff seeks a declaration that the notice of termination does not affect her royalty rights or approval rights under the MSA. Dkt. 45 at 18–21. She argues that because these rights arise under state contract law, and because the Notice of Termination does not mention the MSA, the rights cannot be terminated under section 304(c). Dkt. 65-1 at 15–16.

Defendant responds that Section 304(c) preempts state contract law as to the rights to the renewal terms of the copyrights at issue. As a result, she contends that Sonny could not have granted the terminated grants, and the MSA is now preempted and lacks effect. Dkt. 94 at 6–8. Defendant further contends that, even if Plaintiff does have a continuing right to Sonny's royalties, she is "entitled at most to the percentage she received when the MSA went into effect." Dkt. 64-1 at 27.

(1) Legal Standards

The Copyright Act includes a right of termination that "allows an author, if he is living, or his widow and children, if he is not, to recapture . . . rights that had previously been transferred to third parties." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008). Specifically, section 304(c) provides: "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978 . . . the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978," may be terminated by the author's widow and surviving children by providing "advance notice in writing upon the grantee." 17 U.S.C. § 304(c)(1)–(4). "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *Id.* § 304(c)(5).

These provisions were enacted to "award to the author, and not to the assignee of the right to exploit the copyright during its initial term, the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success." *Classic Media*, 532 F.3d at 983. Thus, "all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest." 17 U.S.C. § 304(c)(6). Congress made clear that termination under section 304(c) "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." *Id.* § 304(c)(6)(E). Moreover, "[u]nless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term." *Id.* § 304(c)(6)(F).

The Ninth Circuit has adopted a two-part test to determine whether a state law claim is preempted by the Copyright Act. *First*, the court must determine "whether the 'subject matter' of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103." *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006) (interpreting 17 U.S.C. § 301). Section 102 of the Copyright Act affords copyright protection to "original works of authorship fixed in any tangible medium of expression," including "musical works" and "sound recordings." 17 U.S.C. § 102.

*Second*, if the claim falls within the subject matter of copyright, the court must determine "whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Laws*, 448 F.3d at 1137–38. Section 106 grants copyright holders the exclusive rights to copy, adapt, sell, perform and display. 17 U.S.C. § 106 (describing the right to: (1) "reproduce the copyrighted work in copies"; (2) "prepare derivate works"; (3) "distribute copies . . . to the public by sale or other transfer"; (4) "perform the copyrighted work publicly"; and (5) "display the copyrighted work publicly"). "To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an extra element which changes the nature of the action." *Laws*, 448 F.3d at 1143 (cleaned up).

(2) Analysis

It is undisputed that Plaintiff's rights under the MSA arise under California law. Dkt. 64-5 ¶ 20. In dissolving their marriage, Plaintiff and Sonny agreed to allocate these rights "to make an equal division of their community estate," thereby "releas[ing] and forever discharg[ing] the other, her or his heirs, executors, administrators, successors, assigns, property and estate from any and all claims, demands, and obligations of every kind and nature arising out of the marital status of the parties. . . ." Dkt. 64-5 ¶¶ 8–9. It also undisputed that the subject matter of the rights under the MSA, the underlying musical compositions and sound recordings, are subject to the Copyright Act. *See* 17 U.S.C. § 102(a). Finally, it is undisputed that because the Notice of Termination does not terminate the MSA or the Recording Contracts, Plaintiff's share of the Record Royalties under the MSA is undisturbed. Dkt. 92-1 ¶ 51; Dkt. 64-1 at 9 n.1; Dkt. 86 at 19.

The resulting question is whether the Composition Royalties and approval rights under the MSA constitute copyright grants that were affected by the Notice of Termination. The MSA states that there shall be an equal division of "contingent receipts . . . from musical compositions and interests therein, written and composed, in whole or in part, by [Sonny] or others prior to February 1, 1974, and/or acquired by [Sonny and certain other entities] prior to" the couple's separation. Dkt. 64-5 ¶ 10(d). The same provision also states that "all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of" Plaintiff. *Id.* As a matter of contract interpretation, these provisions make clear that Plaintiff has a right in the proceeds of these "musical compositions and interests therein . . . from all sources perpetually . . . ." *Id.*

Consequently, Plaintiff's rights under the MSA are linked to the musical compositions and Sonny's corresponding property interests. Because in granting the royalty and approval rights at issue, the MSA did not refer to a "grant of a transfer or license" of the underlying copyrights, Plaintiff's rights under the MSA arise solely under state law. Further, because section 304(c) expressly provides that it "in no way affects rights arising under any other Federal, State, or foreign laws" (17 U.S.C. § 304(c)(6)(E)), the Notice of Termination cannot affect Plaintiff's contractual right to receive financial compensation in exchange for the release and permanent discharge of any and all claims arising out of her marital relationship with Sonny.

Notwithstanding the plain language of the MSA, Defendant argues that, under 17 U.S.C. § 304(c)(5), "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant," and the MSA constitutes such an "agreement to the contrary." Dkt. 64-1 at 26. However, the only rights that are terminable under section 304(c) are

copyright grants. *See* 17 U.S.C. § 304(c)(1)–(4). Therefore, an "agreement to the contrary" under section 304(c)(5) is only a "contractual device that purports to divest" authors and successors of the right to "terminate copyright assignments." 3 Nimmer § 11.07[D][1]. Because the MSA does not refer to the underlying copyrights, it did not affect the ability of Sonny's heirs to terminate the copyrights. Therefore, it is not an "agreement to the contrary."

Defendant then argues that "[a] 'grant' of copyright includes royalties, and the grant that reverts, unencumbered, to the Bono Heirs includes all of its accompanying royalties." Dkt. 94 at 9. To support this position, Defendant cites *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 166 (1985), which explained that the "source of [an] entitlement to a 50 percent share in the royalty income is the [copyright] grant." *Id.* at 166. However, this explanation applied to the specific agreement at issue in *Mills Music*. Under that agreement, the author "assigned his entire interest in all renewals of the copyright to [a publisher] in exchange for an advance royalty and [the publisher's] commitment to pay a cash royalty on sheet music and 50 percent of all net royalties that [the publisher] received for mechanical reproductions." *Id.* at 157.

The MSA is different. It assigned to Plaintiff a right to the "contingent receipts . . . from musical compositions and interests therein" in exchange for the release of "any and all claims . . . arising out of the marital status of the parties." Dkt. 64-5 ¶¶ 8, 10(d). Consequently, the conclusion "that an author-spouse in whom a copyright vests maintains exclusive managerial control of the copyright but that the economic benefits of the copyrighted work belong to the community while it exists and to the former spouses in indivision thereafter . . . is consistent with both federal copyright law and [California] community property law and is reconcilable under both." *Rodrigue v. Rodrigue*, 218 F.3d 432, 435 (5th Cir. 2000).

In reviewing similar agreements assigning royalty rights rather than underlying copyrights, Circuit Courts have determined that a right to receive royalties is distinct from a grant of copyright. *See, e.g.*, *Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) ("Assignments of interests in royalties have no relationship to the existence, scope, duration or identification of a copyright, nor to 'rights under a copyright.' "); *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996) ("[H]olding a royalty interest does not bespeak an interest in the underlying copyright itself—a royalty is simply an interest in receiving money when the owner of the copyright exploits it."); *Merrill v. Hyman*, No. 22-2971-CV, 2024 WL 191807, at *2 (2d Cir. Jan. 18, 2024) ("The plain language of the agreement shows that Merrill was not selling or licensing to Hyman any of his rights under the Copyright Act, but rather some of the financial rights to compensation he had received and would receive by virtue of his copyright rights in the lyrics."); *Rodrigue*, 218 F.3d at 439 ("The *economic benefits* that flow from particular types of one-spouse assets, including but not limited to cars, paychecks, partnership interests—and copyrights—can inure to the benefit of the community without doing violence to the legal results intended by . . . Congress in providing for vesting of title in one spouse only. . . .").

Finally, even if the rights under the MSA were deemed copyright grants under the Copyright Act, section 304(c) termination extends only to "a transfer or license of the renewal copyright or any right under it, executed *before* January 1, 1978." 17 U.S.C. § 304(c) (emphasis added). Because the MSA was executed on August 10, 1978, it is outside the scope of section 304(c).

Notwithstanding Defendant's arguments at the hearing, it is immaterial that Sonny's agreements transferring or licensing copyrights with various music publishers preceded 1978. As discussed, unlike the Record Royalties, the Composition Royalties do not depend on any agreement. Therefore, the relevant agreement for purposes of determining whether the Composition Royalties were terminated is the MSA, and the sole relevant date is January 1, 1978.

For the foregoing reasons, Plaintiff's Motion is **GRANTED** as to the claim for declaratory relief.

b) Second Cause of Action: Breach of Contract

Plaintiff's claim for breach of contract is premised on the same alleged violation that is the basis for the first cause of action: Defendant's refusal to honor her royalty and approval rights under the MSA. As a result, the claim must be resolved in a manner that is consistent with the declaratory relief claim.

(1) Legal Standards

"The essential elements of a claim of breach of contract, whether express or implied, are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." *Green Valley Landowners Ass'n v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015).

(2) Analysis

Because Plaintiff's Motion has been granted as to the claim for declaratory relief, as a matter of law, Defendant has breached the MSA by refusing to pay Plaintiff her share of the Composition Royalties. Dkt. 92-1 ¶ 35. As to the resulting damages, the parties agree that Wixen distributed at least $187,000 of Composition Royalties to Sonny's heirs that, but for the invalid termination, would have been distributed to Plaintiff; of this amount, at least $93,500 was paid to Defendant. *Id.* ¶ 58–59. The parties also do not dispute that, as of June 30, 2022, Wixen held $418,156.82 in Composition Royalties that would have been distributed to Plaintiff. *Id.* ¶ 60.

The parties disagree as to whether the $418,156.32 amount reflects Wixen's deduction of its 10% administration fee. *Id.* The parties also disagree as to whether Plaintiff is entitled to the share of the Composition Royalties due under the MSA after July 1, 2022, *i.e.*, the royalty rights assigned to the third-party buyer. *Id.* ¶ 61–62. Resolving this question turns on the provisions of the General Assignment, which have not been fully disclosed. Plaintiff's representation at the hearing that any disputes as to the proper assignment of damages can be resolved by future litigation between Plaintiff and Wixen, or Plaintiff and the third-party buyer, is not sufficient to resolve the breach of contract claim as a matter of law. For these reasons, Plaintiff's Motion is **GRANTED IN PART** as to the claim for breach of contract.

3. Defendant's Counterclaims

a) First Counterclaim: Declaratory Relief re Administrator Selection

Defendant's first counterclaim seeks declaratory relief as to "Cher's rights and obligations concerning the selection of an administrator." Dkt. 47 ¶ 47. Specifically, Defendant argues that, as Sonny's heirs, she and Defendant's children have "sole discretion" under the MSA to appoint an administrator for all publishing royalties, and that such an administrator could be an entity owned by Sonny's heirs who would be entitled to the 10% administrator fee. Dkt. 64-1 at 30. Plaintiff responds that although Sonny may have had sole discretion to appoint an administrator, she is entitled under the MSA to approve any third-party appointed to the position. Dkt 88 at 26. Plaintiff also contends that under the Creditor Claim Agreement, she and Defendant are required to "cooperate in developing a mutually acceptable royalty mechanism." *Id.*

(1) Legal Standards

Under California law, an agreement to agree is generally unenforceable. *See Avalon Prod. v. Lentini*, 98 Cal. App. 2d 177, 180 (1950) ("An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms. It is absurd to say that a man enters into an agreement until the terms of that agreement are settled."). "Unlike an agreement to agree, . . . an agreement to use best efforts [or to negotiate in good faith] is a closed proposition, discrete and actionable." *Racine & Laramie, Ltd. v. Dep't of Parks & Rec.*, 11 Cal. App. 4th 1026, 1033 (1992) (cleaned up).

Courts may enforce a "contract to negotiate the terms of an agreement." *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1257 (2002). "If, despite their good faith efforts, the parties fail to reach ultimate agreement on the terms in issue the contract to negotiate is deemed performed and the parties are discharged from their obligations. A party will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith." *Id.*

(2) Analysis

The Creditor Claim Agreement provides: "In recognition of Cher's continuing right to receive such royalty interests, and in the interests of the heirs of the estate, Cher and the Administrator hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs after the closing of this estate." Dkt. 64-14 ¶ 3. The provision is more specific than an open-ended agreement to agree. However, it would be more than such an open-ended agreement only if it were deemed performed by the appointment of Jay Glick at the closing of Sonny's estate. It is so interpreted. If, as Plaintiff contends, the Creditor Claim Agreement "has no expiration date or term, and continues as long as royalties are payable" (Dkt. 88 at 27), the contract would be an ongoing agreement to agree. Therefore, the Creditor Claim Agreement is no longer enforceable under California law, and it cannot apply to the dispute.

As to the MSA, it provides: "All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion." Dkt. 64-5 ¶ 10(d). The MSA then states the terms of such

administration: "Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and [his publishing entity] from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph 10(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld." *Id.* The MSA then states: "Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph 10(d)." *Id.*

The relevant text of the MSA may be interpreted in two ways: (1) Sonny had the sole discretion to make the initial decision as to whom to appoint as the third-party administrator, but this decision would then be subject to Plaintiff's reasonable objections as to that selection; or (2) Sonny had the sole discretion to decide whom to appoint as the third-party administrator, but Plaintiff could make reasonable objections as to the *terms* of an agreement with that third-party administrator. Because the parties have not submitted any extrinsic evidence as to the proper interpretation of paragraph 10(d), the construction of the relevant provisions is resolved as a matter of law.

Under California law, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Cal. Civ. Code § 1643. "To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App. 4th 49, 71 (2013) (cleaned up); *see also Yahoo Inc. v. Nat'l Union Fire Ins. Co. etc.*, 14 Cal. 5th 58, 69 (2022) ("favor[ing] an interpretation that gives meaning to each word in a contract over an interpretation that makes part of the writing redundant").

The most straightforward interpretation of paragraph 10(d) is that Plaintiff's approval rights permit her to raise only reasonable objections as to the *terms* of an agreement with a third-party administrator. If the MSA permitted Plaintiff to object to the selection of a third-party administrator, Sonny's "sole discretion" to appoint an administrator would not have any effect.

Defendant also argues that, because she seeks to appoint an entity owned and controlled by the Bono Heirs as the royalty administrator, "[s]uch an entity would not be a third party, and so not subject to approval even under Cher's reading of the MSA." Dkt. 86 at 22. That Sonny appointed himself as the royalty administrator and paid himself the 10% administration fee set forth in the MSA does not compel an interpretation of the contract under which Defendant has the right to do the same. *See* Dkt. 94-1 at 35. Similarly, that Defendant is Sonny's heir does not compel the conclusion that she is not a third party under the MSA.

The MSA expressly provides that Sonny's "successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph 10(d)." Dkt. 64-5 ¶ 10(d). Although this language has some specificity, it does not state that Sonny's successors in interest are not "third parties" for purposes of Plaintiff's approval rights under paragraph 10(d). Therefore, although Defendant may engage an entity owned and controlled by Sonny's heirs as the royalty administrator, Plaintiff may make reasonable objections to the terms of any such agreement, including the reasonableness of the administration fee. Such objections could be based, in part, on the administrator's credentials and qualifications.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-08157 JAK (RAO) | Date | May 29, 2024 |
|---|---|---|---|
| Title | Cher v. Mary Bono | | |

For the foregoing reasons, Defendant's Motion is **GRANTED IN PART** as to the first counterclaim.

b) Second Counterclaim: Declaratory Relief re Recording Contracts

Defendant's second counterclaim seeks declaratory relief "concerning her rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit the sound recording copyrights Mary owns." Dkt. 47 ¶ 50.

(1) Legal Standards

Declaratory relief requires an actual, present controversy. *See Societe de Conditionnement en Aluminum*, 655 F.2d at 943. "The disagreement [underlying the declaratory relief action] must not be nebulous or contingent but must have taken on a fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) (quoting *Pub. Serv. Comm'n v. Wycoff, Co.*, 344 U.S. 237, 244 (1952)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("Our decisions have required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (cleaned up)).

(2) Analysis

Defendant argues that she has the right to renegotiate the Recording Contracts and terminate Plaintiff's share of the Record Royalties. Dkt. 64-1 at 31. However, both parties agree that Plaintiff is a party to the Recording Contracts. Dkt. 94-2 ¶ 140. As a result, pursuant to Plaintiff's approval rights under the MSA, the Recording Contracts cannot be modified without Plaintiff's consent, which cannot be unreasonably withheld. Dkt. 64-5. ¶ 10(d). Moreover, it is undisputed that Defendant has not actually tried to renegotiate the Recording Contracts. Dkt. 94-2 ¶ 141. Because a hypothetical controversy cannot support a claim for declaratory relief, Defendant's Motion is **DENIED** as to the second counterclaim.

## V. Conclusion

For the foregoing reasons, Defendant's Motion is **DENIED** as to all issues presented except for her first counterclaim, which is **GRANTED IN PART**, and Plaintiff's Motion is **GRANTED** as to all remaining issues except for her second claim for breach of contract, which is **GRANTED IN PART**.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer TJ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JOHN A. KRONSTADT, JUDGE PRESIDING

| | | |
|---|---|---|
| CHER,<br><br>Plaintiff,<br><br>Vs.<br><br>MARY BONO,<br><br>Defendant. | ) | No. LACV21-08157-JAK |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

LOS ANGELES, CALIFORNIA

FRIDAY, FEBRUARY 26, 2024

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90012
MVB11893@aol.com

tentatively on that.

With respect to the plaintiff's claims for declaratory relief, a declaration that the notice of termination does not affect plaintiff's royalty rights or approval rights under the marital settlement agreement, which we refer to as the MSA, it's undisputed that these rights arise under the marital settlement agreement, and that these rights are, therefore, ones of state law. There was the termination of the marriage, and this was the marital settlement agreement pursuant to which that termination was effected.

There was a decision then about allocating many rights to the community property and other things, as is common in a family law -- the resolution of a family law matter with which I have some familiarity having done that for three and a half years in the superior court.

It's agreed that the notice that has been provided here that -- the notice of termination of royalty rights does not affect the marital settlement agreement or the underlying recording contracts. I think for that reason, the plaintiff would still be entitled to the composition royalties under the MSA in part because they constitute the -- the key question is whether they constitute copyright grants. I don't think they do. The plain language of the MSA grants the rights to the proceeds of the musical compositions and

appreciate the true value of his work product.

So it is an economic right that we're talking about in 304 that the Supreme Court recognizes. That general purpose is plainly -- continuing to the quote -- that general purpose is plainly defined in the legislative history and indeed is fairly inferable from the text of Section 304 itself.

The Court in Mills, the Supreme Court goes on to discuss what the terminated grant means in Section 304(c)(6)(a), that's the derivative work exception. That's the same terminated grant we're talking about in 304(c) generally. There it clearly includes royalties because that case is entirely about the dispute about who gets the royalties.

THE COURT: Let me ask you this question in light of what you've just stated: A marital settlement agreement, particularly one from 1978, has its purpose to make -- to -- it can resolve a dispute between spouses about community property, about separate property, you know, a lot of complicated issues can be presented. It's ultimately then resolved. There may also be issues about what support should be paid, spousal support and other things, which are -- as well as attorneys' fees, for that matter, which are taken into account in light of all of the terms of the agreement.

Now, one of the terms of the martial settlement

agreement was this flow of funds to which you've just referred. If that flow of fund stops, isn't this a different circumstance than one where an artist has engaged, as you just stated, ill-advised, didn't know the value of works, and, therefore, made a decision that was, you know, subject to review later because Congress so stated. Is that different than the resolution under state law of a marriage where there are a lot of elements?

MR. SCHACHT: Yes, but it would only affect the rights arising out of copyright. 304(c)(6) has a very broad definition of that to say that all rights under the title that were covered by the terminated grant revert. All rights.

So, again, there are lots of pieces of this MSA that have nothing to do with copyright, but royalties arising from copy --

THE COURT: But if the royalty stream stops, then the terms of the overall financial terms of the agreement are subject to -- are being changed.

MR. SCHACHT: But, Your Honor, these were sophisticated parties in 1978. The law existed. In fact, the copyright term was, in part, through Sonny Bono's efforts, interestingly enough, was extended.

THE COURT: If the parties were sophisticated and represented by able counsel and negotiated the MSA, then why

he or she was not living at the time of the renewal. Right.

So this is a long-standing element of copyright law that there are limits to what you can do under the Copyright Act. What you can do under contract. The derivative work exception, Your Honor, would not need to exist if that were not the case. The derivative work exception, which Mills Music talks about, is saying that in a very limited situation state contract rights of somebody who is a grantee or a further downstream licensee, trump the Copyright Act in a very limited way. They do not trump the general right of the heirs to receive the terminated grant.

I think, Your Honor, we've laid out a sort of compromise position. While we believe a hundred percent of the entire copyright comes back, we've laid out an intermediate position that would urge Your Honor to reconsider, because what it does do is it affects the congressional intent and the language of the statute to say that if there is a windfall from a termination, it needs to go back to the heirs that are laid out in the statute. That is Ms. Bono and her -- Sonny's four children.

THE COURT: One second, please. Does the marriage settlement agreement address spousal support, expressly?

MR. SCHACHT: No. It is in lieu of. The cases on point the Rodrigues case from the Fifth -- I forget the circuit. It's not of the Ninth Circuit, but also In Re Worth

from the -- here in California expressly say that the Copyright Act preempts when it's in conflict with family law matters and things of that nature.

THE COURT: Well, but let me ask you this: Suppose there's a marital settlement agreement that calls for -- which resolves all issues and includes certain copyright royalty payments to go to a spouse, and in lieu of or thereby changing the amount of spousal support that might have otherwise been paid. Okay. Then the -- those rights are terminated, as you've suggested here. Why wouldn't that permit the spouse who was previously receiving the royalties in lieu of some or all of spousal support seek to amend the judgment to increase the amount of spousal support to reflect the reduction in the amount of royalties?

MR. SCHACHT: Your Honor, I'm not a family law practitioner, but if I can make some assumptions here. Yes, that would -- if -- as I understand your hypothetical, assuming Sonny had survived, had received the termination, received the 20 percent publisher's share back, then Cher could come back and say, hey, you have more income. I'd like to participate in that. That is under In Re Worth absolutely harmonizable with the Copyright Act.

What is not is the idea that the heirs, who are granted this right, would need to share in something when -- again, I would -- why would in -- why would -- to flip the

before or after there's a final resolution of all of the issues that we've discussed today, and third, with a private neutral or a bench officer.

MR. SCHACHT: Thank you, Your Honor.

MR. ANDERSON: Absolutely. Thank you, Your Honor.

THE COURT: If you have in mind a bench officer, if there is one with whom you'd like to work, let me know. If you want me to do it, I could do it as well. That raises other issues.

Thanks for your help today.

(Proceedings concluded at 9:12 a.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/s/ Miriam V. Baird     04/12/2024

MIRIAM V. BAIRD     DATE
OFFICIAL REPORTER

DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
HAYLEY M. LENAHAN, #343528
hlenahan@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone: (510) 451-3300
Facsimile: (510) 451-1527

*Attorneys for Defendant and Counterclaimant*
*MARY BONO*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>**DECLARATION OF MARY BONO IN SUPPORT OF DEFENDANT MARY BONO'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 26, 2024<br>Time: 8:30 a.m.<br>Judge: Hon. John A. Kronstadt<br>Ctrm: 10B<br><br>Complaint Filed: October 13, 2021<br>Trial Date: n/a |
| AND RELATED COUNTERCLAIMS | |

I, Mary Bono, declare as follows:

1. I am the defendant and counterclaimant in the above captioned matter.

2. I submit this Declaration ("Declaration") in support of Defendant's Motion for Summary Judgment. I have personal knowledge of the facts and circumstances stated in this Declaration, and if called a witness, I could and would competently testify to them.

3. Sonny Bono and I married in 1986, and we remained married until his death in 1998. We had two children, Chesare Bono and Chianna Bono. Chesare was born in 1988 and Chianna in 1991.

4. Sonny's first marriage was to Donna Rankin, and they had a child, Christine Bono in 1958.

5. Sonny's second marriage was to Cher, and they had a child, Chaz Bono, in 1969.

6. Starting no later than 1986 and through Sonny's death in 1998, I handled bookkeeping matters for Chris-Marc Music, Sonny's dba and publishing company. Chris-Marc's sole owner was Sonny. I would receive checks payable to Chris-Marc and deposit them into Chris-Marc's bank accounts. I would regularly help Sonny prepare quarterly accountings and payments to Cher from those receipts. Sonny would always retain ten percent (10%) of Chris-Marc's gross receipts for himself. Of the remaining ninety percent (90%) of the gross publishing receipts, half would be paid to Cher.

7. To this day, Chris-Marc Music remains a dba, and continues to be a payee, for Sonny's publishing income.

8. In or around 2011, in consultation and agreement with Cher's manager, Warren Grant, we terminated Jay Glick's services as royalty administrator for Sonny's music income and hired Wixen Music Publishing, Inc. ("Wixen"). I continued to work with Jay Glick on matters unrelated to Sonny's music income.

9. Until Cher terminated her agreement with Wixen, Wixen received ten percent of all of Sonny's publishing income as the royalty administrator, taken equally from everyone's share, including Cher, Christine, Chaz, Chesare, Chianna, and myself. After Cher terminated Wixen's agreement, Wixen has continued to collect ten percent of the monies due to myself, Christine, Chaz, Chesare and Chianna.

10. When I found out that Cher wanted to terminate Wixen as the administrator, I hoped that she and I and Sonny's children could come to an agreement on a replacement administrator, just as we had mutually agreed to appoint Jay Glick and then Wixen as the administrator. Unfortunately, we were not able to come to an agreement. I now intend, with the support of Sonny's children, to either continue to use Wixen as the royalty administrator for all of Sonny's publishing income, or designate an entity that I own as the royalty administrator to make sure that all Sonny's publishing royalties are properly accounted for to Cher and all of Sonny's heirs. That entity would engage the services of third parties to ensure the proper accounting, and I would pay for those services out of the ten percent administration fee that is called for in the Marriage Settlement Agreement.

11. After Cher sold her interests to Iconic, I cooperated with Iconic to have the record royalties paid directly from the record labels, Warner Music Group and Universal Music Group, to Iconic, for what was Cher's half, and Sonny's heirs, for the other half. Because one of the record labels refused to pay all five heirs directly, we created a limited liability company that would collect and disperse the heirs' half of the record royalties. It has taken several months, but we are now receiving direct payments from one record label and expect to receive direct payments from the other once some administrative matters raised by that label are resolved.

12. At the time of his death, Sonny owned a fifty percent (50%) interest in the television program, "The Sonny and Cher Comedy Hour." Twenty-five percent (25%) was owned by the writer and co-creator of the show, Chris Bearde, and another

twenty-five percent (25%) was owned by Allan Blye, a writer and producer of the show. In or around 2001, I purchased Chris Bearde's twenty five percent (25%) share of "The Sonny and Cher Comedy Hour" on behalf of myself for half of Chris Bearde's share, and as guardian for my two children, Chianna and Chesare Bono, for the other half. Cher has never asked for nor received any royalties from the twenty-five percent (25%) share I purchased from Chris Bearde.

13. In late 2021, I thought it would be a good idea to put the royalties at issue in this lawsuit into an escrow account. In January of 2022, Cher made her approval of a synchronization license for the song "I Got You Babe" for an advertisement contingent on putting the publishing royalties at issue – the U.S. publishing royalties – in an escrow account. Sonny's children and I agreed to this and starting no later than April 6, 2022, Wixen has placed half of Sonny's U.S. publishing royalties into a separate interest-bearing account.

I declare under penalty of perjury under the laws of the United States of America and the laws of the State of California and Colorado that the foregoing is true and correct and that this declaration is executed on November 20, 2023 at La Plata County, CO.

Mary Bono

Mary Bono

ADMITTED IN EVIDENCE
DATE 7-5-79
COUNTY CLERK
DEPUTY

## MARRIAGE SETTLEMENT AGREEMENT

AGREEMENT made and entered into this 10th day of August, 1978, by and between SALVATORE P. BONO (hereinafter referred to as "Husband") and CHER BONO ALLMAN (hereinafter referred to as "Wife").

(1) The parties married November 24, 1967, at Los Angeles, California.

(2) The parties separated on or about February 1, 1974, and the number of years from the date of marriage to the date of separation is 6 years, 2 months and 5 days.

(3) There is one minor child, CHASTITY SUN BONO, born March 4, 1969.

(4) Irreconcilable differences between the parties have caused the irremediable breakdown of the marriage.

(5) Action D842001 for dissolution of the marriage of the parties has been filed in the Superior Court of the State of California for the County of Los Angeles, by Husband as Petitioner on February 18, 1974, which action was thereafter transferred to the West District. Wife filed her response in said action on March 1, 1974. Wife then proceeded to obtain a Final Judgment of Dissolution of the marriage in a bifurcated trial heard on June 27, 1975. Said Final Judgment was entered in Book WE 128, page 163 of Judgments of said Court on June 27, 1975, and preserved to the Court jurisdiction to determine all matters pertaining to the disposition of community property

rev. 7/13/78

Exhibit
0002
Cher

spousal support, child custody, child support, and attorneys fees. This Agreement is to be submitted to the Court for its approval in said proceeding, but this Agreement shall not depend upon such Court approval for its effectiveness.

(6) The purpose of this Agreement is to settle the obligations of the parties to each other with respect to their respective support, their property interests and rights, custody of their minor child, and to relinquish any and all past, present or future claims that each may have against the property or estate of the other and his or her executors, administrators, representatives, successors and assigns, except as otherwise provided herein.

(7) This Agreement is entered into by each party with a general knowledge of the extent and probable value of all of the separate property or estate of the other and of the extent and probable value of their community property. Each party understands the rights that, but for this Agreement, would inure by law to their respective benefit by virtue of their marital relation. Each party warrants that he made a full and complete disclosure to the other of all property each owns separately, jointly, or as community property.

(8) Except as hereinafter provided, each party hereby releases and forever discharges the other, her or his heirs, executors, administrators, successors, assigns, property

and estate from any and all claims, demands, and obligations of every kind and nature arising out of the marital status of the parties, including, but not limited to, all rights to earnings of the other, spousal support and maintenance, family allowance, and probate homestead. Each party further releases, waives and relinquishes all right to inherit from the other, or to act as executor, administrator or representative of the estate of the other, or to in any way participate therein.

(9) Husband and Wife agree to make an equal division of their community estate; to share their liabilities and obligations in such a manner as to implement said equal division of their community estate; to acknowledge the separate ownership of certain property; and to otherwise adjust and settle each and all of their property rights and interests in the manner provided in this Paragraph (9), and in Paragraphs (10), (11), (12), (13) and attached exhibits.

(a) Prior to distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9) (d) hereof, Husband agrees to restore to the community bank accounts of the parties from his separate funds (or to permit adjustments to be made in the distribution of the community bank accounts of the parties pursuant to paragraph (9)(b) and (9) (c)) the following amounts:

(1) $150,000 - which represents the amounts of cash withdrawals by Husband from the community bank accounts of the parties prior to September 30, 1977.

(2) $150,000 - which represents the amount

rev. 8/10/78

of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about November 16, 1977.

(3) $190,930.08 - which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(4) $234,409.00 - which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(5) $11,465.12 - which represents the amount of an excess prior cash withdrawal by Husband from the community bank accounts of the parties on or about August, 1975.

(6) $10,000.00 - which represents the agreed amount of interest accrued on prior withdrawals by Husband listed in this paragraph (9)(a).

(b) The parties agree that prior to distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9)(d) hereof the parties agree that Wife may satisfy a separate obligation to Husband, referred to in Exhibit E hereof, in the amount of $234,409.00 by permitting an adjustment to the community in the amount of $468,818.00 in favor of Husband.

(c) The parties agree that the intent of Paragraphs (9)(a) and (9)(b) hereof may be effectuated by permitting Wife to withdraw $277,986.20 from the community accounts of the parties prior to distribution of the community property in equal amounts pursuant to Paragraph (9)(d) hereof. The parties agree that in making an adjustment to the community property, Husband may sell any municipal bonds in the community account for cash.

(d) Both Husband and Wife agree that there shall be an equal distribution to the parties of all of the community property of the parties, not otherwise specifically disposed of herein, including, but not limited to, the community

assets in the custody of Husband's representatives listed on Exhibit A, attached hereto, to be distributed in cash or in kind where required. Said division and distribution shall be accomplished as soon after the execution of this document as is reasonably practical. If the parties are unable to agree upon a distribution in kind of any of said assets, then the parties agree that such assets shall be sold and the proceeds shall be divided equally between them.

(e) The parties acknowledge that the community bank accounts of the parties are in the custody and control of Husband and Husband's representatives. Both parties acknowledge that all of the monies in the community bank accounts have been properly included therein as community property. Both parties warrant that all monies received by either of them which constitute community monies have been deposited in the community account or that adjustments of the community have been made therefor. Both parties warrant that any monies received by either of them subsequent to the date of this agreement which consitute joint monies will be divided equally between the parties. The parties acknowledge that Husband and Chris-Marc Music entered into an agreement with Broadcast Music, Inc. (hereinafter referred to as "BMI") dated September 9, 1977, that advances were given to Husband from BMI and that BMI encumbered community assets of the parties in order to insure its recoupment of said advances. The parties agree that Husband may retain said advances as his separate property. Husband agrees that he will account directly to Wife all monies to which Wife would have been entitled but for



rev. 7/20/78

the encumbrance by BMI including any administration fee, if applicable. Husband agrees to use his best efforts to have the BMI agreement modified in such a way as to segregate any collateralization of community property with his separate property.

(f) The parties heretofore entered into a Memorandum of Agreement dated May 29, 1974 respecting distribution of certain of their community property and this Marriage Settlement Agreement will not pertain with respect to that distribution that was previously made in accordance with mutual agreement of the parties.

(g) The property described in Paragraphs (9), (10), (11), and (12) hereof constitutes all of the community property of the parties. By this Agreement, the parties intend to divide said property equally between them.

(10) As a part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:

(a) Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.



rev. 7/13/78

(b) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(c) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior

to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris-Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10) (d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by



rev. 7/21/78

Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10) (d). Chris-Marc Music shall be controlled solely by Husband.

(e) Any and all receipts of Cher Enterprises, Inc. payable from and after July 14, 1978, as a result of the following: (1) income derived from joint performances and professional activities of Husband and Wife both before and after February 1, 1974, and (2) income derived as a result of the individual performances and professional activities of the parties prior to February 1, 1974, including, but not limited to, the "Sonny and Cher" television programming, together with any editing thereof to one-half hour shows for syndiciation or any other exploitation thereof, any feature motion pictures produced thereunder, etc. All said receipts of Cher Enterprises, Inc. shall be subject to the following adjustments: (1) reasonable overhead allowance for the administrative costs of collecting and accounting to Wife, (2) reasonable attorneys' fees with respect to new contracts for the use of old programs, (3) any commissions paid to the William Morris Agency, and (4) any direct expenses incurred in the exploitation of the properties. Husband agrees that he will cause Cher Enterprises, Inc. to account to the extent of 50% of said receipts directly to Wife or any company she designates. However, to the extent that Wife receives any such receipts directly or through any other company, she shall be deemed to be satisfied to the extent of such receipts on any accounts payable to Wife by Husband under this Paragraph (10) (e).



rev. 7/13/78

(f) Any and all receipts of Apis Productions, Inc. payable from and after July 14, 1978 as a result of income derived from any future exploitation of "Sonny and Cher" television programming. Wife agrees that she will cause Apis Productions, Inc. to account directly to Husband or any company he designates to the extent of 50% of net profits Husband may be entitled to pursuant to Paragraph I.1. of that certain Settlement Agreement dated November 21, 1975. For purposes of this Paragraph (10)(f), Paragraph I.1. of the said November 21, 1975 Settlement Agreement shall be deemed to remain in effect and as used herein, the term "net profits" shall be defined thereby.

(g) Any and all other receipts and distributions to the parties individually or jointly or to any corporation, business or other entity owned or controlled by either party

from their professional endeavors performed or made jointly or with joint investments on their part both prior to February 1, 1974 and thereafter and after the effective date of this Agreement except as otherwise provided herein or otherwise agreed to in writing. Both parties warrant that each has not conveyed, transferred or encumbered any of the rights referred to in this paragraph (10).

(11) Husband hereby acknowledges that the following property is the sole and separate property of Wife and Wife agrees to assume and perform all obligations of whatsoever kind or character with respect to said separate property. To the extent that such property has not been previously so designated or transferred, Husband hereby transfers, conveys, assigns and quitclaims to Wife as her sole and separate property:

(a) All right, title and interest in and to the real property and improvements, or the proceeds from the sale or other disposition thereof, situated in the City of Los Angeles, County of Los Angeles, State of California and commonly known as 141 South Carolwood Drive, and in and to all furniture, furnishings and other personal property situated therein, or the proceeds from the sale or other disposition thereof;

(b) All right, title and interest in and to the personal property described in Exhibit "B" attached hereto, or the proceeds from the sale or other disposition thereof;

(c) All right, title and interest in and to all business interests, investments, securities, properties or interests in property of whatsoever kind or nature, or the

proceeds from the sale or other disposition thereof, acquired by Wife subsequent to February 1, 1974, and standing in the name of Wife;

(d) All income heretofore received by Wife from her individual and professional services performed after February 1, 1974 and all income from her said services performed after the effective date of this Agreement, except as otherwise agreed to herein.

(12) Wife hereby acknowledges that the following property is the sole and separate property of Husband and Husband agrees to assume and perform all obligations of whatsoever kind or character with respect to said separate property. To the extent that such property has not been previously so designated or transferred, Wife hereby transfers, conveys, assigns and quitclaims to Husband as his sole and separate property:

(a) All right, title and interest in and to the real property and improvements, or the proceeds from the sale or other disposition thereof, situated in the City of Los Angeles, County of Los Angeles, State of California, commonly known as 364 St. Cloud Road, and in and to all of the furniture, furnishings and other personal property situated therein, or the proceeds from the sale or other disposition thereof;

(b) All right, title and interest in and to the real property and improvements, or the proceeds from the sale or other disposition thereof, situated in the City of Palm Springs, County of Riverside, State of California and commonly known as 256 Camino Buena Vista, Palm Springs,

California 92262, and in and to all furniture, furnishings and other personal property situated therein, or the proceeds from the sale or other disposition thereof;

(c) All right, title and interest in and to the personal property described in Exhibit "C" attached hereto, or the proceeds from the sale or other disposition thereof.

(d) All right, title, and interest in and to all business interests, investments, securities, properties, or interests in property of whatsoever kind or nature, or the proceeds from the sale or other disposition thereof, acquired by Husband subsequent to February 1, 1974, and standing in the name of Husband.

(e) All income heretofore received by Husband from his individual and professional services performed after February 1, 1974, and all income from his said services performed by him after the effective date of this Agreement; except as otherwise agreed to herein.

(13) The parties acknowledge that they have heretofore incurred the following potential joint liabilities:

(a) Sahara - Nevada Corporation v. Cher Enterprises, Inc., et al, U.S. District Court for the Central District of California, Case No. 77-3185-DWW, which case alleges anticipatory breach of contract and breach of contract by Cher Enterprises, Inc. and the parties hereto by failing to perform scheduled engagements at the Hotel Sahara in Las Vegas in and after October of 1973. The parties agree that all rights and respective liabilities as between themselves concerning this lawsuit are settled in Exhibit D.

(b) Potential continuing liability to Caesars World, Inc., doing business as Caesars Palace in Las Vegas, Nevada, for breach of contract for personal appearances, which contracts were alleged to have been entered into prior to the separation of the parties hereto. The parties agree that all rights and respective liabilities as between themselves concerning this potential liability have been settled in Exhibit D.

(c) Potential liability to Irwin O. Spiegel for legal fees alleged to be owing to him. Each party hereby indemnifies and agrees to hold the other harmless to the extent of 50% of any and all claims or judgments for legal fees owing to Irwin O. Spiegel out of the joint income of the parties hereto.



rev. 7/31/78

(14) (a) Both parties represent and warrant that except as specifically set forth in this agreement neither has incurred any bills, debts or obligations for which the other may be liable. Each party agrees to indemnify the other party for any such liability.

(b) Each party shall be solely responsible for and shall indemnify the other from any responsibility for the payment, satisfaction and discharge of all debts, obligations, and liabilities of whatsoever kind or nature incurred by that party after February 1, 1974, or based upon facts occurring after said date, except as otherwise agreed to in writing by the parties or as expressly provided in this Agreement.

(c) Insurance coverage on the transferred interests acquired as their respective separate property pursuant to Paragraphs (9), (10), (11) and (12) is hereby assigned to each recipient who shall hereafter pay the premiums due thereon.

(d) Husband and Wife each hereby irrevocably assigns, transfers, and conveys to the other all of the income and distributions to which he or she is entitled by virtue of his or her ownership of all of the property and property interests described in Paragraphs (9), (10), (11) and (12) except as specifically limited in Paragraph (10) hereof. Husband and Wife each covenants and warrants to the other that he or she will, concurrently with the execution of this Agreement, instruct the manager or managing entity of each of the subject



rev. 7/31/78

properties, trusts or other entities, in writing satisfactory to the other, that the other is forthwith to receive all such income or distributions and all notices, statements, or tax returns directly as the owner of his or her said interests. Husband and Wife hereby each expressly and irrevocably constitutes, makes and appoints the other his or her true and lawful attorney for the purpose of executing, certifying, acknowledging, filing or recording any instrument which may be necessary to effectuate the intent of this subparagraph.

(e) By this agreement, Husband and Wife intend to settle all rights and obligations between them including all aspects of their marital and business rights and obligations. Except as otherwise provided by this agreement, each releases the other from all liabilities, debts and obligations of every kind, whether previously or hereafter incurred, based upon any and all acts of the parties prior to the execution hereof, including but not limited to, the following: any and all personal obligations; any and all encumbrances on the other's property; any prior failure of either party to render professional services to any third parties and for any prior breach of employment contract, oral or written, between either or both parties hereto and any third parties; any and all obligations raised by or in any way connected with pleadings in Los Angeles Superior Court Action No. WEC 32438 entitled Bono v. Bono, except as otherwise provided by subsequent settlement agreements; any and all obligations, including but not limited to any claims of malicious prosecution raised by or in any way connected with any of the pleadings in the case of Sahara-Nevada Corporation v. Cher Enterprises, Inc. previously referred to in Paragraph (13)(a) hereof, except as otherwise provided in said Paragraph (13)(a) hereof; any and all obligations, including but not limited to any claims of collusion or interference with settlement raised by or in any way connected with any of the pleadings in the case of

DeCarlo v. Bono, Los Angeles Superior Court, Case No. WEC 29855; any and all obligations raised by or in any way connected with the pleadings in all litigation of any kind in which either or both of the parties or their respective business entities have been parties prior to the execution of this Agreement, as well as any lawsuits which may be filed in the future based in any way upon acts occurring or agreements entered into prior to the execution of this Agreement.

(f) Execpt as otherwise provided in this Agreement, including Exhibits hereto, the parties agree that they shall be jointly liable for any and all liabilities, debts, and obligations incurred, or based upon facts occuring prior to February 1, 1974, including any such liability, debt or obligation of Cher Enterprises, Inc.

(15) The provisions of this Agreement are intended to effect an equal division of all of the parties' community estate. Each party therefore agrees that the adjusted basis (for purposes of both federal and state income taxes) of each asset acquired under these paragraphs by such party as of the effective date of this Agreement, will not change by reason of this division. In the event that the federal or any state government or either party claims for federal or state income tax purposes that the adjusted basis for any such asset is different than the adjusted basis for such asset as of the effective date, and, as a result of such claim, the other party is subsequently assessed for additional federal or state



rev. 8/10/78

income taxes, that party shall indemnify the other party and hold him or her harmless from and against (i) any and all federal or state income tax liabilities arising from such assessments and (ii) any and all costs and expenses incurred by the other party in contesting such assessments (including reasonable

attorneys' fees). Likewise, if as a result of said claim, the other party realizes a tax savings, that party shall pay to the other party such amounts so as to equalize the tax savings between the two parties.

(16) Each of the parties hereto does hereby expressly waive any right to any spousal support from the other.

(17) (a) Wife shall have legal and physical custody of their minor child, CHASTITY SUN BONO, with rights of supervision and control over all matters affecting the welfare and well-being of said child. Husband shall be consulted with regard to the selection of any private school, doctors and dentists for any continuing course of treatment (except in the case of emergencies). Notwithstanding the terms of this Paragraph (17) (a), either party may submit the matters contained in this paragraph to the court for its consideration at the same time as the submission of the matters referred to in Paragraph (17) (c) hereof. If either party so elects, proof of changed circumstances shall not be required.

(b) Husband shall be entitled to reasonable visitation, including the right to take and have the child during all periods of visitation, it being understood that the parties shall endeavor to arrive at a schedule of visitation so as to equalize as much as reasonably possible, the time spent by each of them with the child, guided by the sole criterion

as to what would be in the child's best interests physically, mentally, morally, and spiritually. The Court in case No. D 842 001 shall have continuing jurisdiction with respect to the custody of said child until the child marries or achieves her majority or until further order of the Court. In order that Husband's right to visitation shall not be impaired, Wife agrees to maintain a permanent residence for herself and their minor child within a radius of 100 miles of Los Angeles. This provision shall not prevent Wife from taking the said minor child outside this radius on trips and vacations ~~or for residency up to one-half of each year,~~ upon reasonable notice to Husband, at reasonable times and for reasonable lengths of time. On every change of residence, Wife agrees to promptly notify Husband of her new address and telephone number.

(c) The matter of child support to be paid by husband for months subsequent to December, 1977 shall hereafter be submitted to the Court in case No. D 842 001 for its determination of the responsibilities of the parties in connection therewith. With the consent of the Court, the parties agree to submit such issue of child support upon written statements and oral argument in closed session and without reference by either party to past amounts paid by Husband for child support. Husband shall be given a credit of one half of the amounts withdrawn and paid by him from the community for child support for months subsequent to December, 1977 and prior to the distribution of the community pursuant to Paragraph (9)(d) hereof as well as a credit for the full amount paid therefor by him from his separate funds; Husband shall be required to pay to or shall be entitled to receive from Wife, as the case may be, the difference between the amount of his credit for said period under this Paragraph (17)(c) and the amount ordered by the court to be paid by him.



8/10/78

(18) Each of the parties hereto has been represented by independent counsel of his and her choice in connection with the negotiation and preparation of this Agreement.

(19) This Agreement constitutes the entire agreement of the parties hereto and cannot be modified, amended, or changed in any respect except by an instrument in writing signed by both of the parties hereto.

(20) This Agreement shall be construed and interpreted under the laws of the State of California applicable to agreements both entered into and performed in said State.

(21) This Agreement shall be binding upon, and shall inure to the benefit of, each of the parties hereto, and their respective heirs and assigns.

(22) If any Court of competent jurisdiction should hold any provision of this Agreement to be invalid or unenforceable, the remaining provisions shall not be impaired or invalidated and shall continue with full force and effect.

(23) The warranties, representations and obligations in this Agreement shall survive its execution and delivery and the performances which are rendered in accordance therewith.

(24) Each party agrees to execute and deliver to the other such further and additional documents as are reasonably required to effect the purposes of this Agreement.

(25) The "effective date of this Agreement" as such term is used herein, shall be as of the execution hereof.

(26) Exhibits A,B,C,D,E,F and G are all attached hereto and made a part hereof.

rev. 7/31/78

IN WITNESS WHEREOF the parties hereto have executed this Agreement in Beverly Hills, California on the year and day first stated above.

S. P. Bono

SALVATORE P. BONO

Cher Bono Allman

CHER BONO ALLMAN

APPROVED:

MARVIN M. MITCHELSON

By [signature]
Attorney for Salvatore P. Bono

APPROVED:

RUDIN & PERLSTEIN

By John D. Forbes
Attorneys for Cher Bono Allman

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES ) ss.

On this 10th day of August, 1978, before me the undersigned, a Notary Public in and for said County and State, personally appeared CHER BONO ALLMAN, known to me to be the person whose name is subscribed to the within MARRIAGE SETTLEMENT AGREEMENT and acknowledged that



rev. 7/13/78

# EXHIBIT 11

M. Neil Solarz, Esq. (State Bar #78259)
WEINSTOCK, MANION, REISMAN, SHORE
& NEUMANN, A Law Corporation
1875 Century Park East, 15th Floor
Los Angeles, California 90067
(310) 553-8844; FAX (310) 553-5165

Henry N. Jannol, Esq. (State Bar #66309)
HENRY N. JANNOL, A Professional Corporation
1875 Century Park East, Suite 1400
Los Angeles, CA 90067
310-552-7500 FAX 310-552-7552

Attorneys for Administrator

FILED
SUPERIOR/MUNICIPAL COURT
OF RIVERSIDE COUNTY

AUG 16 1999

ARTHUR A. SIMS, Clerk
By G. Preader, Deputy

Exhibit #: Charlesworth 51
08/03/23
exhibitsticker.com

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| Estate of<br><br>SALVATORE PHILLIP BONO,<br><br>Deceased. | Case No. IP 15865<br><br>ORDER APPROVING FIRST AND FINAL ACCOUNT AND REPORT OF SPECIAL ADMINISTRATOR AND ADMINISTRATOR; PETITION FOR STATUTORY FEES AND FOR EXTRAORDINARY ATTORNEYS' FEES AND FOR FINAL DISTRIBUTION |

The verified FIRST AND FINAL ACCOUNT AND REPORT OF SPECIAL ADMINISTRATOR AND ADMINISTRATOR; PETITION FOR ADMINISTRATOR'S AND ATTORNEYS' FEES FOR STATUTORY SERVICES; FOR ATTORNEYS' FEES FOR EXTRAORDINARY SERVICES AND FOR FINAL DISTRIBUTION, of MARY BONO, as Special Administrator and Administrator of the Estate of SALVATORE PHILLIP BONO, deceased, came on regularly for hearing on August 16, 1999, in Department 3P of the above-entitled Court, the Honorable GRAHAM ANDERSON CRIBBS, Judge, Presiding, WEINSTOCK, MANION, REISMAN, SHORE & NEUMANN, a Law Corporation, appearing for Petitioner. The Court, after examining the petition and hearing the evidence, finds that:



[redacted]

AUG-16-99 MON 10:43 SANGER P.05

AUG 13 '99 12:28PM WEINSTOCK MANION P.5/5

7. The residue of the estate, as set forth above, and any other property of the decedent or decedent's estate not now known or hereafter discovered, shall be distributed to the following persons in the following portions:

| <u>NAME OF BENEFICIARY OF RESIDUE</u> | <u>SHARE OF RESIDUE</u> |
|---|---|
| Mary Bono | 1/3 |
| Chesare Bono | 1/4 of 2/3 |
| Chianna Bono | 1/4 of 2/3 |
| Christy Bono Fasce | 1/4 of 2/3 |
| Chastity Bono | 1/4 of 2/3 |

Distribution to each of the minors, Chesare Bono and Chianna Bono, shall be made to their mother, Mary Bono, as Custodian under the applicable provisions of the California Uniform Transfers to Minors Act, California Probate Code Section 3900, et seq. until the age of twenty-five (25).

Dated: AUG 16 1999

GRAHAM ANDERSON CRIBBS

JUDGE OF THE SUPERIOR COURT



AUG-13-99 FRI 12:28 310 553 5165 P.05

AUG. 16 '99 (MON) 10:36 COMMUNICATION No. 28 PAGE. 5

[redacted]

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of the Veritas Trust,<br><br>Plaintiff,<br><br>vs.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | No. 2:21-cv-08157-JAK-RAO |
| MARY BONO,<br><br>Counter-Plaintiff,<br><br>Vs.<br><br>CHER, individually and as Trustee of the Veritas Trust,<br><br>Counter-Defendant. | |

*** Confidential pursuant to Protective Order ***

REMOTE VIDEOTAPED DEPOSITION OF
CHER
Tuesday, September 5, 2023
Volume I

Reported by:
ALEXIS KAGAY
CSR No. 13795
Job No. 6072224

PAGES 1 - 226

dollar; is that correct?
A Yes.
Q Is your claim -- let me ask you this: Do you have an understanding of your claim as to what you should get under this chart? 12:28:34
A My concept is that I should get what I've always gotten.
Q And would that be the $0.36 here?
A Babe, I don't know.
Q But just to clar- -- 12:28:49
A It's your chart. So I don't know. I mean, they're just numbers for me.
Q But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 before the terminations, you should receive $0.36 12:29:04 after the terminations; is that correct?
A Yes, I -- I believe I should have what I had before.
Q Okay. What -- what is your understan- -- and we can put this away. 12:29:32
What is your understanding of your approval rights over Sonny's publishing catalog?
A I don't have any understanding at all. The only thing that I -- the only thing that I -- I had a conversation with Mary, and she said to me, "I 12:29:50

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 7, 2023

~~<%11776,Signature%>~~

ALEXIS KAGAY

CSR NO. 13795

Peter Anderson, Esq., Cal. Bar No. 88891
peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
ericlamm@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Plaintiff and Counter-Defendant
CHER, Individually and as
Trustee of The Veritas Trust

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>PLAINTIFF'S ANSWER TO DEFENDANT'S COUNTERCLAIM<br><br>DEMAND FOR JURY TRIAL |

Plaintiff and counter-defendant Cher ("Plaintiff"), individually and as Trustee of The Veritas Trust, answers the Counterclaim of defendant Mary Bono ("Defendant"), individually and as Trustee of the Bono Collection Trust, as follows:

"**PARTIES**"[1]

1. Answering paragraph 1 of the Counterclaim, Plaintiff admits that Defendant served as the administrator of the Estate of the late Salvatore Bono ("Sonny") and, with Sonny's children, is an heir of Sonny, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

2. Answering paragraph 2 of the Counterclaim, Plaintiff admits the allegations contained therein.

"**JURISDICTION AND VENUE**"

3. Answering paragraph 3 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant contends that this Court has supplemental subject matter jurisdiction of Defendant's Counterclaim, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

4. Answering paragraph 4 of the Counterclaim, Plaintiff admits the allegations contained therein.

5. Answering paragraph 5 of the Counterclaim, Plaintiff admits the allegations contained therein.

---

[1] Plaintiff includes the Counterclaim's section headings in this Answer purely for ease of organization; to the extent those headings include any allegations of fact, Plaintiff denies those allegations.

**"<u>FACTUAL ALLEGATIONS</u>**

**Sonny and Cher's Marriage"**

6. Answering paragraph 6 of the Counterclaim, Plaintiff admits the allegations contained therein.

7. Answering paragraph 7 of the Counterclaim, Plaintiff admits the allegations contained therein.

8. Answering paragraph 8 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that the Superior Court of the State of California for the County of Los Angeles—after bifurcating the issue of dissolution of Plaintiff's and Sonny's marriage and all matters pertaining to the disposition of community property, spousal support, child custody, child support, and attorneys' fees, and retaining jurisdiction over all of those other matters—entered a judgment of dissolution of their marriage on or about June 27, 1975, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

9. Answering paragraph 9 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that on or about August 10, 1978, she and Sonny entered into the Marriage Settlement Agreement (the "MSA"), denies that she relinquished any and all claims she had, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

**"<u>The MSA and Master Recordings</u>"**

10. Answering paragraph 10 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to

plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

11. Answering paragraph 11 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

12. Answering paragraph 12 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

13. Answering paragraph 13 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff denies that the MSA does not provide for the division and allocation of interests with respect to master recordings other than those delivered under the agreements identified in this paragraph, and Plaintiff is without knowledge

or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

**"Administration"**

14. Answering paragraph 14 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

15. Answering paragraph 15 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

16. Answering paragraph 16 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant quotes some language from the MSA, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

17. Answering paragraph 17 of the Counterclaim, Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein and, on that basis, denies each and every allegation contained therein.

**"The Probate of Sonny's Estate"**

18. Answering paragraph 18 of the Counterclaim, Plaintiff admits the allegations contained therein.

19. Answering paragraph 19 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant had the authority to approve Plaintiff's Creditor's Claim filed in the *Estate of Salvatore Phillip Bono* probate action, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

20. Answering paragraph 20 of the Counterclaim, Plaintiff admits the allegations contained therein.

21. Answering paragraph 21 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Defendant approved Plaintiff's Creditor's Claim filed in the *Estate of Salvatore Phillip Bono* probate action, Plaintiff admits that Defendant quotes some language from the Agreement Regarding Disposition of Creditor's Claim Filed by Cher, denies that Defendant's quotation is complete, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

///

22. Answering paragraph 22 of the Counterclaim, Plaintiff admits that in the *Estate of Salvatore Phillip Bono* probate action, Sonny's heirs were determined to be Defendant and Sonny's children, Christy, Chaz, Chesare, and Chianna, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

23. Answering paragraph 23 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that in August 1999, the Superior Court entered in the *Estate of Salvatore Phillip Bono* probate action, its Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution, and that Plaintiff's Creditor's Claim was approved, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

**"Administration of Royalties"**

24. Answering paragraph 24 of the Counterclaim, Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein and, on that basis, denies each and every allegation contained therein.

25. Answering paragraph 25 of the Counterclaim, Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein and, on that basis, denies each and every allegation contained therein.

///

///

26. Answering paragraph 26 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that in or about 2011, The Bono Collection Trust, The Veritas Trust, then known as The Inshallah Trust, and Wixen Music Publishing, Inc. ("Wixen"), entered into agreements titled, respectively, Administration Agreement, Collection Agreement, and Promotion Agreement (the "Wixen Agreements"), that one or more of those agreements related to, among other things, the collection and distribution of royalties within the scope of the MSA, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

27. Answering paragraph 27 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that one or more of the Wixen Agreements related to, among other things, the collection and distribution of royalties within the scope of the MSA, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

28. Answering paragraph 28 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that Wixen distributed to Plaintiff, as Trustee of The Veritas Trust, some of the royalties due her pursuant to the MSA, denies that Wixen paid to Plaintiff, as Trustee of The Veritas Trust, all of the royalties due her pursuant to the MSA, and Plaintiff is without knowledge or information sufficient to

///

form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

29. Answering paragraph 29 of the Counterclaim, Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein and, on that basis, denies each and every allegation contained therein.

30. Answering paragraph 30 of the Counterclaim, Plaintiff denies the allegations contained therein.

"**Unilateral Attempted Cancellation of Administration**"

31. Answering paragraph 31 of the Counterclaim, Plaintiff admits that Wixen has distributed to Plaintiff, as Trustee of The Veritas Trust, some of the royalties due her pursuant to the MSA, denies that Wixen paid to Plaintiff, as Trustee of The Veritas Trust, all of the royalties due her pursuant to the MSA, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

32. Answering paragraph 32 of the Counterclaim, Plaintiff admits that in or about December 2022, she assigned to a third party various rights and properties, including the right to receive certain amounts due and payable to her under the MSA on or after July 1, 2022, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

33. Answering paragraph 33 of the Counterclaim, Plaintiff admits that on or about October 13, 2021, she, as Trustee of The Veritas Trust, exercised her express right under the Wixen Agreements to terminate them, and Plaintiff denies the remaining allegations contained therein.

34. Answering paragraph 34 of the Counterclaim, Plaintiff admits that in or about 2011, Plaintiff and Defendant, as Trustees of, respectively, The Bono Collection

Trust and The Veritas Trust, then known as The Inshallah Trust, engaged Wixen to, among other things, collect and disburse royalties, alleges that their engagement of Wixen included Plaintiff's and Defendant's agreement that they each have the right to terminate the Wixen Agreements, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

**"Termination of Grants"**

35. Answering paragraph 35 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff admits that in or about 2016 Defendant and her and Sonny's two children issued a notice of termination to various music publishers or other companies to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in various musical compositions, specifying various effective dates of termination ranging from dates in 2018 to 2026, Plaintiff denies that Sonny's other heirs joined in that notice of termination, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

36. Answering paragraph 36 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff denies the allegations contained therein.

37. Answering paragraph 37 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff denies the allegations contained therein.

///

38. Answering paragraph 38 of the Counterclaim, Plaintiff admits that she disputes the claims of Defendant, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

"**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment)**"

39. Answering paragraph 39 of the Counterclaim, Plaintiff repeats and realleges her responses set forth above in paragraphs 1 through 38 as if fully set forth herein.

40. Answering paragraph 40 of the Counterclaim, Plaintiff admits that she disputes the contentions of Defendant in Defendant's Counterclaim, Plaintiff denies Defendant's contentions in Defendant's Counterclaim, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

41. Answering paragraph 41 of the Counterclaim, Plaintiff denies each and every allegation contained therein.

42. Answering paragraph 42 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff denies the allegations contained therein.

43. Answering paragraph 43 of the Counterclaim, Plaintiff denies each and every allegation contained therein.

44. Answering paragraph 44 of the Counterclaim, Plaintiff denies each and every allegation contained therein.

45. Answering paragraph 45 of the Counterclaim, Plaintiff denies each and every allegation contained therein.

///

46. Answering paragraph 46 of the Counterclaim, Plaintiff denies each and every allegation contained therein.

47. Answering paragraph 47 of the Counterclaim, Plaintiff admits that Defendant requests declaratory relief regarding Plaintiff's rights and, if any, obligations concerning the selection of an administrator, Plaintiff denies that Defendant is entitled to the relief Defendant seeks, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

"**<u>SECOND CLAIM FOR RELIEF</u>**

**(Declaratory Judgment)**"

48. Answering paragraph 48 of the Counterclaim, Plaintiff repeats and realleges her responses set forth above in paragraphs 1 through 47 as if fully set forth herein.

49. Answering paragraph 49 of the Counterclaim, to the extent the allegations contained therein allege conclusions of law, Plaintiff is not required to plead thereto; to the extent the allegations in that paragraph are deemed to be allegations of fact, Plaintiff denies the allegations contained therein.

50. Answering paragraph 50 of the Counterclaim, Plaintiff admits that she disputes Defendant's contentions in Defendant's Counterclaim, and Plaintiff is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

51. Answering paragraph 51 of the Counterclaim, Plaintiff admits that Defendant requests declaratory relief concerning her rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit the sound recording copyrights Defendant claims to own, Plaintiff denies that Defendant is entitled to the relief Defendant seeks, and Plaintiff is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained therein and, on that basis, denies each and every remaining allegation contained therein.

**FIRST AFFIRMATIVE DEFENSE**[2]

**(Failure to State a Claim)**

52. Defendant's Counterclaim fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

**(The Copyright Act's Limitations on § 304(c) Terminations)**

53. Defendant's claims, and each of them, in her Counterclaim, and the relief Defendant seeks, are precluded by, or otherwise fail by reason of, the provisions of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, including, without limitation, the provisions of 17 U.S.C. § 304(c), and the Federal Regulations promulgated thereunder, that:

(a) Termination of a grant requires, among other things, serving an advance notice in writing upon the grantee or the grantee's successor in title;

(b) Termination of a grant requires, among other things, that the notice of termination identify the terminated grant;

(c) A derivative work prepared under authority of a grant before its termination may continue to be utilized under the terms of the grant after its termination;

///

///

---

[2] To the extent that the burden of proof of any matter raised or mentioned in the following defenses lies with Defendant, Plaintiff raises the defense out of an abundance of caution and does not thereby assume that burden of proof.

> (d) Termination of a grant under 17 U.S.C. § 304(c) affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws; and
>
> (e) Unless and until termination is effected under 17 U.S.C. § 304(c), a grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

17 U.S.C. § 304(c)(4), (c)(4)(B), (c)(6)(A), (c)(6)(E), and (c)(6)(F); 37 C.F.R. § 201.10(d).

## THIRD AFFIRMATIVE DEFENSE

**(Unclean Hands)**

54. Defendant wrongfully induced Wixen to breach the Wixen Agreements by, among other things, paying to Defendant royalties due and payable to Plaintiff, and Defendant, by falsely claiming that her and her children's purported notice of termination terminates Plaintiff's rights to musical composition royalties in the United States, has put a cloud on Plaintiff's rights and interfered with Plaintiff's exercise of her rights.

55. Defendant is barred by the doctrine of unclean hands from obtaining the relief she seeks.

## FOURTH AFFIRMATIVE DEFENSE

**(Defendant's Breach)**

56. Defendant is barred by her breach of the MSA, the agreement approving Plaintiff's Creditor's Claim, and/or the Wixen Agreements, from obtaining the relief she seeks

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Cher prays for judgment as follows:

1. That Defendant take nothing by way of her Counterclaim and that the Counterclaim be dismissed, with prejudice;

///

2. That Plaintiff be awarded her costs and attorneys' fees; and

3. For such other and further relief as the Court deems just and proper.

Dated: May 2, 2023

/s/ Peter Anderson

Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
and Counter-Defendant
CHER
Individually and as Trustee of
The Veritas Trust

**DEMAND FOR JURY TRIAL**

Plaintiff and counter-defendant Cher respectfully demands trial by jury of all issues and claims as to which there is a right of trial by jury.

Dated: May 2, 2023

/s/ Peter Anderson
Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
and Counter-Defendant
CHER
Individually and as Trustee of
The Veritas Trust

DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
HAYLEY M. LENAHAN, #343528
hlenahan@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520

Telephone: (510) 451-3300
Facsimile: (510) 451-1527

Attorneys for Defendant
MARY BONO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-cv-08157-JAK (RAOx)<br><br>**DEFENDANT MARY BONO'S ANSWER TO FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT; RESTATEMENT OF COUNTERCLAIMS FOR:**<br><br>**1. Declaratory Judgment (Administration)**<br>**2. Declaratory Judgment (Record Royalties)**<br><br>First Amended Complaint Filed: March 28, 2023 |
| MARY BONO,<br><br>Counter-Plaintiff,<br><br>v.<br><br>CHER, individually and as Trustee of The Veritas Trust,<br><br>Counter-Defendant. | |

Defendant Mary Bono ("Mary"), by and through her undersigned attorneys, hereby files her Answer to Plaintiff Cher's ("Cher") First Amended Complaint for Declaratory Judgment and Breach of Contract ("FAC"), as follows:

## PRELIMINARY STATEMENT

Cher's claims against Mary concerns Cher's access to certain royalties provided to her by the late Salvatore ("Sonny") Bono via a Marriage Settlement Agreement ("MSA") entered into between them in 1978, and the extent to which her continued access to such royalties trumps the statutory limitations set out in the Copyright Act.

The works at issue, and the copyright interests associated with those works, are subject to the Copyright Act. 17 U.S.C. § 102(a). And, contrary to Cher's allegations, the Copyright Act preempts Cher's claims. It is the Copyright Act that allows Sonny's Heirs, which include Sonny's widow, Mary, as well as Sonny's four children – Chesare, Chianna, Christy, and Chaz – to terminate grants made pursuant to the Copyright Act. And, through those terminations, any such royalties allegedly due to Cher no longer exists.

In addition to the fact that the Copyright Act terminates the distribution of certain royalties to Cher, Cher has also failed to include all the necessary parties to this litigation. Although Cher names "Does 1 through 10," Cher has only named Mary as a defendant in this litigation. Cher has failed to name Chesare, Chianna, Christy, and Chaz as defendants, although they, like Mary, are Sonny's statutory heirs and clearly have an interest in the litigation.

And although Mary will not forego a motion to dismiss the FAC, Cher's allegations do not adequately respond to the issues raised by the Court in its March 14, 2023 Order re Defendant's Motion to Dismiss (ECF No. 43) concerning the Record Royalties.

For all of these reasons, and the others addressed below, Cher is barred from pursuing her claims asserted in the FAC.

## GENERAL DENIAL

Except as otherwise expressly stated herein, Mary: (1) generally denies each and every allegation of the FAC, including, without limitation, any allegations contained in the preamble, introduction, headings, subheadings, unnumbered Paragraphs and footnotes in the FAC; (2) specifically denies that she has caused Cher to suffer any harm, losses, or damages; (3) denies any liability to Cher; and (4) declines to adopt or acknowledge as accurate any defined terms in the FAC to the extent they constitute allegations directed at Mary. Mary reserves the right to challenge the authenticity of all sources and documents referred to or purportedly quoted from in the FAC, and to assert that any of the sources or documents referred to or purportedly quoted from by Cher in the FAC are covered by the attorney-client privilege, the work product doctrine, and/or otherwise applicable privileges. Mary reserves the right to seek to amend or supplement her Answer as may be necessary or appropriate.

## RESPONSES TO SPECIFIC ALLEGATIONS

### JURISDICTION AND VENUE

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted that Mary's agent, Wixen Music Publishing, Inc. ("Wixen"), is a resident in this District. Denied that all defendants are residents of the State of California. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4, and therefore denies the remaining allegations.

### THE PARTIES

5. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 5, and therefore denies the allegations.

6. Admitted that Mary is an individual domiciled in Colorado. Admitted that Mary was the Trustee of the Bono Collection Trust. Denied that the Bono

Collection Trust is still in existence. Denied as to the remainder of the allegations in Paragraph 6.

7. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore denies the allegations.

## BACKGROUND FACTS

### Plaintiff and the Music that She and Sonny Bono Made Famous

8. Admitted.

9. Admitted.

10. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies the allegations.

11. To the extent the allegations in Paragraph 11 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

### Plaintiff and Sonny's 1978 Marriage Settlement Agreement

12. Admitted.

13. Admitted.

14. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph (9) of the Marriage Settlement Agreement states as follows:

> (9) Husband and Wife agree to make an equal division of their community estate; to share their liabilities and obligations in such a manner as to implement said equal division of their community estate; to acknowledge the separate ownership of certain property; and to otherwise adjust and settle each and all of their property rights and interests in the manner provided in this Paragraph (9), and in Paragraphs (10), (11), (12), (13) and attached exhibits.
>
> (a) Prior to the distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9)(d) hereof, Husband agrees to restore to the community bank accounts of the parties from his separate funds (or to permit adjustments to be made in the distribution of the community bank accounts of the parties pursuant to paragraph (9)(b) and (9)(c)) the following amounts:

(1) $150,000 – which represents the amounts of cash withdrawals by Husband from the community bank accounts of the parties prior to September 30, 1977.

(2) $150,000 – which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about November 16, 1977.

(3) $190,930.08 – which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(4) $234,409.00 – which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(5) $11,465.12 – which represents the amount of an excess prior cash withdrawal by Husband from the community bank accounts of the parties on or about August, 1975.

(6) $10,000.00 – which represents the agreed amount of interest accrued on prior withdrawals by Husband listed in this paragraph (9)(a).

(b) The parties agree that prior to distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9)(d) hereof the parties agree that Wife my satisfy a separate obligation to Husband, referred to in Exhibit E hereof, in the amount of $234,409.00 by permitting an adjustment to the community in the amount of $468,818.00 in favor of Husband.

(c) The parties agree that the intent of Paragraphs (9)(a) and (9)(b) hereof may be effectuated by permitting Wife to withdraw $277,986.20 from the community accounts of the parties prior to distribution of the community property in equal amounts pursuant to Paragraph (9)(d) hereof. The parties agree that in making an adjustment to the community property, Husband may sell any municipal bonds in the community account for cash.

(d) Both Husband and Wife agree that there shall be an equal distribution to the parties of all of the community property of the parties, not otherwise specifically disposed of herein, including, but not limited to, the community assets in the custody of Husband's representatives listed in Exhibit A, attached hereto, to be distributed in cash or in kind where required. Said division and distribution shall be accomplished as soon after the execution of this document as is reasonably practical. If the parties are unable to agree upon a distribution in kind of any of said assets, then the parties agree that such assets shall be sold and the proceeds shall be divided equally between them.

(e) The parties acknowledge that the community bank accounts of the parties are in the custody and control of Husband and Husband's representatives. Both parties acknowledge that all of the monies in the community bank

> accounts have been properly included therein as community property. Both parties warrant that all monies received by either of them which constitute community monies have been deposited in the community account or that adjustments of the community have been made therefor. Both parties warrant that any monies received by either of them subsequent to the date of this agreement which constitute joint monies will be divided equally between the parties. The parties acknowledge that Husband and Chris-Marc Music entered into an agreement with Broadcast Music, Inc. (hereinafter referred to as "BMI") dated September 9, 1977, that advances were given to Husband from BMI and that BMI encumbered community assets of the parties in order to insure its recoupment of said advances. The parties agree that Husband may retain said advances as his separate property. Husband agrees that he will account directly to Wife all monies to which Wife would have been entitled but for the encumbrance by BMI including any administration fee, if applicable. Husband agrees to use his best efforts to have the BMI agreement modified in such a way as to segregate any collateralization of community property with his separate property.
>
> (f) The parties heretofore entered into a Memorandum of Agreement dated May 29, 1974 respecting distribution of certain of their community property and this Marriage Settlement Agreement will not pertain with respect to that distribution that was previously made in accordance with mutual agreement of the parties.
>
> (g) The property described in Paragraphs (9), (10), (11), and (12) hereof constitutes all of the community property of the parties. By this Agreement, the parties intend to divide said property equally between them.

Admitted that paragraph (10) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> (a) Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(b) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(c) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be

unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

(e) Any and all receipts of Cher Enterprises, Inc. payable from and after July 14, 1978, as a result of the following: (1) income derived from joint performances and professional activities of Husband and Wife both before and after February 1, 1974, and (2) income derived as a result of the individual performances and professional activities of the parties prior to February 1, 1974, including, but not limited to, the "Sonny and Cher" television programming, together with any editing thereof to one-half hour shows for syndiciation [sic] or any other exploitation thereof, any feature motion pictures produced thereunder, etc. All said receipts of Cher Enterprises, Inc. shall be subject to the following adjustments: (1) reasonable overhead allowance for the administrative costs of collecting and accounting to Wife, (2) reasonable attorneys' fees with respect to new contracts for the use of old programs, (3) any commissions paid to the William Morris Agency, and (4) any direct expenses incurred in the exploitation of the properties. Husband agrees that he will cause Cher Enterprises, Inc. to account to the extent of 50% of said receipts directly to Wife or any company she designates. However, to the extent that Wife receives any such receipts directly or through any other company, she shall be deemed to be satisfied to the extent of such receipts on any accounts payable to Wife by Husband under this Paragraph (10)(e).

(f) Any and all receipts of Apis Productions, Inc. payable from and after July 14, 1978 as a result of income derived from any future exploitation of "Sonny and Cher" television programming. Wife agrees that she will cause Apis Productions, Inc. to account directly to Husband or any company he designates to the extent of 50% of net profits Husband may be entitled to pursuant to Paragraph I.1 of that certain Settlement Agreement dated November 21, 1975. For purposes of this Paragraph (10)(f), Paragraph I.1 of the said November 21, 1975 Settlement Agreement shall be deemed to remain in effect and as used herein, the term "net profits" shall be defined thereby.

(g) Any and all other receipts and distributions to the parties individually or jointly or to any corporation, business or other entity owned or controlled by either party from their professional endeavors performed or made jointly or with joint investments on their part both prior to February 1, 1974 and thereafter after the effective date of this Agreement except as otherwise provided herein or otherwise agreed to in writing. Both parties warrant that each has not conveyed, transferred or encumbered any of the rights referred to in this paragraph (10).

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14, and therefore denies the remaining allegations.

15. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraphs (10)(a), (b), and (c) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> (a) Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.
>
> (b) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.
>
> (c) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15, and therefore denies the remaining allegations.

///

///

16. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> ***
>
> (d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16, and therefore denies the remaining allegations.

17. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> ***
>
> (d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with

> the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17, and therefore denies the remaining allegations.

18. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> ***
>
> (d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or

> Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18, and therefore denies the remaining allegations.

19. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that Cher received sums of money from Sonny or his designees under the Marriage Settlement Agreement. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19, and therefore denies the remaining allegations.

**Sonny's 1998 Death and His Estate's Confirmation of Plaintiff's Ownership of Fifty Percent of the Royalties**

20. Admitted.

21. Admitted.

22. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that, in July 1998, Cher caused to be filed in the probate action her creditor's claim, raising Sonny's obligations to her under the Marriage Settlement Agreement. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22, and therefore denies the remaining allegations.

23. Admitted that, in July 1999, Mary, as administrator of the Estate, caused to be filed in the probate action a document entitled "Agreement Regarding Disposition of Creditor's Claim Filed by Cher" ("Cher's Creditor's Claim Agreement"). Admitted that Cher's Creditor's Claim Agreement states as follows:

> On or about July 20, 1998, CHER filed a Creditor's Claim with this Court for an unascertainable amount (hereinafter referred to as "Claim") based upon obligations arising under that certain Marital Settlement Agreement dated August 10, 1987 by and between Cher and the decedent

> (hereinafter referred to as the "Marital Settlement Agreement"). MARY BONO is the duly appointed and acting Administrator of the Estate of SALVATORE
>
> PHILLIP BONO (hereinafter referred to as "Administrator").
>
> In regard to the Claim, the parties now agree as follows:
>
> 1. The Administrator acknowledges Cher's interest in certain ongoing royalties relating to the assets inventoried in this estate as Items 1 through 4 on Attachment 2 of the Final Inventory and Appraisement filed herein on March 17, 1999. Cher hereby acknowledges and agrees that the Claim relates solely to her ongoing rights under the terms and conditions of the Marital Settlement Agreement, and the judgment entered in the subject marital dissolution proceeding. Cher acknowledges that she has no knowledge of any breach of the decedent's obligations thereunder as of the date hereof;
>
> 2. During the course of the administration of this estate, Cher acknowledges that to her knowledge the Administrator has been collecting said royalties, and has disbursed to Cher her share of such royalties, as provided for in the Marital Settlement Agreement;
>
> 3. In recognition of Cher's continuing right to receive such royalty interests, and in the interests of the heirs of the estate, Cher and the Administrator hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs after the closing of this estate;
>
> 4. In reliance on the foregoing provisions of this Agreement, the Administrator hereby approves the Claim filed herein by Cher, subject to the terms and provisions hereof.

Admitted that Mary approved Cher's creditor's claim. Denied as to the remaining allegations.

**The Estate's 1999 Distribution of its Assets, Subject to Plaintiff's Ownership of Fifty Percent of the Royalties, to Sonny's Heirs**

24. Admitted that, in August 1999, the probate court entered an "Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution" (the "Order"). Admitted that the Order provided that all creditor's claims have either been approved, compromised, or settled. Admitted that Order provided for a balance which included Sonny's music portfolio assets including royalties and publishing rights. Admitted that the Order provided that the

residue of the estate and any other property of Sonny or Sonny's estate would be distributed to Mary, Chesare, Chianna, Christy, and Chaz (collectively, the "Heirs"). Denied as to the remaining allegations.

25. Admitted.

**The Veritas Trust and The Bono Collection Trust**

26. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies the allegations.

27. Admitted that there was The Bono Collection Trust, of which Mary was the sole Trustee. Admitted that the Heirs transferred their rights to receive Royalties, subject to certain obligations to Cher, to The Bono Collection Trust. Denied that The Bono Collection Trust still is in existence. Denied as to the remaining allegations.

**The 2011 Agreements with Wixen Music Publishing, Inc.**

28. Admitted.

29. Admitted.

30. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies the allegations.

31. Admitted.

**The Heirs' 2016 Notice of their Claimed 17 U.S.C. § 304(c) Termination of Sonny's Pre-1978 Music Publishing Grants**

32. To the extent the allegations in Paragraph 32 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, admitted.

33. Admitted.

34. To the extent the allegations in Paragraph 34 contain legal conclusions and Cher's characterization of her legal claims, no response is required. Admitted that the Notice of Termination was not served on the Record Companies, does not identify any Record Companies as grantees whose rights are being terminated, and

did not purport to terminate any of the Recording Contracts. To the extent a response is required, denied as to the remaining allegations.

35. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore denies the allegations.

36. Admitted.

**Defendants' Claim that the Heirs' § 304(c) Termination of Music Publishing Grants Also Terminates Plaintiff's Rights, Including Her Ownership of Fifty Percent of the Royalties**

37. To the extent the allegations in Paragraph 37 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

38. To the extent the allegations in Paragraph 38 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required as to the remaining allegations in Paragraph 38, denied.

39. To the extent the allegations in Paragraph 39 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

**FIRST CLAIM FOR RELIEF**
**(For Declaratory Relief as to Effect of 17 U.S.C. § 304(c) Termination on Plaintiff's Rights)**
**(Against Defendants)**

40. Mary incorporates by reference and restates the responses to Paragraphs 1-39 as set forth above.

41. To the extent the allegations in Paragraph 41 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

42. To the extent the allegations in Paragraph 42 contain legal conclusions and Cher's characterization of her legal claims, no response is required. Admitted that Cher is making the contentions set forth in Paragraph 42. To the extent a response is required as to the remaining allegations in Paragraph 42, denied.

43. To the extent the allegations in Paragraph 43 contain legal conclusions and Cher's characterization of her legal claims, no response is required. Admitted that Cher is making the contentions set forth in Paragraph 43. To the extent a response is required as to the remaining allegations in Paragraph 43, denied.

44. To the extent the allegations in Paragraph 44 contain legal conclusions and Cher's characterization of her legal claims, no response is required. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44, and therefore denies the remaining allegations.

45. To the extent the allegations in Paragraph 45 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

**SECOND CLAIM FOR RELIEF**
**(For Breach of Contract)**
**(Against Defendants)**

46. Mary incorporates by reference and restates the responses to Paragraphs 1-45 as set forth above.

47. To the extent the allegations in Paragraph 47 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, admitted that Sonny and Cher entered into an MSA. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47, and therefore denies the remaining allegations.

48. To the extent the allegations in Paragraph 48 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

49. To the extent the allegations in Paragraph 49 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

///

///

50. To the extent the allegations in Paragraph 50 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

51. To the extent the allegations in Paragraph 51 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

## ANSWER TO PRAYER

Mary denies that Cher is entitled to the relief sought in the Prayer for Relief or any other relief under any theory.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to them as to any element of Cher's claims, and without waiving and hereby expressly reserving the right to assert any and all such defenses at such time and to such extent as discovery and factual developments establish a basis therefore, Mary asserts the following defenses:

### FIRST AFFIRMATIVE DEFENSE

The FAC fails, in whole or in part, to state claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Cher has failed to name or join a necessary party or parties to the present action, including each of Sonny's Heirs, who have rights and interests in the claims for relief at issue.

### THIRD AFFIRMATIVE DEFENSE

Cher's claims for relief are preempted by the Copyright Act.

### FOURTH AFFIRMATIVE DEFENSE

Mary has fully performed all conditions and covenants required to be performed under the alleged agreements with Cher.

///

**FIFTH AFFIRMATIVE DEFENSE**

Mary's obligation to perform under the applicable agreements, if any, was excused by Mary's substantial performance.

**SIXTH AFFIRMATIVE DEFENSE**

As to any and all causes of action based upon purported contracts or agreements, such contracts or agreements have been the subject of written and/or oral modifications, abandonment, mutual rescission, and/or termination and therefore, Cher's action is barred and/or Cher's right of recovery as against Mary, if any, is barred or must be reduced accordingly.

**SEVENTH AFFIRMATIVE DEFENSE**

Any action or inaction by Mary with respect to the allegations contained in the FAC was lawful, justified, and/or privileged.

**EIGHTH AFFIRMATIVE DEFENSE**

Cher lacks standing to pursue her claims because she has assigned all rights thereto to a third party as part of a sale of her interests under the MSA.

**NINTH AFFIRMATIVE DEFENSE**

Cher is seeking amounts that would result in her receiving more than she is otherwise entitled to, such that she would be unjustly enriched.

**ADDITIONAL DEFENSES**

Mary asserts, and expressly reserves all rights with respect to, all counterclaims, crossclaims, third-party claims, or contribution claims that may be revealed during the course of discovery. Mary also asserts and expressly reserves all rights with respect to all other defenses that may be revealed during the course of discovery. Mary expressly reserves the right to amend and/or supplement this Answer.

**PRAYER**

WHEREFORE, Mary prays as follows:

1. That Cher take nothing by this action;

2. That Mary be awarded attorneys' fees and costs of this suit; and

3. That Mary be awarded such other relief as the Court deems just and proper.

## COUNTERCLAIM

In her original Answer to Plaintiff/Counter-Defendant Cher ("Cher"), Defendant/Counter-Plaintiff Mary Bono ("Mary") filed Counterclaims ("Counterclaim") against Cher. *See* ECF No. 44. Mary herein reiterates and realleges each of the allegations and her Counterclaims in full, as follows:

## PARTIES

1. Mary is an individual residing and domiciled in Colorado. Mary served as administrator to the Estate of Salvatore ("Sonny") Bono, and is an heir, along with his children to Sonny's Estate.

2. Cher is an individual who, upon information and belief, resides and is domiciled in Los Angeles, California, and is Trustee of The Veritas Trust, a California trust formerly known as The Inshallah Trust.

## JURISDICTION AND VENUE

3. This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) because the counterclaims are so related to the claims in the action within such original jurisdiction that they form the same case or controversy under Article III of the U.S. Constitution.

4. This Court has personal jurisdiction over Cher because she is a resident of the State of California and, upon information and belief, resides in this District.

5. Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b) and (c) because Cher resides in this District. Additionally, Cher has consented to venue in this District by filing her Complaint against Mary in this District.

///

///

## FACTUAL ALLEGATIONS

### Sonny and Cher's Marriage

6. Cher and Sonny were married in or about November 24, 1967.

7. Cher and Sonny separated on or about February 1, 1974.

8. Cher and Sonny dissolved their marriage on or about June 27, 1975.

9. Cher and Sonny entered into the Marriage Settlement Agreement ("MSA") on or about August 10, 1978, in which the parties settled their obligations to each other as well as to relinquish any and all claims that they may have had against each other.

### The MSA and Master Recordings

10. As part of the MSA, Cher and Sonny agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband [Sonny] and Wife [Cher] jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

11. As part of the MSA, Cher and Sonny further agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

///

12. As part of the MSA, Cher and Sonny further agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

13. The MSA does not provide for the division and allocation of interests with respect to master recordings between Sonny and Cher other than from the Atlantic Recording Corporation agreement dated August 30, 1966, the Liberty/U.A. Inc. agreements dated from and after November 1, 1964, and the MCA Records, Inc. agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc. (the "Record Royalties").

**Administration**

14. As part of the MSA, Cher and Sonny also agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any,

///

withheld therefrom at the source) and obligations to pay royalties to the other writers."

15. As part of the division of this interest (the "Composition Royalties"), Cher and Sonny approved, and the MSA provided, that "Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris-Marc Music or other business, under this Paragraph (10)(d)."

16. Furthermore, Sonny and Cher agreed through the MSA that "[a]ll said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband."

17. On information and belief, Sonny acted as the worldwide administrator in his lifetime in exchange for a ten percent fee.

**The Probate of Sonny's Estate**

18. In January 1998, Sonny died from injuries suffered in a skiing accident.

19. Thereafter, a probate action for Sonny's Estate was initiated in the California Superior Court. Mary was appointed administrator of Sonny's Estate. As

administrator, Mary had the authority to handle any and all claims made against Sonny's Estate.

20. In July 1998, Cher caused to be filed in the probate action her creditor's claim, raising Sonny's obligations to her under the MSA.

21. In July 1999, Mary, as administrator of the Estate, caused to be filed in the probate action a document entitled "Agreement Regarding Disposition of Creditor's Claim Filed by Cher" ("Cher's Creditor's Claim Agreement"). As part of Cher's Creditor's Claim Agreement, Mary approved Cher's creditor's claim. Mary further acknowledged the terms and conditions of the MSA. And "[i]n recognition of Cher's continuing right to receive such royalty payments, and in the interest of the heirs of the estate, Cher and the Administrator hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs after the closing of [Sonny's] Estate."

22. In addition to Mary, the heirs of Sonny's Estate include Sonny's four children: Chesare, Chianna, Christy, and Chaz (with Mary, the "Heirs").

23. In August 1999, the probate court entered its Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution," which approved, among other things, Cher's Creditor's Claim Agreement.

**Administration of the Royalties**

24. In or about 1999, after the closing of Sonny's Estate, Cher and Mary, in her role as Administrator, agreed to appoint Montgomery, Glick & Company ("Glick") to oversee the collection and proper disbursement of royalties due Cher.

25. In or about 2011, Cher and Mary agreed to replace Glick as administrator of the royalties.

26. In or about 2011, Cher, through The Veritas Trust, and Mary, through a trust then known as The Bono Collection Trust, entered into agreements with Wixen

Music Publishing, Inc. ("Wixen") concerning the administration, collection, and distribution of, among others, Composition Royalties and the Record Royalties (collectively, the "Royalties").

27. The agreements entered into with Wixen provided that Wixen would receive commissions in connection with its administration, collection, and distribution of the Royalties consistent with the MSA.

28. Upon information and belief, Wixen duly administered, collected, and distributed the Royalties to Cher pursuant to the terms set forth in the MSA.

29. Upon information and belief, Wixen also administered and collected, among other things, Royalties outside of the agreements at issue in the MSA. Wixen has nonetheless distributed the collected funds to Cher pursuant to the terms set forth in the MSA.

30. Upon information and belief, Wixen has, throughout its tenure as royalty administrator, provided Cher and Mary with detailed, accurate quarterly accounting statements; negotiated significant increases in sync royalties to the benefit of Cher and Mary and the Heirs; and otherwise fulfilled all of its duties as royalty administrator as provided for in the MSA.

**Unilateral Attempted Cancellation of Administration**

31. Wixen continues to collect and disburse to Cher (or her Trust) sums that constitute Cher's percentage of the Royalties pursuant to the terms of the MSA.

32. Upon information and belief, in or about 2021 or 2022, Cher sold all royalties to which she was entitled, including her Royalties, in part or in full, for a lump sum to a third-party company that acquires such artist royalties. Such companies endeavor to handle all collection and accounting matters in-house and minimize third-party costs. Upon information and belief, by eliminating any third-party collection costs, including those specifically provided for in the MSA for a worldwide royalty administrator, Cher would receive a higher payment for her Royalties.

33. As part of the sale of her Royalties, Cher has unilaterally sought to cancel Wixen's administration, collection, and distribution of the Royalties. Cher seeks to receive all the benefits of Wixen's labors, including worldwide royalty collection, effective negotiations of Royalty licenses, and detailed accounting statements, while having Mary pay the entire cost of such representation and Cher paying nothing.

34. Cher and Mary cooperated in 1999 and again in 2011 in developing a mutually acceptable mechanism for the collection and proper disbursement of the Royalties, and they cooperated for over twenty years in implementing that mechanism. Unfortunately, that cooperation has now broken down.

**Termination of Grants**

35. In or about 2016, Mary and the Heirs, or a majority of them, issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers or other companies to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them. The notice of termination specified various effective dates of termination ranging from 2018 to 2026.

36. The termination of a grant or license of the renewal copyrights includes the termination of any agreement that Sonny entered into with a third party that allowed the third party to exploit rights provided to it pursuant to the grant or license of the copyright.

37. As Sonny's heirs and owners of his copyrights, Mary and the Heirs may exercise any of the rights available to them under the Copyright Act, including entering into new agreements with third parties to exploit the copyrights.

38. Cher disputes the exercise of such rights by Mary and the Heirs.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment)**

39. Mary incorporates by reference each of the allegations in Paragraphs 1 to 38 of this Counterclaim as though set forth fully herein.

40. There is a dispute over the rights and obligations of the Parties as it concerns the selection of a worldwide royalty administrator to collect, account for, and properly disburse the Royalties collected, as required pursuant to the MSA and Cher's Creditor's Claim Agreement.

41. Cher wrongly disputes that Mary has failed to fulfill all of her obligations under the Cher's Creditor's Claim Agreement, including by developing a mutually acceptable mechanism for the collection and proper disbursement of royalties after the closing of Sonny's Estate.

42. Mary is now solely bound by the terms of the MSA as to the selection of a worldwide royalty administrator, including its provision that such a royalty administrator may be appointed at the sole discretion of a majority of the Heirs.

43. In the alternative, Cher has been unreasonably withholding her agreement to the selection of an administrator to administer, collect, and distribute, among other things, the Royalties, in contravention of the Cher's Creditor's Claim Agreement entered into between Cher and Mary.

44. In the alternative, Cher must abide by her approval of Wixen as the worldwide royalty administrator.

45. Because the obligations under Cher's Creditor's Claim Agreement regarding the administrator expired, or, in the alternative, have been fulfilled as to Wixen, or, in the alternative, Cher has withheld her approval of an administrator without reason, the MSA allows for the engagement of an administrator be subject to Sonny's "sole discretion."

46. Mary is subject only to the requirements of the MSA, which allows for the "sole discretion" to engage an administrator.

47. Mary prays for a declaratory judgment concerning Cher's rights and obligations concerning the selection of an administrator.

///

///

**SECOND CLAIM FOR RELIEF**

**(Declaratory Judgment)**

48. Mary incorporates by reference each of the allegations in Paragraphs 1 to 47 of this Counterclaim as though set forth fully herein.

49. Pursuant to the MSA, Cher is entitled only to master royalties that are paid "from Atlantic Recording Corporation under the agreement dated August 30, 1966 . . . from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 . . . [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971."

50. There is a dispute as to Mary's ability to enter into new agreements to exploit the sound recording copyrights Mary owns and whether Cher or her assignee would be entitled to fifty percent of the receipts arising from such new agreements.

51. Mary prays for a declaratory judgment concerning her rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit the sound recording copyrights Mary owns.

**PRAYER FOR RELIEF**

WHEREFORE, Mary respectfully prays for the following relief:

1. For entry of judgment in favor of Mary and against Cher on each of Mary's claims for relief alleged in this Counterclaim;

2. A declaration finding that any obligation under Cher's Creditor's Claim Agreement to develop a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the Heirs was satisfied and is no longer binding on Mary;

3. A declaration finding that (i) Cher does not have a right to approve or disapprove a worldwide administrator for the royalties due her and the Heirs under the MSA and (ii) the right to select such a worldwide royalty administrator is at the sole discretion of the Heirs that hold a majority interest in such royalties;

///

4. In the alternative, a declaration finding that (i) Cher is not entitled to unreasonably withhold approval of a selection of an administrator and (ii) Wixen was approved by Cher as the worldwide administrator for the royalties due her and the Heirs and may continue to act as a worldwide administrator for the royalties due her and the Heirs under the MSA and receive up to ten percent of all such royalties, including those due Cher;

5. A declaration finding that (i) Mary has the right to renegotiate and enter into new agreements to exploit the sound recording copyrights that she holds and (ii) any revenue arising from such new agreements would be subject neither to the MSA nor to any claim by Cher or her assignee;

6. For costs of suit; and

7. For such other relief as this Court finds just and proper.

Respectfully submitted,

Dated: April 11, 2023 DONAHUE FITZGERALD LLP

By:/s/ Daniel J. Schacht
Daniel J. Schacht
Mario M. Choi
Hayley M. Lenahan
Attorneys for Defendant
MARY BONO

Peter Anderson, Esq., Cal. Bar No. 88891
peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
ericlamm@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Plaintiff
CHER, Individually and as
Trustee of The Veritas Trust

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF; AND BREACH OF CONTRACT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Cher ("Plaintiff") alleges:

## **JURISDICTION AND VENUE**

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), insofar as it arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, including by requiring the interpretation of the Copyright Act and the scope, meaning, and effect of the statutory termination provisions of 17 U.S.C. § 304(c), and because federal principles should control the claim.

2. Alternatively, the Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) insofar as it is between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3. The Court has supplemental jurisdiction of the State law claim pursuant to 28 U.S.C. § 1367(a) insofar as it is so related to the federal claim in this action that it forms part of the case or controversy under Article III of the United States Constitution.

4. Venue is proper in this District under 28 U.S.C. § 1400(a), insofar as defendants or their agents, including, without limitation, Wixen Music Publishing, Inc. ("Wixen"), reside or may be found here, or, alternatively, under 28 U.S.C. § 1391(b)(1), insofar as at least one defendant resides in this District and all defendants are residents of the State of California, or, alternatively, under 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the events or omissions giving rise to the claims occurred in this District, or, alternatively, under 28 U.S.C. § 1391(b)(3), insofar as at least one defendant is subject to the Court's personal jurisdiction here.

## **THE PARTIES**

5. Plaintiff is an individual domiciled in Los Angeles County, California, and the Trustee of The Veritas Trust, a California trust formerly known as The Inshallah Trust.

///

///

6. Plaintiff is informed and believes, and upon that basis alleges, that defendant Mary Bono is an individual domiciled in Colorado and the Trustee of The Bono Collection Trust.

7. Plaintiff is presently unaware of the true names and/or the involvement of the defendants sued herein by the fictitious designations Does 1-10 and for that reason sues them by those designations. Plaintiff will seek leave of Court to amend this pleading to identify those defendants when their true names and involvement in the infringements hereinafter described are known.

## BACKGROUND FACTS

### Plaintiff and the Music that She and Sonny Bono Made Famous

8. Plaintiff is a world-renowned Grammy, Oscar, Emmy, and Golden Globe award-winning singer, recording artist, and actor.

9. In or about 1964, Plaintiff and the late Salvatore ("Sonny") Bono began performing together as the musical group, Sonny and Cher. They married in 1967 and during their marriage they achieved unparalleled success as a musical duo and television personalities. Among other things, they publicly performed and recorded multiple hit musical compositions – including musical compositions written, co-written, or acquired by Sonny during their marriage – and starred in their own television series. They performed and recorded numerous classic popular musical compositions during their marriage, including, by way of example only, *I Got You Babe*, *The Beat Goes On*, *Baby Don't Go*, *Little Man*, and *Bang Bang*.

10. When they divorced, Plaintiff and Sonny agreed to an equal division of their community property and, to that end, in 1978 Sonny irrevocably assigned to Plaintiff, as her sole and separate property throughout the world and in perpetuity, fifty percent of their rights in musical composition royalties, record royalties, and other assets. Since 1978, Plaintiff has been the unchallenged owner of her fifty percent of all musical composition and record royalties to which Plaintiff and Sonny were

entitled by reason of their collaboration and marriage, including fifty percent of all royalties that Sonny, his businesses, and his successors, receive from those musical compositions and recordings.

11. This action has become necessary because now, more than forty years after Plaintiff received her fifty percent ownership of her and Sonny's community property, Sonny's fourth wife and widow, defendant Mary Bono, claims that a wholly inapplicable statutory termination provision of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, has undone Plaintiff's ownership of her royalties from the songs and recordings that she and Sonny made famous during their marriage, and deprived Plaintiff of other long-established rights under the 1978 agreement.

**Plaintiff and Sonny's 1978**

**Marriage Settlement Agreement**

12. On or about February 1, 1974, Plaintiff and Sonny separated and in 1975 their marriage was dissolved by the California Superior Court in an action for marital dissolution, subject to the disposition of Plaintiff and Sonny's community property.

13. On or about August 10, 1978, Plaintiff and Sonny entered into a written Marriage Settlement Agreement, which is expressly governed by California law and was subsequently approved by the California Superior Court in their marital dissolution action.

14. In paragraphs (9) and (10) of their Marriage Settlement Agreement, they agreed to the equal division of their community property. To accomplish that equal division, in paragraph (10) of their Marriage Settlement Agreement Sonny assigned to Plaintiff, as her sole and separate property, an undivided fifty percent interest in various community properties they owned as of their February 1, 1974, separation.

15. In paragraphs (10)(a), (b), and (c) of their Marriage Settlement Agreement, Sonny assigned to Plaintiff an undivided fifty percent of all contingent receipts after July 14, 1978 (the "Record Royalties"), pursuant to recording contracts entered into prior to their separation (the "Recording Contracts"), with the record

companies Atlantic Recording Corporation, York Records, Imperial Records, Liberty Records, and MCA Records, Inc. (the "Record Companies"), and Sonny also agreed that Plaintiff has the right to elect to have her fifty percent of Record Royalties paid directly to her.

16. Further, in paragraph (10)(d) of their Marriage Settlement Agreement Sonny assigned to Plaintiff, as her sole and separate property, an undivided fifty percent interest in, among other things, all of Sonny's right, title, and interest, individually or through any business, corporation, firm, or entity in which he had an interest (referred to as his "other business" or "other businesses"), the contingent receipts that he and his other business received after July 14, 1978, "from all sources perpetually and throughout the world" (the "Composition Royalties"), from musical compositions and interests in musical compositions that he wrote in whole or part and/or acquired prior to their February 1, 1974, separation (collectively, the "Musical Compositions").

17. Sonny also agreed to account, or to cause others to account, directly to Plaintiff for her fifty percent of share of the Composition Royalties, after deduction of a ten percent administration fee paid to a worldwide administrator or administrators chosen by Sonny. In addition, Sonny agreed that Plaintiff has the right to approve all other agreements with third parties respecting the Musical Compositions and Composition Royalties that are the subject of paragraph (10)(d), with her approval not to be unreasonably withheld.

18. The Marriage Settlement Agreement expressly binds the two parties' respective heirs and assigns. Also, Sonny specifically agreed in paragraph (10)(d) that his successors in interest, his assigns, and all third parties with whom he or any of his other businesses contract, are subject to Plaintiff's rights as set forth in that paragraph (10)(d).

19. In the years following Plaintiff's and Sonny's 1978 Marriage Settlement Agreement, Plaintiff received sums that Sonny or his designees represented were

Plaintiff's fifty percent of all Record Royalties and Composition Royalties (collectively, the "Royalties") that Sonny or his other businesses received, directly or indirectly, and, to the best of Plaintiff's knowledge and belief, Sonny and his other businesses honored Plaintiff's approval and other rights under the Marriage Settlement Agreement.

**Sonny's 1998 Death and His Estate's Confirmation of Plaintiff's Ownership of Fifty Percent of the Royalties**

20. In January 1998, Sonny died from injuries suffered in a skiing accident.

21. Shortly after his death, a probate action was initiated in the California Superior Court and his widow, defendant Mary Bono, was appointed the administrator of his Estate. Pursuant to California law, Ms. Bono, as administrator of the Estate, had the right to approve creditor's claims.

22. In July 1998, Plaintiff caused to be filed in the probate action her creditor's claim, raising Sonny's obligations to her under the Marriage Settlement Agreement, including but not limited to the obligation to pay and account to her for monies due under paragraph (10) of the Marriage Settlement Agreement and which include Plaintiff's fifty percent of the Royalties.

23. In July 1999, Ms. Bono, as administrator of the Estate, caused to be filed in the probate action the written agreement reached with Plaintiff regarding Plaintiff's creditor's claim (the "Agreement *re* Creditor's Claim"). In the Agreement *re* Creditor's Claim:

(a) Ms. Bono "acknowledge[d] Plaintiff's interest in certain ongoing royalties relating to the assets inventoried in this estate as Items 1 through 4 on Attachment 2 of the Final Inventory and Appraisement filed herein on March 17, 1999," Item 1 of which is "Music portfolio assets including royalties and publishing rights";

(b) Plaintiff confirmed that her creditor's claim was limited "to her ongoing rights under the terms and conditions of the [Marriage

Settlement Agreement], and the judgment entered in the subject marital dissolution proceeding," that Sonny was not in breach of the Marriage Settlement Agreement, and that, in the course of administering the Estate, Ms. Bono had disbursed to Plaintiff her share of the Royalties as provided in the Marriage Settlement Agreement.

(c) Ms. Bono and Plaintiff agreed, "[i]n recognition of Plaintiff's continuing right to receive such royalty interests, and in the interests of the heirs of the estate, … to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate."

The Agreement *re* Creditor's Claim filed in the probate action includes and ends with Ms. Bono's express approval, as administrator of the Estate, of Plaintiff's creditor's claim.

**The Estate's 1999 Distribution of its Assets, Subject to Plaintiff's Ownership of Fifty Percent of the Royalties, to Sonny's Heirs**

24. In August 1999, the probate court entered its Order Approving First and Final Account and Report and:

(a) Confirmed that all creditor's claims have either been approved, compromised, or settled;

(b) Confirmed that the residue of the Estate included the "Music portfolio assets including royalties and publishing rights" referenced in the Agreement *re* Creditor's Claim; and

(c) Directed that the residue be distributed to Sonny's heirs, namely Ms. Bono, Chesare Bono, Chianna Bono, Christy Bono, and Chastity (Chaz) Bono (the "Heirs").

25. Following the Heirs' receipt of their distributions in 1999, Plaintiff received sums that they or their designees represented were Plaintiff's fifty percent of all Royalties they received, directly or indirectly, as her share of community property

assigned to her under the Marriage Settlement Agreement as her separate property, and, to the best of Plaintiff's knowledge and belief, the Heirs honored Plaintiff's approval and other rights under the Marriage Settlement Agreement.

**The Veritas Trust and**
**The Bono Collection Trust**

26. In 1990, Plaintiff formed The Veritas Trust, initially known as the Inshallah Trust, and transferred to herself, as Trustee of that Trust, her undivided fifty percent ownership of the Royalties, including her rights to receive accountings and payments with respect to her fifty percent interest.

27. Plaintiff is informed and believes, and upon that basis alleges, that at some time prior to April 2011, the Heirs transferred their rights to receive Royalties, subject to their obligations to pay and account to Plaintiff with respect to her fifty percent of the Royalties, to The Bono Collection Trust, of which Ms. Bono is the sole Trustee.

**The 2011 Agreements with**
**Wixen Music Publishing, Inc.**

28. In or about April 2011, The Bono Collection Trust and The Veritas Trust entered into three agreements with Wixen:

(a) an Administration Agreement providing Wixen a ten percent commission on publishing income with respect to the Musical Compositions;

(b) a Collection Agreement relating to Record Royalties and certain performance monies and providing Wixen a ten percent commission with respect to those Record Royalties and performance monies; and

(c) a Promotion Agreement providing Wixen a fifteen percent commission on receipts from opportunities it obtains to exploit Musical Compositions and other properties that were the community property of

Plaintiff and Sonny and part of their equal division of their community property pursuant to the Marriage Settlement Agreement (the "Wixen Agreements").

29. Each of the Wixen Agreements provides for an initial two-year term followed by successive six-month terms, and also provides that each party has the right to terminate the Wixen Agreements. Each agreement also provides that termination of one of the three agreements terminates them all.

30. Both the Administration Agreement and Collection Agreement provide that Wixen shall not be involved in any attempts by The Bono Collection Trust or The Veritas Trust Copyright Act to terminate transfers of copyrights, recapture copyright interests, or issue termination notices, with the sole exception that Wixen shall, at the request of The Bono Collection Trust and The Veritas Trust, assist them in locating and engaging counsel to provide those services.

31. Under one or more of the Wixen Agreements, Wixen, after deducting its commission or commissions, has since April 2011 collected and disbursed to Plaintiff (or her Trust) sums that Wixen represented constitute Plaintiff's fifty percent of Royalties that Sonny assigned to Plaintiff in the Marriage Settlement Agreement as her share of their community property, and, to the best of Plaintiff's knowledge and belief, the Heirs honored Plaintiff's approval and other rights under the Marriage Settlement Agreement.

**Ms. Bono's 2016 Notice of the Claimed 17 U.S.C. § 304(c)**
**Termination of Sonny's Pre-1978 Music Publishing Grants**

32. Section 304(c) of the Copyright Act of 1976 provides, subject to various conditions and limitations, that a deceased author's widow or widower and surviving children may terminate the deceased author's grant of a transfer or license of a renewal copyright or any right under it, executed prior to January 1, 1978.

33. Plaintiff is informed and believes, and upon that basis alleges, that in or about 2016, Ms. Bono, with the assistance or participation of Wixen, issued a notice

of termination(the "Notice of Termination" or "Notice") to various music publishers to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in the Musical Compositions. The Notice identified the music publishers whose rights are being terminated, and specified various effective dates of termination ranging from dates in 2018 to 2026.

34. The Notice of Termination did not purport to terminate any grants to Record Companies, nor could the Notice have done so.

(a) The Notice of Termination was not served on the Record Companies, does not identify any Record Companies as grantees whose rights are being terminated, and did not purport to terminate any of the Recording Contracts. As a result, all of the Record Royalties, of which fifty percent is owned by Plaintiff, are paid pursuant to Recording Contracts that the Notice did not mention and did not purport to terminate.

(b) Also, Section 304(c)(6)(E) provides that termination under that Section affects only grants of rights that arise under Title 17 of the United States Code. Sound recordings were not protected under Title 17 until February 15, 1972, when the Copyright Act was amended to extend federal copyright protection to sound recordings created on or after that date. However, all of the Recording Contracts and the majority of the sound recordings created under them, were created prior to February 15, 1972. As a result, their grants were not grants of rights arising under title 17 of the United States Code when the Notice of Termination was issued in 2016.

(c) In addition, upon information and belief, all of the Recording Contracts provide that the sound recordings are works for hire. If that is the case, their grants cannot be terminated under Section 304(c)

///

because that Section expressly excludes from its scope grants as to copyrights in a work for hire.

35. The Notice of Termination was issued without Plaintiff's knowledge or participation, and Plaintiff never requested that Wixen assist in the issuance of any Notice of Termination.

36. Following the 2016 Notice of Termination, Wixen, after deducting its commission or commissions, has continued to collect and disburse to Plaintiff (or her Trust) sums that Wixen represented constitute Plaintiff's fifty percent of Royalties that Sonny assigned to Plaintiff in the Marriage Settlement Agreement as her share of their community property, and, to the best of Plaintiff's knowledge and belief, Ms. Bono and the other Heirs honored Plaintiff's approval and other rights under the Marriage Settlement Agreement.

**Defendants' Claim that Ms. Bono's § 304(c) Termination of Music Publishing Grants Also Terminates Plaintiff's Rights, Including Her Ownership of Fifty Percent of the Royalties**

37. In or about September 2021, representatives of Ms. Bono and The Bono Collection Trust advised Plaintiff's representatives that Ms. Bono and The Bono Collection Trust contend that the § 304(c) Notice of Termination, by terminating grants to music publishers that have paid Royalties to The Bono Collection Trust, also terminates the stream of Composition Royalties that Sonny assigned to Plaintiff in the 1978 Marriage Settlement Agreement and, as a result, Ms. Bono's statutory termination ends Plaintiff's right to those Royalties. Based on that contention, The Bono Collection Trust has advised Plaintiff that upon the effective dates of Ms. Bono's termination of each of the music publisher and other contracts, The Bono Collection Trust will no longer pay and account to Plaintiff for her fifty percent ownership of the Composition Royalties that Sonny assigned to Plaintiff in the Marriage Settlement Agreement as her share of their community property.

///

38. In addition, Ms. Bono and The Bono Collection Trust now contend that Plaintiff no longer has approval rights with respect to all agreements with third parties respecting the Musical Compositions and Composition Royalties; no longer is entitled to direct payment of fifty percent of Record Royalties directly from record companies; no longer is entitled to object to administration fees in excess of ten percent; and does not have the right to terminate the Wixen Agreements and, if Plaintiff has that right, by her 2011 approval of the Wixen Agreements she is deemed to have irrevocably approved any and all new agreements with Wixen.

39. Plaintiff disputes each of Ms. Bono's and The Bono Collection Trust's contentions but Ms. Bono and The Bono Collection Trust continue to adhere to their contentions and, among other things, have claimed and will continue to claim Plaintiff's fifty percent of the Composition Royalties, and have ceased honoring Plaintiff's full rights under the Marriage Settlement Agreement.

**<u>FIRST CLAIM FOR RELIEF</u>**

**(For Declaratory Relief as to Effect of**

**17 U.S.C. § 304(c) Termination on Plaintiff's Rights)**

**(Against Defendants)**

40. Plaintiff refers to and re-alleges each and every allegation contained in paragraphs 1 through 39, inclusive, above, as if set forth herein.

41. Section 304(c) provides, *inter alia*, that termination under that Section is limited to grants by an author executed prior to January 1, 1978, of rights in renewal copyrights or rights under renewal copyright; that a Notice of Termination must be timely served on the grantee or the grantee's successor in title and recorded with the Copyright Office; and that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under the Copyright Act, and in no way affects rights arising under any other Federal, State, or foreign laws."

///

///

42. Plaintiff contends that even if, and to the extent that, the § 304(c) Notice of Termination is valid and effective:

(a) The Notice did not terminate, and could not have terminated, the Marriage Settlement Agreement or its recognition and confirmation of Plaintiff's community property, the Marriage Settlement Agreement's assignment to her of fifty percent of the Royalties as her sole and separate property in perpetuity and throughout the world, and Plaintiff's other rights under the Marriage Settlement Agreement, or any of the foregoing;

(b) The Notice did not terminate, and could not have terminated, grants executed by Sonny on or after January 1, 1978, of renewal copyrights, or rights under renewal copyrights, in the Musical Compositions, and, as a result, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(c) The Notice did not terminate Sonny's grants of rights under the Recording Contracts, including because the Notice was not served on the Record Companies and does not identify the Record Companies as grantees whose rights were being terminated;

(d) The Notice did not terminate, and could not have terminated, Sonny's grants of renewal copyrights, or rights under renewal copyrights, in the Musical Compositions that he did not author or co-author but instead acquired prior to July 14, 1978, and, for that additional reason, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(e) The Notice did not terminate, and could not have terminated, Sonny's grants of rights outside the United States and, for

///

that additional reason, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(f) The Marriage Settlement Agreement's recognition and confirmation of Plaintiff and Sonny's community property, including the Record Royalties, Musical Compositions, and Composition Royalties, is not a grant of renewal copyrights, or rights under renewal copyrights, and, instead, Plaintiff's fifty percent ownership of Record Royalties, Musical Compositions, and Composition Royalties arose under State law and, for that additional reason, are not subject to § 304(c) termination;

(g) Sonny's assignment to Plaintiff in the Marriage Settlement Agreement of an undivided fifty percent ownership of the Royalties is not a grant of renewal copyrights or rights that arise under the Copyright Act and, for that additional reason, is not subject to § 304(c) termination; and

(h) Plaintiff's approval rights and other rights under the Marriage Settlement Agreement, and her termination rights under the Wixen Agreements, are rights that arise under State law and not rights that arise under the Copyright Act and, for that additional reason, are not subject to § 304(c) termination.

43. Plaintiff further contends that, despite Ms. Bono's Notice of Termination, Plaintiff, individually or as the Trustee of The Veritas Trust:

(a) Continues to own and owns an undivided fifty percent of the Composition Royalties, from any and all sources, including whether those sources are music publishers or other companies identified in the Notice of Termination or others taking their place upon termination of Sonny's grants to them;

(b) Continues to own and owns an undivided fifty percent of the Record Royalties payable under the Recording Contracts;

(c) Continues to have the right to reimbursement and compensation in the event that Sonny or his successors, including Ms. Bono, individually or as Trustee of The Bono Collection Trust, has agreed to, permitted, or allowed administrators to charge, and, in the calculation of Plaintiff's fifty percent of Composition Royalties, have deducted or deduct, administration fees in excess of ten percent;

(d) Continues to have approval rights as to any and all third party contracts with respect to the Musical Compositions and Royalties, including but not limited to any future agreement or agreements with Wixen;

(e) Continues to have the right to terminate the Wixen Agreements as expressly provided in the Wixen Agreement;

(f) Continues to have the right to disapprove a new agreement or agreements with Wixen, and the withholding of approval of Wixen is reasonable, including, without limitation, on the grounds that:

(1) Paying Wixen a commission to administer the Musical Compositions that already are administered by other music publishers in return for administration fees equal to or in excess of ten percent, violates the Marriage Settlement Agreement and exceeds the ability and authority of The Bono Collection Trust, as successor in interest to Sonny, to select administrators; and

(2) Plaintiff is informed and believes, and upon that basis alleges, that Wixen, without Plaintiff's knowledge or consent and in violation of the terms of the Administration Agreement and Collection Agreement, has encouraged, aided, and abetted defendants' scheme of misusing the Notice of Termination in an attempt to deprive Plaintiff of her rights and her ownership of her

fifty percent of Royalties that Sonny assigned to her in the Marriage Settlement Agreement as her share of their community property;

(g) Continues to have approval rights with respect to all other agreements with third parties respecting the Musical Compositions and Composition Royalties; and

(h) Continues to have the right to elect to have her fifty percent of Record Royalties paid directly to her by record companies.

44. Plaintiff is informed and believes, and upon that basis alleges, that defendants dispute the foregoing contentions, and each of them.

45. A judicial declaration of the respective rights and obligations of Plaintiff and defendants is necessary and appropriate.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(For Breach of Contract)**

**(Against Defendants)**

46. Plaintiff refers to and re-alleges each and every allegation contained in paragraphs 1 through 44, inclusive, above, as if set forth herein.

47. The Marriage Settlement Agreement provides, *inter alia*, that it is binding upon, and inures to the benefit, of the parties and their respective heirs and assigns.

48. Plaintiff has performed all of her obligations, and satisfied all conditions to be satisfied by her, under the Marriage Settlement Agreement, except as her performance and satisfaction are excused by reason of the defendants' breaches.

49. Defendants have breached, or anticipatorily breached, or both, the Marriage Settlement Agreement by:

(a) Refusing to pay, and directing Wixen not to pay, to Plaintiff, as Trustee of the Veritas Trust, her undivided fifty percent of the United States Composition Royalties;

(b) Repudiating Plaintiff's approval rights with respect to all agreements with third parties respecting the Musical Compositions and Composition Royalties, including new agreements with Wixen;

(c) Repudiating Plaintiff's right to terminate the Wixen Agreements;

(d) Agreeing to, permitting, or allowing Wixen and possibly others to charge administration fees in addition to those administration fees charged by other music publishers with respect to the same Composition Royalties, thereby increasing the levels of administration and increasing the administration fees charged against and deducted from those Composition Royalties and, as a result, violating the Marriage Settlement Agreement's limit on administration fees and reducing the amount paid to Plaintiff after deduction of those excessive administration fees; and

(e) Refusing to honor Plaintiff's election to have her fifty percent of Record Royalties paid directly to her, as expressly provided in the Marriage Settlement Agreement.

The full nature and extent of defendants' breaches are not presently known and Plaintiff will, if necessary and appropriate, seek leave of Court to amend this Complaint to allege all of defendants' breaches once they are ascertained.

50. As a direct and proximate result of defendants' breaches, Plaintiff has sustained damages, and will continue to sustain damages, in an amount not presently known but believed to exceed $1,000,000.

51. Plaintiff is entitled to and requests the imposition of a constructive trust on the undivided fifty percent of Royalties that she owns but which defendants have received and failed to pay over to her or instruct that she be paid directly.

///

///

**PRAYER**

**WHEREFORE,** Plaintiff prays for judgment as follows:

1. On the First Claim for Relief for declaratory relief against defendants, a declaration in accordance with plaintiff's contentions, including as follows, and such further necessary or proper relief as Plaintiff may request based on that declaration:

(a) The Notice of Termination did not terminate, and could not have terminated, the Marriage Settlement Agreement or its recognition and confirmation of Plaintiff's community property, the Marriage Settlement Agreement's assignment to her of fifty percent of the Royalties as her sole and separate property in perpetuity and throughout the world, and Plaintiff's other rights under the Marriage Settlement Agreement, or any of the foregoing;

(b) The Notice did not terminate, and could not have terminated, grants executed by Sonny on or after January 1, 1978, of renewal copyrights, or rights under renewal copyrights, in the Musical Compositions, and, as a result, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(c) The Notice did not terminate Sonny's grants of rights under the Recording Contracts, including because the Notice was not served on the Record Companies and does not identify the Record Companies as grantees whose rights were being terminated;

(d) The Notice did not terminate, and could not have terminated, Sonny's grants of renewal copyrights, or rights under renewal copyrights, in the Musical Compositions that he did not author or co-author but instead acquired prior to July 14, 1978, and, for that additional reason, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(e) The Notice did not terminate, and could not have terminated, Sonny's grants of rights outside the United States and, for that additional reason, has no effect on Plaintiff's ownership of fifty percent of all Composition Royalties received pursuant to those grants;

(f) The Marriage Settlement Agreement's recognition and confirmation of Plaintiff and Sonny's community property, including the Record Royalties, Musical Compositions, and Composition Royalties, is not a grant of renewal copyrights, or rights under renewal copyrights, and, instead, Plaintiff's fifty percent ownership of Record Royalties, Musical Compositions, and Composition Royalties arose under State law and, for that additional reason, are not subject to § 304(c) termination;

(g) Sonny's assignment to Plaintiff in the Marriage Settlement Agreement of an undivided fifty percent ownership of the Royalties is not a grant of renewal copyrights or rights that arise under the Copyright Act and, for that additional reason, is not subject to § 304(c) termination;

(h) Plaintiff's approval rights and other rights under the Marriage Settlement Agreement, and her termination rights under the Wixen Agreements, are rights that arise under State law and not rights that arise under the Copyright Act and, for that additional reason, are not subject to § 304(c) termination; and

(i) Despite the Notice of Termination, Plaintiff, individually or as the Trustee of The Veritas Trust:

(1) Continues to own and owns an undivided fifty percent of the Royalties, from any and all sources, including whether those sources are music publishers or other companies identified in the Notice of Termination or others taking their place upon termination of Sonny's grants to them;

///

(2) Continues to have the right to reimbursement and compensation in the event that Sonny or his successors, including Ms. Bono, individually or as Trustee of The Bono Collection Trust, has agreed to, permitted, or allowed administrators to charge, and, in the calculation of Plaintiff's fifty percent of Composition Royalties, have deducted or deduct, administration fees in excess of ten percent;

(3) Continues to have approval rights as to any and all third party contracts with respect to the Musical Compositions and Royalties, including but not limited to any future agreement or agreements with Wixen;

(4) Continues to have the right to terminate the Wixen Agreements as expressly provided in the Wixen Agreement;

(5) Continues to have the right to disapprove a new agreement or agreements with Wixen, and the withholding of approval of Wixen is reasonable, including, without limitation, on the grounds that:

(i) Paying Wixen a commission to administer the Musical Compositions that already are administered by other music publishers in return for administration fees equal to or in excess of ten percent, violates the Marriage Settlement Agreement and exceeds the ability and authority of The Bono Collection Trust, as successor in interest to Sonny, to select administrators; and

(ii) Plaintiff is informed and believes, and upon that basis alleges, that Wixen, without Plaintiff's knowledge or consent and in violation of the terms of the Administration Agreement and Collection Agreement, has

encouraged, aided, and abetted defendants' scheme of misusing the Notice of Termination in an attempt to deprive Plaintiff of her rights and her ownership of her fifty percent of Royalties that Sonny assigned to her in the Marriage Settlement Agreement as her share of their community property;

(6) Continues to have approval rights with respect to all other agreements with third parties respecting the Musical Compositions and Composition Royalties; and

(7) Continues to have the right to elect to have her fifty percent of Record Royalties paid directly to her by record companies;

2. On the Second Claim for Relief for breach of contract, damages according to proof but believed to exceed $1,000,000;

3. For Plaintiff's costs of suit and, to the extent permitted by law, reasonable attorneys' fees;

4. For prejudgment interest on all sums awarded; and

5. For such other and further relief as the Court deems just and proper.

Dated: March 28, 2023

/s/ Peter Anderson
Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
CHER
Individually and as Trustee of
The Veritas Trust

## DEMAND FOR JURY TRIAL

Plaintiff Cher respectfully demands trial by jury of all issues and claims as to which there is a right of trial by jury.

Dated: March 28, 2023

/s/ Peter Anderson
Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
CHER
Individually and as Trustee of
The Veritas Trust

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-08157 JAK (RAO) | Date | March 14, 2023 |
| Title | Cher v. Mary Bono, et al. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
| Patricia Kim | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION TO DISMISS (DKT. 18); AND**

**FIRST STIPULATION TO EXTEND DEADLINES (DKT. 40)**

## I. <u>Introduction</u>

On October 13, 2021, Cher ("Plaintiff") brought this action against Mary Bono ("Defendant"), the widow of Salvatore Bono ("Sonny"). Dkt. 1.[1] The Complaint advances two causes of action that arise from a dispute over musical composition and recording royalties: (1) declaratory relief regarding the effect of 17 U.S.C. § 304(c) termination on Plaintiff's rights; and (2) breach of contract. *Id.* ¶¶ 39–50.

On December 8, 2021, Defendant filed a motion to dismiss the Complaint. Dkt. 18 (the "Motion"). On December 22, 2021, Plaintiff filed an opposition. Dkt. 19 (the "Opposition"). On January 12, 2022, Defendant filed a reply. Dkt. 20 (the "Reply").

A hearing on the Motion was held on April 25, 2022. Dkt. 23. For the reasons stated in this Order, the Motion is **GRANTED IN PART WITHOUT PREJUDICE**, *i.e.,* with leave to amend, as to Plaintiff's claims based on the Record Royalties. The Motion is **DENIED** as to Plaintiff's claims based on the Composition Royalties. The Scheduling Order is amended as stated in this Order.

## II. <u>Factual Background</u>

### A. The Parties

It is alleged that Plaintiff is a resident of Los Angeles County, California, and the trustee of The Veritas Trust, which is a California trust. Dkt. 1 ¶ 5.

It is alleged, on information and belief, that Defendant is a resident of Colorado and the trustee of the

[1] The use of the first name of Mr. Bono follows the common protocol to do so when two or more persons with the same last name are parties or otherwise identified in an action. No disrespect is intended by doing so in order to simplify the discussion in this Order.

Bono Collection Trust. *Id.* ¶ 6. It is alleged that Defendant is Sonny's widow and was appointed as the administrator of Sonny's estate upon his death in 1998. *Id.* ¶¶ 20–21.

B. Allegations in the Complaint

It is alleged that Plaintiff and Sonny performed together, were married in 1967 and achieved success as performers and television personalities. *Id.* ¶ 9. It is also alleged that they performed and recorded several very popular musical compositions, including some written or acquired by Sonny during the marriage. *Id.* It is alleged that the marriage of Plaintiff and Sonny was dissolved in 1975, through a judgment entered by the Los Angeles Superior Court. *Id.* ¶ 12.

1. <u>1978 Marriage Settlement Agreement ("MSA")</u>

It is alleged that, as part of their dissolution proceedings in the Los Angeles Superior Court, in August 1978, Plaintiff and Sonny entered into a written Marriage Settlement Agreement ("MSA"). *Id.* ¶ 13; *see* Dkt. 18-2, Ex. A. The MSA states that it is governed by California law; it was approved by the Los Angeles Superior Court. *Id.*

The MSA assigned to Plaintiff an "undivided 50% interest" in the following:

- Any and all contingent receipts payable after July 14, 1978, "from Atlantic Recording Corporation under the agreement dated August 30, 1966 . . . from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 . . . [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971" (the "Record Royalties"), *see* Dkt. 18-2, Ex. A at 11–12, ¶ 10(a)–(c); and

- Any and all of Sonny's "right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as 'other business')" in and to contingent receipts payable after July 14, 1978, "from musical compositions and interests therein, written and composed, in whole or in part, by [Sonny] or others prior to February 1, 1974, and/or acquired by [Sonny and certain other entities] prior to [the couple's separation]" (the "Composition Royalties"), *id.* at 12, ¶ 10(d).

The MSA further provides that Plaintiff has the right to approve all other agreements with third parties regarding the musical compositions and Composition Royalties that are the subject of Paragraph 10(d). *Id.* at 13, ¶ 10(d).

The MSA also provides that all of Sonny's successors in interest, assigns, and all third parties with whom he or any of his other businesses had contracted, were subject to Plaintiff's rights set forth in Paragraph 10(d). *Id.*

It is alleged that, pursuant to the MSA, Sonny and his other businesses recognized Plaintiff's approval and other rights under the MSA, and that Plaintiff received payments that were represented to be her 50% percent share of all Record Royalties and Composition Royalties. Dkt. 1 ¶ 19.

2. <u>Sonny's Death in 1998</u>

It is alleged that Sonny died in January 1998, and that a probate action was initiated thereafter in the Los Angeles Superior Court. *Id.* ¶¶ 20–21. It is alleged that Plaintiff filed a creditor's claim in that action, raising Sonny's obligations to her under the MSA. *Id.* ¶ 22. It is alleged that, in July 1999, Plaintiff and Defendant, as administrator of Sonny's estate, reached an agreement as to Plaintiff's claim, recognizing Plaintiff's ongoing rights under the terms and conditions of the MSA. *Id.* ¶ 23.

It is alleged that the Superior Court approved Plaintiff's claim, and that Defendant subsequently honored Plaintiff's rights under the MSA, including her 50% percent interest in the Record and Composition Royalties. *Id.* ¶ 25.

3. <u>2016 Notice of Termination of Sonny's Pre-1978 Music Publishing Grants</u>

It is alleged that in 2016, Defendant issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers to whom Sonny had granted a transfer or license of copyright in musical compositions authored or co-authored by Sonny, with effective termination dates ranging from 2018 to 2026. *Id.* ¶ 33. It is alleged that the notice of termination was issued without Plaintiff's knowledge or consent. *Id.* ¶ 34.

It is alleged that Defendant has advised Plaintiff that the § 304(c) notice of termination also terminates Plaintiff's 50% share of Composition Royalties under the MSA. *Id.* ¶ 36. It is alleged that Defendant further contends that Plaintiff is no longer entitled to Plaintiff's other rights under the MSA, including Plaintiff's approval rights with respect to all agreements with third parties regarding Sonny's musical compositions and the Composition Royalties and Plaintiff's 50% share of the Record Royalties. *Id.* ¶ 37.

C. Prayer for Relief

As noted, the Complaint asserts two causes of action: (1) declaratory relief regarding the effect of the § 304(c) termination notice on Plaintiff's rights under the MSA; and (2) breach of contract. *Id.* ¶¶ 39–50. As to the first cause of action, the Complaint seeks a judicial declaration, including that Defendant's notice of termination did not terminate the MSA or its recognition of Plaintiff's community property rights and holdings. *Id.* at 16–19.The second cause of action seeks compensatory damages. *Id.* at 20.

## III. <u>Request for Judicial Notice</u>

In support of the Opposition, Defendant filed a Request for Judicial Notice ("RFN" (Dkt. 13)). The RFN seeks judicial notice of the MSA, and the Certificate of Recordation of the notice of termination on October 14, 2016. *See* Dkt. 18-2, Ex. A at 5–43 (the "MSA"); *id.*, Ex. B at 44–63 (the "Termination Notice").

Fed. R. Evid. 201(b) provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Consideration of such materials ensures that "allegations that contradict matters properly subject to judicial notice or by exhibit" are not simply "accept[ed] as true" in connection with a motion to dismiss. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citing *Mullis v. U.S. Bankr. Ct.*,

828 F.2d 1385, 1388 (9th Cir. 1987)). A court may take judicial notice of a wide range of records, including public records, government documents, judicial opinions, municipal ordinances, newspaper and magazine articles and the contents of websites. *See, e.g.*, *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 259 n.2 (9th Cir. 2013); *Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007); *United States v. Chapel*, 41 F.3d 1338, 1342 (9th Cir. 1994); *Heidelberg USA, Inc. v. PM Lithographers, Inc.*, No. CV1702223ABAJWX, 2017 WL 7201872, at *2 (C.D. Cal. Oct. 19, 2017); *United States, ex rel. Modglin v. DJO Glob., Inc.*, 114 F. Supp. 3d 993, 1008 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017).

The RFN seeks notice of public records which, under Rule 201(b)(2), are properly subject to judicial notice. The MSA was filed publicly on the docket of the Los Angeles County Superior Court in Plaintiff and Sonny's marital dissolution action, *Salvatore P. Bono v. Cher Bono*, Case No. D842001. See Dkt. 18-2 at 3. Moreover, the Complaint references the MSA multiple times and is the basis for Plaintiff's claims against Defendant. The Certificate of Recordation of the notice of termination is also a public record filed with the United States Copyright Office and has also been referred to in the Complaint. Plaintiff has not opposed the request for judicial notice of these documents, and their authenticity is not disputed.

For the foregoing reasons, the RFN is **GRANTED**.

## IV. <u>Motion to Dismiss</u>

### A. Legal Standards

#### 1. <u>Stating a Claim</u>

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading must allege facts that if established would be sufficient to show that a claim for relief is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not include detailed factual allegations but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Fed. R. Civ. P. 12(b)(6) permits a party to move to dismiss a cause of action that fails to state a claim. It is appropriate to grant such a motion "only where the complaint lacks a cognizable legal theory or sufficient facts to support" one. *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Fed. R. Evid. 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g.*, *id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

2. Copyright Preemption

The Ninth Circuit has adopted a two-part test to determine whether a state law claim is preempted by the Copyright Act. *First*, it must be determined "whether the 'subject matter' of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103." *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006) (interpreting 17 U.S.C. § 301). Section 102 of the Copyright Act affords copyright protection to "original works of authorship fixed in any tangible medium of expression," including "pictorial, graphic, and sculptural works." 17 U.S.C. § 102.

*Second*, if the claim falls within the subject matter of copyright, it must be determined "whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Laws*, 448 F.3d at 1137–38. The exclusive rights provided in Section 106 include the right "to reproduce the copyrighted work in copies[,]" "to prepare derivate works[,]" "to distribute copies . . . to the public by sale or other transfer of ownership" and "to display the copyrighted work publicly." 17 U.S.C. § 106. "To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an extra element which changes the nature of the action." *Laws*, 448 F.3d at 1143 (internal quotation marks and citation omitted).

B. Application

1. First Cause of Action for Declaratory Relief

a) Legal Standards

The parties agree that the underlying works at issue, which are musical compositions and sound recordings, are subject to the Copyright Act. *See* 17 U.S.C. § 102(a) (federal copyright law protects "original works of authorship" including "musical works" and "sound recordings"). The Copyright Act includes a right of termination that "allows an author, if he is living, or his widow and children, if he is not, to recapture . . . rights that had previously been transferred to third parties." *Classic Media, Inc. v.*

*Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008).

Defendant's termination notice relied on the termination right provided in 17 U.S.C. § 304(c). That provision states, in relevant part, that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978 . . . the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978," may be terminated by the author's widow and surviving children by providing "advance notice in writing upon the grantee." *Id.* §§ 304(c)(1)–(4).[2] "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *Id.* § 304(c)(5).

These provisions were enacted to "award to the author, and not to the assignee of the right to exploit the copyright during its initial term, the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success." *Classic Media*, 532 F.3d at 983. Thus, "all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest." 17 U.S.C § 304(c)(6). However, termination under § 304(c) "affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws." *Id.* § 304(c)(6)(E).

b) Application

The declaratory relief claim seeks a judicial declaration that the termination notice did not terminate the copyright grants made by Sonny or through the MSA. Dkt. 1 ¶ 41. Based on these contentions, it seeks a determination that the termination notice did not affect either Plaintiff's royalty rights or Plaintiff's approval rights regarding third-party contracts with respect to Sonny's musical compositions and royalties. *See id.* at 16–19.

The parties agree that the termination notice did not terminate the MSA, and that Plaintiff's royalty and approval rights arise under state law. *See, e.g.*, Motion at 15 n.9; Reply at 11–12. However, certain of those royalty rights are dependent on the existence of the underlying copyright grants.

As to the Record Royalties, the MSA states that there shall be an equal division of "any and all contingent receipts from [certain agreements with record companies] under the agreement[s] . . . with respect to master recordings" of either or both Sonny and Cher. *See* Dkt. 18-2 at 11–13, ¶ 10(a)–(c). Thus, these royalties are only relevant if the agreements with the record companies remain in force. Those agreements transferred or licensed certain copyrights to record companies, and the agreements were the subject of Defendant's termination notices. With respect to the Record Royalties, the MSA does not include any provisions specifying the ownership or assignment of those copyright grants, nor their continued existence. Instead, the MSA only relates to the subsequent allocation of those royalties that arise from the copyright grants.

As noted, Section 304 of the Copyright Act provides to Defendant, as Sonny's widow, and to his surviving children, an inalienable right to terminate those grants, within a specified time period and by

[2] 17 U.S.C. § 203 is a related provision of the Copyright Act. It provides similar termination rights for copyrights granted or executed on or after January 1, 1978.

using a prescribed notice procedure. Plaintiff agrees that Defendant has the right to terminate the copyright grants at issue, and does not raise any issues as to whether the procedural requirements for the notice of termination were met. *See, e.g.*, Opposition at 20 ("[N]othing in the MSA prevented the Heirs from terminating Sonny's grant of copyright rights to the music publishers.").

Consequently, once Defendant and Sonny's other heirs exercised the right to terminate certain of those grants as listed in the termination notice, there were no more royalties from those grants to pay to Plaintiff. However, the MSA remains in place. Defendant notes that Plaintiff continues to receive royalties and exercise approval rights for Sonny's non-terminated copyright grants, including foreign copyrights. *See* Motion at 16 n.8.

Plaintiff argues that Defendant cannot exercise her statutory right to terminate Sonny's copyright grants, and thereby effectively terminate Plaintiff's contractual royalty rights, because Plaintiff's rights are governed by state law. *See* Dkt. 19 at 16–18. Plaintiff cites several cases to support the position that royalty rights from copyrighted musical works arise solely under state law and cannot be subject to termination under the copyright statute. *See id.*

The cases on which Plaintiff relies are distinguishable, and do not support Plaintiff's contention that a contractual assignment of royalties from copyright grants cannot be affected by a termination of the grants. For example, *Yount v. Acuff Rose-Opryland* held that, when a party transferred the underlying copyright and obtained a contractual right to royalties from that copyright, "federal copyright law essentially ceased to be concerned with how that contractual royalty right or assignments of it would be enforced." 103 F.3d 830, 836 (9th Cir. 1996). Thus, that party's subsequent "assignment of contractual royalty interests alone" to someone else was governed by state law. *Id.* at 834. The dispute addressed in *Yount* involved only royalty rights, and did not arise with respect to the copyright underlying the royalties. Similarly, *Broad. Music, Inc. v. Hirsch* involved contractual assignments of royalties. 104 F.3d 1163 (9th Cir. 1997) Therefore, it was determined that the contracts were not subject to federal recording rules of the Copyright Act because the assignments did not involve the transfer of the underlying copyrights. *Id.* at 1166–67.

The dispute in this action is different in nature. It concerns Plaintiff's contractual royalty rights, which are directly related to the termination of the underlying copyright grants. Thus, federal law applies as to the existence and assignment of the underlying grants. This then affects whether there are any royalties due under those grants. *Ray Charles Found. v. Robinson*, 795 F.3d 1109 (9th Cir. 2015) is instructive. It held that a plaintiff receiving royalties from various copyright grants had standing under federal law to challenge the validity of defendant's termination notice of those grants. *Id.* at 1123. It also explained that, although a third party receiving royalties is "not expressly mentioned in the termination statutes," the plaintiff alleged a cognizable injury to its interest in the royalties because "[t]ermination, if effective, would directly extinguish the [plaintiff's] right to receive prospective royalties from the current grants." *Id.* at 1123–24. "This interest is the one Congress contemplated, regulated, and protected in enacting the termination provisions." *Id.* Although *Ray Charles* addressed a standing issue, its analysis as to the injury to plaintiff supports the view that federal termination rights can end contractual royalty rights by terminating the underlying copyright grants.

The practical effect of the termination notice is that Plaintiff no longer receives royalties for the copyright grants that no longer exist. Further, as Plaintiff concedes, the MSA "leaves the Heirs free to enter into

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-08157 JAK (RAO) | Date | March 14, 2023 |
| Title | Cher v. Mary Bono, et al. | | |

new music publishing agreements with respect to the copyrights on better terms, or exercise any rights available to them under the Copyright Act." Opposition at 25. Whether Plaintiff is entitled to 50% of royalties from any new agreements is governed by the terms of the MSA. For example, the MSA provides that the division of receipts from Atlantic Recording Corporation is only based on "the agreement dated August 30, 1966." Dkt. 18-2, Ex. A at 11, ¶ 10(a). That royalty right arises from that specific agreement; if that agreement is terminated, the royalty right no longer applies because its basis no longer is in place.

Plaintiff has not sought leave to amend this claim. However, it is possible that Plaintiff could plead additional facts to show either that the termination notices were deficient in some manner or that the Record Royalties are not based on the now-terminated agreements. Given that leave to amend is to be granted with extreme liberality, it is appropriate to do so in this action.

As to the Composition Royalties, the MSA states that there shall be an equal division of "contingent receipts . . . from musical compositions and interests therein, written and composed, in whole or in part, or acquired by [Sonny] or others prior to February 1, 1974, and/or acquired by [Sonny and certain other entities] prior to" Plaintiff's divorce from Sonny. Dkt. 18-2, Ex. A at 12–13, ¶ 10(d). The same provision also states that "all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of" Plaintiff. *Id.* at 13, ¶ 10(d). On their face, these provisions would not fail simply because Sonny's heirs have terminated his agreements with certain record companies. Unlike the terms that apply to the Record Royalties, these provisions do not mention the agreements. Instead, they provide that Plaintiff has a right in the proceeds of these "musical compositions and interests therein . . . from all sources perpetually. . . ." *Id.* Because Plaintiff's rights are linked to the musical compositions themselves and to Sonny's corresponding property interests, with respect to the allegations in the Complaint, the termination notices at issue do not affect the Composition Royalties. Once this case proceeds to discovery, Defendant may be able to present evidence as to the meaning of paragraph 10(d) of the MSA. Therefore, the merits of this component of Plaintiff's declaratory-judgment claim cannot be resolved at this time.

Defendant contends that Plaintiff's rights under these provisions were terminated pursuant to Section 304(c) of the Copyright Act. Motion at 14–16. To establish this claim, Defendant would have to show that the Composition Royalties, among other things, arose from an "exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978. . . ." 17 U.S.C. § 304(c). Plaintiff argues that a grant of royalties is not a transfer or license of a right under any copyright because the right to receive royalties is not one stated in the Copyright Act. Opposition at 16–17; *see* 17 U.S.C. § 106. Defendant argues that a right to royalties is a "right under [a copyright]" because the royalties are paid in exchange for a waiver of the rights listed in the Copyright Act.

Assuming without deciding that a right to receive royalties is one that arises under a copyright, Plaintiff's right to the Composition Royalties would not be terminated by Section 304(c) of the Copyright Act. The Composition Royalties appear to arise solely from the MSA. That agreement was executed on August 10, 1978, which makes the MSA an agreement that is outside the scope of Section 304(c). Dkt. 18-2, Ex. A at 5. On this record, it has not presently been established that Plaintiff's rights to the Composition Royalties have been terminated.

For the foregoing reasons, the Motion is **GRANTED IN PART WITHOUT PREJUDICE**, *i.e.,* with leave

to amend, as to the portion of this claim based on the Record Royalties. The Motion is **DENIED** as to the portion of this claim based on the Composition Royalties.

2. Second Cause of Action for Breach of Contract

The claim for breach of contract is based on Defendant's alleged refusal to honor Plaintiff's royalty and approval rights. As a result, this claim rises or falls with the declaratory relief claim.

The MSA is still in force. Plaintiff does not dispute that she continues to receive royalties and exercise approval rights for Sonny's non-terminated copyright grants, including foreign copyrights, under the MSA. *See* Motion at 16 n.8. Plaintiff also agrees that the MSA does not prevent Defendant from exercising her termination rights under the Copyright Act, *i.e.*, to terminate certain copyright grants and enter into new agreements. *See* Opposition at 25. That some of those grants have been validly terminated under federal law, thereby ending certain of Plaintiff's royalties, does not constitute a breach of contract as a matter of law.

For the foregoing reasons, the Motion is **GRANTED IN PART WITHOUT PREJUDICE**, *i.e.*, with leave to amend, as to the portion of this claim based on the Record Royalties. The Motion is **DENIED IN PART** as to the portion of this claim based on the Composition Royalties.

## V. Stipulation to Extend Deadlines

On March 6, 2023, the parties filed a Stipulation to Extend Deadlines. Dkt. 40 (the "Stipulation"). Based on a review of the Stipulation, good cause has been shown for the requested relief. The Stipulation is **GRANTED**, and the Scheduling Order amended, as follows:

| Event | Current Date | Continued Date |
|---|---|---|
| Non-Expert Discovery Cut-Off | March 20, 2023 | June 26, 2023 |
| Initial Expert Disclosures | April 3, 2023 | July 10, 2023 |
| Rebuttal Expert Disclosures | April 17, 2023 | July 24, 2023 |
| Expert Discovery Cut-Off | May 1, 2023 | August 7, 2023 |
| Last Day to File All Motions (Including Discovery Motions) | May 8, 2023 | August 14, 2023 |

The parties will be invited to submit proposed dates for the final pretrial conference and trial, if necessary, upon the issuance of orders on the motions. The trial estimate will be set at the final pretrial conference.

## VI. Conclusion

For the reasons stated in this Order, the Motion is **GRANTED IN PART WITHOUT PREJUDICE**, as to the portion of Plaintiff's claims based on the Record Royalties. The Motion is **DENIED IN PART** as to the portion of Plaintiff's claims based on the Composition Royalties. Any amended complaint shall be filed with 14 days of the issuance of this Order. The Scheduling Order is amended as stated in this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-08157 JAK (RAO) | Date | March 14, 2023 |
| Title | Cher v. Mary Bono, et al. | | |

**IT IS SO ORDERED.**

| | |
|---|---|
| | : |
| Initials of Preparer | pk |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

CHER, individually and as Trustee of The Veritas Trust,

Plaintiff,

v. No. 2:21-cv-08157-JAK

MARY BONO, individually and as Trustee of The Bono Collection Trust,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

APRIL 25, 2022

---

SUZANNE M. McKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

referenced in the MSA. Okay?

Given that part of the marital settlement agreement was giving up any right to spousal support, would there then be an open issue in the state law proceedings as to whether the MSA somehow should be modified -- not modified. But whether there should be a modification to take into account the absence of spousal support? Or would that have been an issue that would have had to been addressed in the probate proceedings?

MR. SCHACHT: Your Honor, I think it simply would stand as a preemptive fact. And there are the cases -- I believe, it's McCarty versus McCarty. We cited several cases, including Hisquierdo versus Hisquierdo, and Boggs versus Boggs, about preemption in other areas. And I believe it's McCarty versus McCarty, where the state had tried to, circumvent the alienation of certain -- I'm sorry. It's not McCarty versus McCarty. One of these cases there is an attempt by the state to circumvent certain provisions of the anti-alienation rules applicable to retirement funds.

So the state had concocted a scheme to basically enforce their community property standards in contrary to what federal rule on retirement was.

And the Supreme Court said, "No, that's not correct." The court -- excuse me -- Congress said that these -- this is how these entitlements flow, and courts have to follow that.

THE COURT: Okay. Mr. Anderson, anything on this?

MR. ANDERSON: Just briefly, Your Honor, you raise a very interesting question which, I think, basically, the idea that termination would undue the marital settlement agreement because a material term was this continuing royalty right in return for a waiver of support is just another reason to conclude that these are state law rights that are excluded from the scope of termination expressly by 304.

THE COURT: Okay.

MR. SCHACHT: Your Honor, they are --

THE COURT: I'm sorry. Let me just -- I don't want to belabor this. But let me ask you this hypothetical. Two spouses end their marriage, have a marital settlement agreement doing so. And like here, one of the spouses agrees to share royalties with the other spouse in exchange for which there will be no spousal support. Okay? And it was a lengthy marriage, so the spousal support would be, you know -- under that state's law, the spousal support could continue for the balance of the life of the spouse who would be otherwise receiving spousal support.

A year later, while both spouses are still alive and working, there is this termination of the source of the revenue so that the spouse that was going to be getting, like, the revenues here doesn't get them anymore.

Having waived spousal support a year earlier, do you think there would be -- I know that is not -- do you think that

spouse would be remediless? Couldn't go back to the Court and say, change the -- modify the judgment we previously entered because that assumed I would be receiving spousal -- I would be receiving revenues I'm no longer getting?

MR. SCHACHT: Was that a question to me, Your Honor?

THE COURT: It is.

MR. SCHACHT: I think you've touched on an element of fairness that sometimes permeates these cases, and I would just point to one of the cases I mentioned just now on this, anti-alienation rules under retirement -- Federal Retirement Act. And the Court noted this was similarly a case where the sense of fairness might dictate a different outcome, but in Boggs versus Boggs, the Supreme Court, if I may quote, they said, "Perhaps even more troubling, the recipient of the testamentary transfer need not be a family member."

They were talking about what would happen if they ruled sort of on their gut -- in this case maybe saying, "Well, Cher clearly had a role with Sonny, and even they divorced in '78 and he subsequently remarried, it just doesn't seem fair that she should be cut out of these."

The court, the Supreme Court, in Boggs v. Boggs addressed this by saying this is a rule that has to be applied universally. And it's not frankly the Chers of the world that Congress is worried about. It's the publishers. It's the people who they're trying to protect the authors from and allow

them to grant another bite at the apple. There's plenty in the MSA that Cher still has 50 percent of.

THE COURT: No. I understand that. I understand,

All right. Mr. Anderson, anything briefly on this?

MR. ANDERSON: Yes, Just very briefly. The heirs are now in the position of being able to go to the music publishers and get more renewed contracts. That is not at issue. They can -- God bless them, if they can get contracts that generate three, four times the amount of money, that is fine. There is just a contractual right for Cher to get any money from any source.

THE COURT: All right. I'll look forward to your briefs. And I'll review them. And upon receiving them, I will take this under submission. If upon receiving your briefs I think I need to hear further from you, I will arrange to do so.

MR. ANDERSON: Thank you, Your Honor.

MR. SCHACHT: Thank you, Your Honor.

THE COURT: Anything else we need to do today, Mr. Schacht?

MR. SCHACHT: No.

THE COURT: Mr. Anderson?

MR. ANDERSON: No. Thank you, Your Honor. Thank you for your time.

THE COURT: Thanks for your help today.

MR. SCHACHT: Thank you.

(Adjourned at 10:41 a.m.)

-oOo-

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/ Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter

Date: 03/02/2023

Name Daniel J. Schacht (259717)
Address Donahue Fitzgerald LLP; 1999 Harrison Street, 26th Floor
City, State, Zip Oakland, California 94612-3520
Phone (510) 451-3300
Fax (510) 451-1527
E-Mail dschacht@donahue.com

☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☒ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust<br>PLAINTIFF(S),<br>v.<br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 thorugh 10, inclusive<br>DEFENDANT(S). | CASE NUMBER:<br>2:21-cv-08157-JAK (RAO)<br>**NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that MARY BONO hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☐ Order (specify):

☒ Judgment (specify):

☐ Other (specify):

Imposed or Filed on November 26, 2025. Entered on the docket in this action on December 1, 2025.

A copy of said judgment or order is attached hereto.

December 22, 2025
Date

[signature]
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHER,<br>Plaintiff,<br>v.<br>MARY BONO, et al.,<br>Defendants. | No. 2:21-cv-08157-JAK (RAOx)<br>**JUDGMENT**<br>**[JS-6: CASE TERMINATED]** |
| AND RELATED CLAIMS | |

The Court having ruled on the Motion for Summary Judgment filed by Plaintiff and Counterdefendant Cher ("Plaintiff") and the Motion for Summary Judgment filed by Defendant and Counterclaimant Mary Bono ("Defendant"), having considered the parties' Stipulation to Certain Facts, and having determined that no issues remain preventing the entry of Judgment, **IT IS ORDERED AND ADJUDGED** that:

1. As to Plaintiff's first claim for relief, it is hereby declared that:
    a. The September 30, 2016, Notice of Termination (the "Notice of Termination") served on behalf of Defendant and others under Section 304(c) of the Copyright Act did not terminate or otherwise have any effect on the August 10, 1978, Marriage Settlement Agreement ("MSA") between Plaintiff and Sonny Bono, the MSA's recognition and confirmation of Plaintiff's community property, or the MSA's assignment of the following to Plaintiff as her sole and separate property in perpetuity and throughout the world:
        i. fifty percent of all contingent receipts received by Sonny Bono, his successors in interest, assigns, and his other businesses, after July 14, 1978, from all sources perpetually and throughout the world from musical compositions and interests in musical compositions written or composed, in whole or part, by Sonny Bono or others, and/or acquired by Sonny Bono or his other business (as that term is defined in the MSA), prior to February 1, 1974 less certain costs and the administration fee as set forth in the MSA (the "Composition Royalties");
        ii. fifty percent of all contingent receipts after July 14, 1978, pursuant to recording contracts entered into prior to the separation of Plaintiff and Sonny Bono (as set forth in the MSA), with the following record companies: Atlantic Recording Corporation; York Records; Imperial

Records; Liberty Records, Inc. and MCA Records, Inc. (the “Record Royalties”);

b. the Notice of Termination did not terminate or otherwise have any effect on the following rights of Plaintiff, individually or as the Trustee of the Veritas Trust, and/or her successors and assigns:

   i. ownership in perpetuity and throughout the world of an undivided fifty percent of all Composition Royalties and Record Royalties, including without limitation any Composition Royalties due and payable on or after July 1, 2022, regardless of when paid; and

   ii. the approval rights as to any and all third party contracts with respect to the Musical Compositions granted to Plaintiff under paragraph 10(d) of the MSA.

2. As to Plaintiff’s second claim for relief, Plaintiff is awarded damages against Defendant in the amount of the $187,534.91 in Composition Royalties that Defendant received and retained in breach of the MSA, plus prejudgment interest at the rate of seven percent per annum, from February 1, 2022, to the date of entry of Judgment.

3. As to Defendant’s first counterclaim for relief, it is hereby declared that Defendant, subject to the rights of Sonny Bono’s four children (the four children and Defendant referred to as the “Bono Heirs”), has the sole discretion to decide whom to appoint as the royalty administrator pursuant to the MSA, including an entity owned and controlled by the Bono Heirs; provided, however, Plaintiff may raise reasonable objections to the terms of any such agreement entered into with such a royalty administrator, including as to the reasonableness of the administration fee and as to the administrator’s credentials and qualifications.

4. As to Defendant’s second counterclaim for relief, no relief is granted.

5. Except as expressly provided herein, Judgment is entered in favor of Plaintiff on Plaintiff's First Claim for Relief, Plaintiff's Second Claim for Relief, and Defendant's Second Counterclaim for Relief; and Judgment is entered in favor of Defendant in part on Defendant's First Counterclaim for Relief.
6. Plaintiff is awarded costs incurred, in an amount to be determined by the Court, as to Plaintiff's First Claim for Relief, Plaintiff's Second Claim of Relief, and Defendant's Second Counterclaim for Relief; and Defendant is awarded costs incurred, in an amount to be determined by the Court, as to Defendant's First Counterclaim for Relief.

**IT IS SO ORDERED.**

Dated: 11/26/2025

John A. Kronstadt
United States District Judge

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Mary Bono

Name(s) of counsel (if any):

Daniel J. Schacht, Andrew MacKay, Hayley M. Lenahan, and Melanie Y. Kim

Address: 1999 Harrison Street, 26th Floor, Oakland, CA 94612

Telephone number(s): (510) 451-3300

Email(s): dschacht@donahue.com; amackay@donahue.com; hlenahan@donahue.com; mkim@donahue.com

Is counsel registered for Electronic Filing in the 9th Circuit? ◉ Yes ○ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Cher

Name(s) of counsel (if any):

Peter Anderson, Sean M. Sullivan, Eric H. Lamm, and Samuel Turner

Address: 350 South Grand Avenue, 27th Floor, Los Angeles, California 90071

Telephone number(s): (213) 633-6800

Email(s): peteranderson@dwt.com; seansullivan@dwt.com; ericlamm@dwt.com; samturner@dwt.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

ACCO,(RAOx),APPEAL,CLOSED,DISCOVERY,MANADR,PROTORD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:21-cv-08157-JAK-RAO

Cher v. Mary Bono
Assigned to: Judge John A. Kronstadt
Referred to: Magistrate Judge Rozella A. Oliver
Demand: $1,000,000
Case in other court: 9th CCA, 25-08085
9th CCA, 26-04919
Cause: 28:2201 Declaratory Judgment

Date Filed: 10/13/2021
Date Terminated: 11/26/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 10/13/2021 | 1 | COMPLAINT Receipt No: ACACDC-32146008 - Fee: $402, filed by plaintiff Cher. (Attorney Peter J. Anderson added to party Cher(pty:pla))(Anderson, Peter) (Entered: 10/13/2021) |
| 10/13/2021 | 2 | CIVIL COVER SHEET filed by Plaintiff Cher. (Anderson, Peter) (Entered: 10/13/2021) |
| 10/13/2021 | 3 | NOTICE of Interested Parties filed by Plaintiff Cher, (Anderson, Peter) (Entered: 10/13/2021) |
| 10/13/2021 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by plaintiff Cher. (Anderson, Peter) (Entered: 10/13/2021) |
| 10/14/2021 | 5 | NOTICE OF ASSIGNMENT to District Judge John A. Kronstadt and Magistrate Judge Rozella A. Oliver. (esa) (Entered: 10/14/2021) |
| 10/14/2021 | 6 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (esa) (Entered: 10/14/2021) |
| 10/14/2021 | 7 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (esa) (Entered: 10/14/2021) |
| 10/14/2021 | 8 | NOTICE OF DEFICIENCIES in Request to Issue Summons. The following error(s) was found: The name and address of the attorney for plaintiff(s)must be entered in the appropriate field. The summons cannot be issued until this defect has been corrected. Please correct the defect and re-file your request. (esa) (Entered: 10/14/2021) |
| 10/14/2021 | 9 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by plaintiff Cher. (Anderson, Peter) (Entered: 10/14/2021) |
| 10/15/2021 | 10 | STANDING ORDERS FOR CIVIL CASES ASSIGNED TO JUDGE JOHN A. KRONSTADT upon filing of the complaint by Judge John A. Kronstadt. Please read each Order carefully as they differ in some respects from the Local Rules. Counsel are advised that the Court, at any time, may amend one or more of its Standing Orders. It is the responsibility of counsel to refer to this Court's Procedures and Schedules found on the website for the United States District Court, Central District of California (www.cacd.uscourts.gov) to obtain the operative order. The Court thanks the parties and their counsel for their anticipated cooperation in carrying out these requirements. (tj) (Entered: 10/15/2021) |

| | | |
|---|---|---|
| 10/15/2021 | 11 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Mary Bono. (jp) (Entered: 10/15/2021) |
| 10/18/2021 | 12 | PROOF OF SERVICE Executed by Plaintiff Cher, upon Defendant Mary Bono served on 10/18/2021, answer due 11/8/2021. Service of the Summons and Complaint were executed upon Attorney in compliance with Federal Rules of Civil Procedure by method of service not specified.Original Summons returned. (Anderson, Peter) (Entered: 10/18/2021) |
| 11/04/2021 | 13 | NOTICE of Appearance filed by attorney Mario Man-Lung Choi on behalf of Defendant Mary Bono (Attorney Mario Man-Lung Choi added to party Mary Bono(pty:dft))(Choi, Mario) (Entered: 11/04/2021) |
| 11/04/2021 | 14 | STIPULATION Extending Time to Answer the complaint as to Mary Bono answer now due 12/8/2021, re Complaint (Attorney Civil Case Opening) 1 filed by Defendant Mary Bono.(Choi, Mario) (Entered: 11/04/2021) |
| 11/04/2021 | 15 | NOTICE of Interested Parties filed by Defendant Mary Bono, identifying Christine Bono, Chaz Bono, Chesare Bono, Chianna Bono. (Choi, Mario) (Entered: 11/04/2021) |
| 11/04/2021 | 16 | NOTICE of Appearance filed by attorney Daniel J Schacht on behalf of Defendant Mary Bono (Attorney Daniel J Schacht added to party Mary Bono(pty:dft))(Schacht, Daniel) (Entered: 11/04/2021) |
| 11/05/2021 | 17 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Appearance 13 , Notice of Appearance 16 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance of Withdrawal of Counsel G123.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 11/05/2021) |
| 12/08/2021 | 18 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Mary Bono. Motion set for hearing on 4/11/2022 at 08:30 AM before Judge John A. Kronstadt. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Request for Judicial Notice) (Schacht, Daniel) (Entered: 12/08/2021) |
| 12/22/2021 | 19 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss Case 18 filed by Plaintiff Cher. (Anderson, Peter) (Entered: 12/22/2021) |
| 01/12/2022 | 20 | REPLY IN SUPPORT OF NOTICE OF MOTION AND MOTION to Dismiss Case 18 filed by Defendant Mary Bono. (Schacht, Daniel) (Entered: 01/12/2022) |
| 04/05/2022 | 21 | (IN CHAMBERS) ORDER CONTINUING HEARING ON MOTION TO DISMISS CASE (DKT. 18 ) by Judge John A. Kronstadt: The Court, on its own motion, continues Defendant's Motion to Dismiss Case (Dkt. 18 ) from April 11, 2022, to April 25, 2022, at 8:30 a.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jaklc2) TEXT ONLY ENTRY (Entered: 04/05/2022) |
| 04/22/2022 | 22 | (IN CHAMBERS) ORDER CHANGING THE TIME FOR THE MOTION TO DISMISS HEARING (DKT. 18 ) by Judge John A. Kronstadt: On the Court's own motion, the TIME for the hearing is RESET from 8:30 a.m. to 10:00 a.m., on April 25, 2022. The hearing will proceed by zoom webinar. Counsel are directed to refer to the Court's Procedures and Schedules page found on the website for the United States District Court for zoom webinar information.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (tj) TEXT ONLY ENTRY (Entered: 04/22/2022) |

| | | |
|---|---|---|
| 04/25/2022 | 23 | MINUTE ORDER OF MOTION TO DISMISS THE COMPLAINT [DKT. 18 ) held before Judge John A. Kronstadt. On or before May 9, 2022, each party shall submit a supplemental brief, not to exceed ten pages, on the issues discussed with respect to how Defendants undisputed termination rights under the Copyright Act affect Plaintiffs rights under the Marriage Settlement Agreement. Based on a review of the briefing, the Court will determine whether the Motion will be taken under submission or a further hearing will be scheduled. IT IS SO ORDERED. Court Reporter: Suzanne McKennon. (yl) (Entered: 04/28/2022) |
| 05/09/2022 | 24 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Dismiss Case 18 *Supplemental Brief in Support of Motion Dismiss* filed by Defendant Mary Bono. (Schacht, Daniel) (Entered: 05/09/2022) |
| 05/09/2022 | 25 | PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION TO DISMISS re NOTICE OF MOTION AND MOTION to Dismiss Case 18 filed by Plaintiff Cher. (Anderson, Peter) (Entered: 05/09/2022) |
| 05/25/2022 | 26 | Notice of Appearance or Withdrawal of Counsel: for attorney Hayley Miller Lenahan counsel for Defendant Mary Bono. Adding Hayley M. Lenahan as counsel of record for Mary Bono for the reason indicated in the G-123 Notice. Filed by Defendant Mary Bono. (Attorney Hayley Miller Lenahan added to party Mary Bono(pty:dft))(Lenahan, Hayley) (Entered: 05/25/2022) |
| 06/24/2022 | 27 | ORDER SETTING RULE 16(b)/26(f) SCHEDULING CONFERENCE by Judge John A. Kronstadt. Counsel shall file a Joint Report consistent with this Order. A hearing is not necessary and, therefore, the matter is taken under submission. Upon review of the Joint Report, a scheduling order will be issued. Rule 26 Meeting Report due by 9/2/2022. (tj) (Entered: 06/24/2022) |
| 08/26/2022 | 28 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 4 days, filed by Plaintiff Cher.. (Anderson, Peter) (Entered: 08/26/2022) |
| 09/12/2022 | 29 | ORDER/REFERRAL to ADR Procedure No 3 by Judge John A. Kronstadt. Case ordered to a private mediator based upon a stipulation of the parties or by the court order. ADR Proceeding to be held no later than March 1, 2023. Post Mediation Status Conference set for 3/13/2023 11:30 AM before Judge John A. Kronstadt. (tj) (Entered: 09/12/2022) |
| 09/12/2022 | 30 | (IN CHAMBERS) ORDER SETTING PRETRIAL DEADLINES (DKT. 28) by Judge John A. Kronstadt. The Court has reviewed the parties August 26, 2022 Joint Report and sets the following deadlines: Last day to amend or add parties 10/3/2022, Post Mediation Status Conference set for 3/13/2023 11:30 AM. The Court grants the parties' request to participate in a settlement conference with a private neutral. If a settlement is reached, the parties are ordered to file a notice of settlement, with a proposed date by which the matter will be dismissed. No appearance will be required on March 13, 2023, if such notice is filed on or before March 3, 2023. (See document for further details) (yl) (Entered: 09/13/2022) |
| 09/23/2022 | 31 | JOINT REPORT of AGREED-UPON PRIVATE NEUTRAL filed by Plaintiff Cher. (Anderson, Peter) (Entered: 09/23/2022) |
| 11/04/2022 | 32 | NOTICE of Decision: Re Issue Raised by defendant's pending Motion to Dismiss under submission, filed by plaintiff Cher. (Anderson, Peter) (Entered: 11/04/2022) |
| 02/10/2023 | 33 | JOINT REPORT of RE MEDIATION filed by Plaintiff Cher. (Anderson, Peter) (Entered: 02/10/2023) |
| 02/27/2023 | 34 | TRANSCRIPT ORDER as to Non-party Requestor for Court Reporter. Court will contact Rachel Howard at rdh@phillaw.com with further instructions regarding this order. |

| | | |
|---|---|---|
| | | Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 02/27/2023) |
| 03/02/2023 | 35 | TRANSCRIPT for proceedings held on 04-25-22; 9:58 a.m. Court Reporter: Suzanne M. McKennon, CSR, CRR, RMR, phone number (559) 658-0362. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 3/23/2023. Redacted Transcript Deadline set for 4/3/2023. Release of Transcript Restriction set for 5/31/2023. (McKennon, Suzanne) (Entered: 03/02/2023) |
| 03/02/2023 | 36 | NOTICE OF FILING TRANSCRIPT filed for proceedings 04-25-22; 9:58 a.m. re Transcript 35 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (McKennon, Suzanne) TEXT ONLY ENTRY (Entered: 03/02/2023) |
| 03/02/2023 | 37 | STIPULATION for Protective Order filed by plaintiff Cher. (Attachments: # 1 Stipulated Protective Order marked against Magistrate Judge's Form)(Anderson, Peter) (Entered: 03/02/2023) |
| 03/03/2023 | 38 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Rozella A. Oliver re Stipulation for Protective Order 37 (dml) (Entered: 03/03/2023) |
| 03/06/2023 | 39 | REQUEST to Appear Remotely *at Status Conference on March 13, 2023 at 11:30 a.m.* filed by Defendant Mary Bono. Request set for hearing on 3/13/2023 at 11:30 AM before Judge John A. Kronstadt. (Attachments: # 1 Declaration) (Schacht, Daniel) (Entered: 03/06/2023) |
| 03/06/2023 | 40 | Joint STIPULATION to Reschedule Deadlines filed by Defendant Mary Bono. (Attachments: # 1 Proposed Order)(Schacht, Daniel) (Entered: 03/06/2023) |
| 03/06/2023 | 41 | (IN CHAMBERS) ORDER TAKING POST MEDIATION STATUS CONFERENCE OFF CALENDAR by Judge John A. Kronstadt: Based on a review of the parties' Joint Report Re: Mediation (Dkt. 33 ), it is determined that the March 13, 2023 Post Mediation Status Conference is unnecessary and is taken off calendar. No appearance by counsel is necessary. The parties shall file a notice of settlement if their further direct discussions result in a settlement. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (JAKLC2) TEXT ONLY ENTRY (Entered: 03/06/2023) |
| 03/08/2023 | 42 | ORDER RE REQUEST TO APPEAR AT STATUS CONFERENCE VIA TELEPHONE OR BY ZOOM (DKT. 39) by Judge John A. Kronstadt: the Request is MOOT because the Post Mediation Status Conference in this matter was taken off calendar in a previous Order. See Dkt. 41. 39 . (pj) (Entered: 03/09/2023) |

| | | |
|---|---|---|
| 03/14/2023 | 43 | (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION TO DISMISS (DKT. 18); AND FIRST STIPULATION TO EXTEND DEADLINES (DKT. 40) by Judge John A. Kronstadt. For the foregoing reasons, the Motion is GRANTED IN PART WITHOUT PREJUDICE, i.e., with leave to amend, as to the portion of this claim based on the Record Royalties. The Motion is DENIED IN PART as to the portion of this claim based on the Composition Royalties. On March 6, 2023, the parties filed a Stipulation to Extend Deadlines. Dkt. 40. Based on a review of the Stipulation, good cause has been shown for the requested relief. The Stipulation is GRANTED, and the Scheduling Order amended, as follows: The Expert Discovery Cut off is August 7, 2023. The last day to file all motions is Aug 14, 2023. For the reasons stated in this Order, the Motion is GRANTED IN PART WITHOUT PREJUDICE, as to the portion of Plaintiffs claims based on the Record Royalties. The Motion is DENIED IN PART as to the portion of Plaintiffs claims based on the Composition Royalties. Any amended complaint shall be filed with 14 days of the issuance of this Order. The Scheduling Order is amended as stated in this Order. (See document for further details) (yl) (Entered: 03/15/2023) |
| 03/28/2023 | 44 | ANSWER to Complaint (Attorney Civil Case Opening) 1 , COUNTERCLAIM against Cher filed by Defendant Mary Bono.(Schacht, Daniel) (Entered: 03/28/2023) |
| 03/28/2023 | 45 | FIRST AMENDED COMPLAINT against Defendants Cher amending Complaint (Attorney Civil Case Opening) 1 , filed by Plaintiff Cher(Anderson, Peter) (Entered: 03/28/2023) |
| 04/10/2023 | 46 | STIPULATION for Order Re Defendant's Answer and Counterclaims filed by defendant Cher. (Attachments: # 1 Proposed Order)(Anderson, Peter) (Entered: 04/10/2023) |
| 04/11/2023 | 47 | ANSWER to Amended Complaint/Petition 45 , COUNTERCLAIM against Cher filed by Defendant Mary Bono.(Schacht, Daniel) (Entered: 04/11/2023) |
| 04/13/2023 | 48 | ORDER RE STIPULATION RE ANSWER AND COUNTERCLAIMS (DKT. 46) by Judge John A. Kronstadt. The Stipulation is APPROVED, as follows: Defendant's April 11, 2023 Answer and Counterclaims constitutes the operative pleading for the purpose of calculating the deadline for Plaintiff to respond to Defendant's Counterclaims. IT IS SO ORDERED. (yl) (Entered: 04/14/2023) |
| 05/02/2023 | 49 | ANSWER to Answer to Complaint (Attorney Civil Case Opening), Counterclaim 47 with JURY DEMAND filed by Plaintiff and Counter-Defendant Cher.(Anderson, Peter) (Entered: 05/02/2023) |
| 06/09/2023 | 50 | Second STIPULATION to Extend Discovery Cut-Off Date to 7/17/2023 filed by Defendant Mary Bono(individually and as Trustee of The Bono Collection Trust). (Attachments: # 1 Proposed Order)(Schacht, Daniel) (Entered: 06/09/2023) |
| 06/12/2023 | 51 | ORDER RE STIPULATION TO EXTEND FACT DISCOVERY DEADLINE ONLY (DKT. 50 ) by Judge John A. Kronstadt. Therefore, the Stipulation is APPROVED, as follows: The Non-Expert Discovery Cut-Off is continued to July 17, 2023. IT IS SO ORDERED. (yl) (Entered: 06/13/2023) |
| 07/17/2023 | 52 | STIPULATION to Reschedule Deadlines filed by Defendant Mary Bono. (Attachments: # 1 Proposed Order)(Choi, Mario) (Entered: 07/17/2023) |
| 07/18/2023 | 53 | ORDER RE STIPULATION TO EXTEND DEADLINES by Judge John A. Kronstadt. Based on a review of the Stipulation to Extend Deadlines (the "Stipulation" (Dkt. 52)), sufficient good cause has been shown for the requested relief. Therefore, the Stipulation is APPROVED. (See document for further details) (yl) (Entered: 07/19/2023) |
| 07/24/2023 | 54 | Notice of Appearance or Withdrawal of Counsel: for attorney Samuel Turner counsel for Plaintiff Cher, Counter Defendants Cher, Cher. Adding Samuel Austin Turner as counsel |

| | | |
|---|---|---|
| | | of record for Plaintiff and Counterdefendant CHER for the reason indicated in the G-123 Notice. Filed by Plaintiff and Counterdefendant CHER. (Attorney Samuel Turner added to party Cher(pty:pla), Attorney Samuel Turner added to party Cher(pty:cd), Attorney Samuel Turner added to party Cher(pty:cd))(Turner, Samuel) (Entered: 07/24/2023) |
| 08/28/2023 | 55 | STIPULATION for Discovery as to Extending Fact Discovery Cutoff as to One Deponent filed by Defendant and Counterclaimant Mary Bono. (Attachments: # 1 Proposed Order)(Choi, Mario) (Entered: 08/28/2023) |
| 08/31/2023 | 56 | ORDER RE STIPULATION TO ENTRY OF ORDER EXTENDING FACT DISCOVERY CUTOFF AS TO ONE DEPONENT 55 by Judge John A. Kronstadt. The cutoff for non-expert discovery is continued from August 28, 2023 to September 5, 2023 for the limited purpose of conducting the deposition of Plaintiff. (rolm) Modified on 9/1/2023 (rolm). (Entered: 09/01/2023) |
| 11/06/2023 | 57 | Motion RE Informal Discovery Dispute before Magistrate Judge Rozella A. Oliver. The Court ORDERS the following briefing: Deadline for plaintiff to file letter briefing: Monday, November 13, 2023 Deadline for defendant to file response: Wednesday, November 22, 2023 Deadline for plaintiff to file reply: Friday, December 1, 2023. The Court sets a total page limit of 5-7 single-spaced pages, per party. Any documents referenced in the letter briefs may be attached as exhibits. (eq) (Entered: 11/06/2023) |
| 11/08/2023 | 58 | STIPULATION for Extension of Time to File Rule 56 motions filed by plaintiff and counterdefendant Cher. (Attachments: # 1 Proposed Order)(Anderson, Peter) (Entered: 11/08/2023) |
| 11/13/2023 | 59 | Discovery Letter Brief filed by Plaintiff Cher, Counter Defendant Cher (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Anderson, Peter) (Entered: 11/13/2023) |
| 11/14/2023 | 60 | ORDER RE STIPULATION TO EXTEND BY ONE WEEK THE DEADLINE TO FILE MOTIONS FOR SUMMARY JUDGMENT (DKT. 58) by Judge John A. Kronstadt. The last day to file Rule 56 motions is extended to November 20, 2023. Oppositions shall be filed on or before December 22, 2023; replies shall be filed on or before January 19, 2024; and the hearing on any Rule 56 motions shall be held on February 26, 2024. IT IS SO ORDERED. (yl) (Entered: 11/14/2023) |
| 11/20/2023 | 61 | APPLICATION to file document *Exhs. to Schacht Declaration in Support of Def.'s Motion for Summary Judgment* under seal filed by Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono. (Attachments: # 1 Exhibit Exh. 12 to Schacht Decl., # 2 Exhibit Exh. 13 to Schacht Decl., # 3 Exhibit Exh. 14 to Schacht Decl., # 4 Exhibit Exh. 16 to Schacht Decl., # 5 Exhibit Exh. 21 to Schacht Decl., # 6 Exhibit Exh. 22 to Schacht Decl., # 7 Exhibit Exh. 27 to Schacht Decl., # 8 Exhibit Exh. 29 to Schacht Decl., # 9 Exhibit Exh. 30 to Schacht Decl., # 10 Proposed Order)(Schacht, Daniel) (Entered: 11/20/2023) |
| 11/20/2023 | 62 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Exhs. to Schacht Declaration in Support of Def.'s Motion for Summary Judgment* under seal 61 filed by Defendant Mary Bono. (Attachments: # 1 Exhibit Exh. 12 to Schacht Decl., # 2 Exhibit Exh. 13 to Schacht Decl., # 3 Exhibit Exh. 14 to Schacht Decl., # 4 Exhibit Exh. 16 to Schacht Decl., # 5 Exhibit Exh. 21 to Schacht Decl., # 6 Exhibit Exh. 22 to Schacht Decl., # 7 Exhibit Exh. 27 to Schacht Decl., # 8 Exhibit Exh. 29 to Schacht Decl., # 9 Exhibit Exh. 30 to Schacht Decl.)(Schacht, Daniel) (Entered: 11/20/2023) |
| 11/20/2023 | 63 | BRIEF *Discovery Letter Brief Opposition* regarding Miscellaneous Document, 59 . (Attachments: # 1 Exhibit Exhibit A)(Schacht, Daniel) (Entered: 11/20/2023) |

| | | |
|---|---|---|
| 11/20/2023 | 64 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Claims and Def.'s Counterclaims filed by Defendant Mary Bono. Motion set for hearing on 2/26/2024 at 08:30 AM before Judge John A. Kronstadt. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Supplement Separate Statement, # 3 Declaration Bono Decl. in support, # 4 Declaration Schacht Decl. in support, # 5 Exhibit 1 to Schacht Decl., # 6 Exhibit 2 to Schacht Decl., # 7 Exhibit 3 to Schacht Decl., # 8 Exhibit 4 to Schacht Decl., # 9 Exhibit 5 to Schacht Decl., # 10 Exhibit 6 to Schacht Decl., # 11 Exhibit 7 to Schacht Decl., # 12 Exhibit 8 to Schacht Decl., # 13 Exhibit 9 to Schacht Decl., # 14 Exhibit 10 to Schacht Decl., # 15 Exhibit 11 to Schacht Decl., # 16 Exhibit 12 to Schacht Decl., # 17 Exhibit 13 to Schacht Decl., # 18 Exhibit 14 to Schacht Decl., # 19 Exhibit 15 to Schacht Decl., # 20 Exhibit 16 to Schacht Decl., # 21 Exhibit 17 to Schacht Decl., # 22 Exhibit 18 to Schacht Decl., # 23 Exhibit 19 to Schacht Decl., # 24 Exhibit 20 to Schacht Decl., # 25 Exhibit 21 to Schacht Decl., # 26 Exhibit 22 to Schacht Decl., # 27 Exhibit 23 to Schacht Decl., # 28 Exhibit 24 to Schacht Decl., # 29 Exhibit 25 to Schacht Decl., # 30 Exhibit 26 to Schacht Decl., # 31 Exhibit 27 to Schacht Decl., # 32 Exhibit 28 to Schacht Decl., # 33 Exhibit 29 to Schacht Decl., # 34 Exhibit 30 to Schacht Decl.) (Schacht, Daniel) (Entered: 11/20/2023) |
| 11/20/2023 | 65 | NOTICE OF MOTION AND MOTION for Summary Judgment filed by Plaintiff and Counterdefendant Cher. Motion set for hearing on 2/26/2024 at 08:30 AM before Judge John A. Kronstadt. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Statement of Uncontroverted Facts - REDACTED, # 3 Declaration of Cher, # 4 Declaration of Lindsay Scott, # 5 Declaration of Donald Passman, # 6 Declaration of Peter Anderson, # 7 Appendix of Exhibits - REDACTED, # 8 Exhibit 1, # 9 Exhibit 2, # 10 Exhibit 3, # 11 Exhibit 4, # 12 Exhibit 5, # 13 Exhibit 6, # 14 Exhibit 7, # 15 Exhibit 8 - REDACTED, # 16 Exhibit 9 - REDACTED, # 17 Exhibit 10 - REDACTED, # 18 Exhibit 11 - REDACTED, # 19 Exhibit 12 - REDACTED, # 20 Exhibit 13 - REDACTED, # 21 Exhibit 14 - REDACTED, # 22 Exhibit 15 - REDACTED, # 23 Exhibit 16, # 24 Exhibit 17, # 25 Exhibit 18 - REDACTED, # 26 Exhibit 19, # 27 Exhibit 20, # 28 Exhibit 21, # 29 Exhibit 22 - REDACTED, # 30 Exhibit 23 - REDACTED, # 31 Exhibit 24, # 32 Exhibit 25, # 33 Exhibit 26, # 34 Exhibit 27, # 35 Exhibit 28, # 36 Exhibit 29, # 37 Exhibit 30, # 38 Exhibit 31, # 39 Exhibit 32 - REDACTED, # 40 Exhibit 33, # 41 Exhibit 34, # 42 Exhibit 35, # 43 Exhibit 36, # 44 Exhibit 37, # 45 Exhibit 38, # 46 Proposed Judgment) (Anderson, Peter) (Entered: 11/20/2023) |
| 11/20/2023 | 66 | APPLICATION to file document under seal filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Declaration of Eric Lamm, # 2 Proposed Statement of Uncontroverted Facts - REDACTED, # 3 Exhibit 8 - REDACTED, # 4 Exhibit 9 - REDACTED, # 5 Exhibit 10 - REDACTED, # 6 Exhibit 11 - REDACTED, # 7 Exhibit 12 - REDACTED, # 8 Exhibit 13 - REDACTED, # 9 Exhibit 14 - REDACTED, # 10 Exhibit 15 - REDACTED, # 11 Exhibit 18 - REDACTED, # 12 Exhibit 22 - REDACTED, # 13 Exhibit 23 - REDACTED, # 14 Exhibit 32 - REDACTED, # 15 Certificate of Service, # 16 Proposed Order)(Anderson, Peter) (Entered: 11/20/2023) |
| 11/20/2023 | 67 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 66 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Unredacted Document Proposed Statement of Uncontroverted Facts, # 2 Unredacted Document Exhibit 8, # 3 Unredacted Document Exhibit 9, # 4 Unredacted Document Exhibit 10, # 5 Unredacted Document Exhibit 11, # 6 Unredacted Document Exhibit 12, # 7 Unredacted Document Exhibit 13, # 8 Unredacted Document Exhibit 14, # 9 Unredacted Document Exhibit 15, # 10 Unredacted Document Exhibit 18, # 11 Unredacted Document Exhibit 22, # 12 Unredacted Document Exhibit 23, # 13 Unredacted Document Exhibit 32) (Anderson, Peter) (Entered: 11/20/2023) |

| | | |
|---|---|---|
| 11/21/2023 | 68 | PROOF OF SERVICE filed by Defendant Mary Bono, re Sealed Declaration in SupportDeclaration,, 67 , Sealed Declaration in SupportDeclaration,, 62 *and Documents to be Filed Under Seal* served on 11/20/2023. (Schacht, Daniel) (Entered: 11/21/2023) |
| 11/27/2023 | 69 | (IN CHAMBERS) ORDER RE SEALING APPLICATIONS (DKTS. 61 AND 66 ) by Judge John A Kronstadt: Based on a review of the parties' respective applications to file certain documents under seal (Dkts. 61 and 66 ), a ruling on the applications is deferred. Neither of the applications was supported by a declaration from a percipient witness with personal knowledge of the alleged need to file the documents under seal on behalf of the party designating the material as confidential. On or before December 5, 2023, appropriate declaration(s) from a percipient witness(es), i.e., not by counsel, shall be submitted in support of the applications. Failure to do so may result in the denial of an application. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (JAKLC2) TEXT ONLY ENTRY (Entered: 11/27/2023) |
| 12/01/2023 | 70 | Discovery Letter Brief filed by Plaintiff Cher, Counter Defendant Cher re: Miscellaneous Document, 59 (Anderson, Peter) (Entered: 12/01/2023) |
| 12/05/2023 | 71 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Exhs. to Schacht Declaration in Support of Def.'s Motion for Summary Judgment* under seal 61 , APPLICATION to file document under seal 66 filed by Counter Claimant Mary Bono. (Attachments: # 1 Exhibit)(Schacht, Daniel) (Entered: 12/05/2023) |
| 12/05/2023 | 72 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Exhs. to Schacht Declaration in Support of Def.'s Motion for Summary Judgment* under seal 61 , APPLICATION to file document under seal 66 filed by Counter Claimant Mary Bono. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(Schacht, Daniel) (Entered: 12/05/2023) |
| 12/06/2023 | 73 | PROOF OF SERVICE filed by Defendant Mary Bono, re Sealed Declaration in SupportDeclaration, 72 served on 12/5/2023. (Schacht, Daniel) (Entered: 12/06/2023) |
| 12/06/2023 | 74 | PROOF OF SERVICE filed by Defendant Mary Bono, re Sealed Declaration in SupportDeclaration, 71 served on 12/5/2023. (Schacht, Daniel) (Entered: 12/06/2023) |
| 12/06/2023 | 75 | ORDER RE APPLICATION OF DEFENDANT MARY BONO FOR LEAVE TO FILE UNDER SEAL PORTIONS OF HER MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS (DKT. 61) by Judge John A. Kronstadt. Based on a review of the Application of Defendant Mary Bono for Leave to File Under Seal Portions of Her Motion for Summary Judgment and Supporting Documents (the Application (Dkt. 61)), sufficient good cause has been shown for the requested relief. Therefore, the relief requested through the Application is GRANTED, as follows: The items for which the confidentiality designations have not been withdrawn shall be filed under seal. (yl) (Entered: 12/07/2023) |
| 12/06/2023 | 76 | ORDER RE APPLICATION FOR LEAVE TO FILE DOCUMENTS IN SUPPORT OF PLAINTIFF AND COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER SEAL (DKT. 66 ) by Judge John A. Kronstadt. Based on a review of the Application for Leave to File Documents in Support of Plaintiff and Counter-defendant's Motion for Summary Judgment Under Seal, sufficient good cause has been shown for the requested relief. Therefore, the relief requested through the Application is GRANTED, as follows: The items for which the confidentiality designations have not been withdrawn shall be filed under seal. IT IS SO ORDERED. (yl) (Entered: 12/07/2023) |

| | | |
|---|---|---|
| 12/11/2023 | 77 | NOTICE OF LODGING filed *re REFILING OF DOCUMENTS IN CONNECTION WITH DEFENDANT AND COUNTERCLAIMANT MARY BONOS MOTION FOR SUMMARY JUDGMENT* re Order on Motion for Leave to File Document Under Seal,, 75 (Attachments: # 1 Exhibit 12 to Schacht Decl., # 2 Exhibit 13 to Schacht Decl., # 3 Exhibit 14 to Schacht Decl., # 4 Exhibit 16 to Schacht Decl., # 5 Exhibit 21 to Schacht Decl., # 6 Exhibit 22 to Schacht Decl., # 7 Exhibit 27 to Schacht Decl., # 8 Exhibit 29 to Schacht Decl., # 9 Exhibit 30 to Schacht Decl.)(Choi, Mario) (Entered: 12/11/2023) |
| 12/11/2023 | 78 | SEALED DOCUMENT *Notice of Filing Sealed Documents in Connection with Def. and Counterclaimants Motion for Summary Judgment* re Order on Motion for Leave to File Document Under Seal,, 75 filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Attachments: # 1 Exhibit 12 to Schacht Decl., # 2 Exhibit 13 to Schacht Decl., # 3 Exhibit 14 to Schacht Decl., # 4 Exhibit 16 to Schacht Decl., # 5 Exhibit 22 to Schacht Decl., # 6 Exhibit 27 to Schacht Decl., # 7 Exhibit 29 to Schacht Decl., # 8 Exhibit 30 to Schacht Decl.)(Choi, Mario) (Entered: 12/11/2023) |
| 12/12/2023 | 79 | STATEMENT of REDACTED Proposed Statement of Uncontroverted Facts in Support of Plaintiff and Counterdefendant Cher's NOTICE OF MOTION AND MOTION for Summary Judgment 65 filed by Plaintiff Cher, Counter Defendant Cher. (Anderson, Peter) (Entered: 12/12/2023) |
| 12/12/2023 | 80 | SEALED DOCUMENT *Sealed Statement of Uncontroverted Facts* re NOTICE OF MOTION AND MOTION for Summary Judgment 65 , Order on Motion for Leave to File Document Under Seal,, 76 filed by Plaintiff Cher, Counter Defendant Cher.(Anderson, Peter) (Entered: 12/12/2023) |
| 12/12/2023 | 81 | APPENDIX filed by Plaintiff Cher, Counter Defendant Cher. Re: NOTICE OF MOTION AND MOTION for Summary Judgment 65 *Appendix of Exhibits* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Redacted Document Exhibit 9, # 10 Redacted Document Exhibit 10, # 11 Redacted Document Exhibit 11, # 12 Exhibit 12, # 13 Redacted Document Exhibit 13, # 14 Redacted Document Exhibit 14, # 15 Redacted Document Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Redacted Document Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38)(Anderson, Peter) (Entered: 12/12/2023) |
| 12/12/2023 | 82 | SEALED DOCUMENT *Appendix of Exhibits* re NOTICE OF MOTION AND MOTION for Summary Judgment 65 , Order on Motion for Leave to File Document Under Seal,, 76 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Unredacted Document Exhibit 9, # 10 Unredacted Document Exhibit 10, # 11 Unredacted Document Exhibit 11, # 12 Exhibit 12, # 13 Unredacted Document Exhibit 13, # 14 Unredacted Document Exhibit 14, # 15 Unredacted Document Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Unredacted Document Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38)(Anderson, Peter) (Entered: 12/12/2023) |
| 12/14/2023 | 83 | MINUTE ORDER IN CHAMBERS by Magistrate Judge Rozella A. Oliver: re: In Camera Review for Discovery Dispute 57 . The Court finds that an in camera review is warranted of the communications for which Ms. Bono has asserted attorney work product |

| | | |
|---|---|---|
| | | protection. Counsel may either lodge those entries by email or by a secure file link to RAO_Chambers@cacd.uscourts.gov. The documents shall be lodged by December 21, 2023. See Order for further details. (eq) (Entered: 12/14/2023) |
| 12/22/2023 | 84 | APPLICATION to file document *Portions of Def./Counter Claimant s Opposition to Plt.'s/Counter-Def.'s Motion for Summary Judgment* under seal filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Attachments: # 1 Redacted Document Stmt Disputed Facts in Opp'n to Pltf.'s MSJ, # 2 Proposed Order)(Schacht, Daniel) (Entered: 12/22/2023) |
| 12/22/2023 | 85 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Portions of Def./Counter Claimant s Opposition to Plt.'s/Counter-Def.'s Motion for Summary Judgment* under seal 84 filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Attachments: # 1 Unredacted Document Stmt Disputed Facts in Opp'n to Pltf.'s MSJ)(Schacht, Daniel) (Entered: 12/22/2023) |
| 12/22/2023 | 86 | Opposition re: NOTICE OF MOTION AND MOTION for Summary Judgment 65 filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Attachments: # 1 Declaration Schacht Decl. ISO Opposition, # 2 Exhibit 1 to Schacht Decl.)(Schacht, Daniel) (Entered: 12/22/2023) |
| 12/22/2023 | 87 | STATEMENT of DISPUTED FACTS AND CONCLUSIONS OF LAW IN OPPOSITION TO PLAINTIFF AND COUNTERDEFENDANT CHERS MOTION FOR SUMMARY JUDGMENT NOTICE OF MOTION AND MOTION for Summary Judgment 65 filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Schacht, Daniel) (Entered: 12/22/2023) |
| 12/22/2023 | 88 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Claims and Def.'s Counterclaims 64 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Statement of Genuine Disputes of Material Fact, # 2 Statement of Additional Material Facts, # 3 Declaration of Peter Anderson, # 4 Exhibit 39, # 5 Exhibit 40, # 6 Exhibit 41, # 7 Exhibit 42, # 8 Exhibit 43, # 9 Exhibit 44, # 10 Exhibit 45, # 11 Exhibit 46)(Anderson, Peter) (Entered: 12/22/2023) |
| 12/22/2023 | 89 | Evidentiary Objections re: NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Claims and Def.'s Counterclaims 64 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Proposed Order)(Anderson, Peter) (Entered: 12/22/2023) |
| 12/26/2023 | 90 | MINUTES (IN CHAMBERS) by Magistrate Judge Rozella A. Oliver re: Application for Order 57 . The Court overrules Defendant's assertions of attorney-client privilege and work product protection for communications including Wixen and Warner Chappell. Defendant is ordered to produce the communications at issue without redactions, with one exception. Defendant shall produce the communications by January 9, 2024. See order for further details. (RAO) (Entered: 12/26/2023) |
| 12/28/2023 | 91 | ORDER RE APPLICATION OF DEFENDANT MARY BONO FOR LEAVE TO FILE UNDER SEAL PORTIONS OF HER OPPOSITION TO PLAINTIFF AND COUNTERDEFENDANT CHER'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS (DKT. 84) by Judge John A. Kronstadt. Based on a review of the Application of Defendant Mary Bono for Leave to File Under Seal Portions of Her Opposition to Plaintiff and Counterdefendant Cher's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment and Supporting Documents, sufficient good cause has been shown for the requested relief. Therefore, the relief requested through the Application is GRANTED, as follows: The materials sought |

| | | |
|---|---|---|
| | | to be filed under seal shall be filed under seal. IT IS SO ORDERED. (yl) (Entered: 12/29/2023) |
| 01/19/2024 | 92 | REPLY in Support of NOTICE OF MOTION AND MOTION for Summary Judgment 65 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Redacted Document Response to Defendant and Counterclaimant's Statement of Disputed Facts, # 2 Response to Defendant and Counterclaimant's Additional Facts, # 3 Declaration of Peter Anderson, # 4 Exhibit 47, # 5 Exhibit 48, # 6 Exhibit 49)(Anderson, Peter) (Entered: 01/19/2024) |
| 01/19/2024 | 93 | APPLICATION to file document *Portions of Plaintiff and Counterdefendant's Response to Defendant and Counterclaimant's Statement of Disputed Facts* under seal filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Declaration of Eric Lamm, # 2 Redacted Document Response to Defendant and Counterclaimant's Statement of Disputed Facts, # 3 Proposed Order)(Anderson, Peter) (Entered: 01/19/2024) |
| 01/19/2024 | 94 | REPLY Support NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Claims and Def.'s Counterclaims 64 filed by Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono. (Attachments: # 1 Def.'s Resp. to Disputed Separate Statement, # 2 Def.'s Resp. to Pltf.'s Add'l Stmt. in Opp. to Def.'s MSJ, # 3 Def.'s Resp.to Pltf.'s Objections to Evidence)(Schacht, Daniel) (Entered: 01/19/2024) |
| 01/19/2024 | 95 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Portions of Plaintiff and Counterdefendant's Response to Defendant and Counterclaimant's Statement of Disputed Facts* under seal 93 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Unredacted Document Response to Defendant and Counterclaimant's Statement of Disputed Facts)(Anderson, Peter) (Entered: 01/19/2024) |
| 01/23/2024 | 96 | ORDER RE APPLICATION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF PLAINTIFF AND COUNTERDEFENDANT'S RESPONSE TO DEFENDANT AND COUNTERCLAIMANT'S STATEMENT OF DISPUTED FACTS 93 by Judge John A. Kronstadt. Therefore, the relief requested through the Application is GRANTED, as follows: The identified materials shall be filed under seal. (rolm) (Entered: 01/23/2024) |
| 01/26/2024 | 97 | RESPONSE filed by Plaintiff Cher, Counter Defendant Cher *REDACTED Plaintiff and Counterdefendant's Response to Defendant and Counterclaimant's Statement of Disputed Facts* (Anderson, Peter) (Entered: 01/26/2024) |
| 01/26/2024 | 98 | SEALED DOCUMENT *Unredacted Plaintiff and Counterdefendant's Response to Defendant and Counterclaimant's Statement of Disputed Facts* re Order on Motion for Leave to File Document Under Seal, 96 filed by Plaintiff Cher, Counter Defendant Cher. (Anderson, Peter) (Entered: 01/26/2024) |
| 02/01/2024 | 99 | NOTICE of Decision: of Other Court filed by plaintiff and counter-defendant Cher. (Anderson, Peter) (Entered: 02/01/2024) |
| 02/21/2024 | 100 | (IN CHAMBERS) ORDER CONFIRMING THE TIME FOR DEFENDANT MARY BONO'S MOTION FOR SUMMARY JUDGMENT (DKT. 64 ) and PLAINTIFF AND COUNTER DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT HEARING (DKT. 65 ) by Judge John A. Kronstadt: The TIME for the hearing is CONFIRMED for 8:30 a.m., on February 26, 2024. The hearing will proceed in-person at the First Street Courthouse, Courtroom 10C. (NOTE: COURTROOM CHANGE) THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (tj) TEXT ONLY ENTRY (Entered: 02/21/2024) |
| 02/26/2024 | 101 | DEFENDANT MARY BONO'S MOTION FOR SUMMARY JUDGMENT (DKT. 64 ); PLAINTIFF AND COUNTER DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY |

| | | |
|---|---|---|
| | | JUDGMENT (DKT. 65 ) held before Judge John A. Kronstadt: The motion hearing is held. The Court states its tentative views that it is inclined to deny in part and grant in part Defendant Mary Bono's Motion for Summary Judgment at Dkt. 64 , and grant in part and deny in part Plaintiff and Counter Defendant's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment at Dkt. 65 (together, the "Motions"). Counsel address the Court. The Court takes the Motions UNDER SUBMISSION and a ruling will be issued. See minutes for details. Court Reporter: Miriam Baird. (jgr) Modified on 2/28/2024 (tj). (Entered: 02/27/2024) |
| 03/05/2024 | 102 | JOINT REPORT of RE MEDIATION filed by Plaintiff Cher, Counter Defendant Cher. (Anderson, Peter) (Entered: 03/05/2024) |
| 03/19/2024 | 103 | TRANSCRIPT ORDER as to Defendant Mary Bono(individually and as Trustee of The Bono Collection Trust) for Court Reporter. Court will contact Pam Trempel at ptrempel@donahue.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Schacht, Daniel) (Entered: 03/19/2024) |
| 04/11/2024 | 104 | Notice of Withdrawal of Counsel Mario M. Choi for Defendant and Counterclaimant Mary Bono filed by Plaintiff Mary Bono(individually and as Trustee of The Bono Collection Trust). (Choi, Mario) (Entered: 04/11/2024) |
| 04/12/2024 | 105 | TRANSCRIPT for proceedings held on 2/26/24. Court Reporter/Electronic Court Recorder: Miriam Baird, phone number mvb11893@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/3/2024. Redacted Transcript Deadline set for 5/13/2024. Release of Transcript Restriction set for 7/11/2024. (Baird, Miriam) (Entered: 04/12/2024) |
| 04/12/2024 | 106 | NOTICE OF FILING TRANSCRIPT filed for proceedings 2/26/24 re Transcript 105 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Baird, Miriam) TEXT ONLY ENTRY (Entered: 04/12/2024) |
| 05/29/2024 | 107 | MINUTES (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 64); PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE M OTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 65) by Judge John A. Kronstadt: granting in part and denying in part 64 for Summary Judgment; granting in part and denying in part 65 for Summary Judgment: For the foregoing reasons, Defendant's Motion is DENIED as to all issues presented except for her first counterclaim, which is GRANTED IN PART, and Plaintiff's Motion is GRANTED as to all remaining issues except for her second claim for breach of contract, which is GRANTED IN PART. (see document for further details) (bm) (Entered: 05/29/2024) |
| 05/29/2024 | 108 | (IN CHAMBERS) ORDER SETTING DATE TO FILE JOINT TRIAL REPORT by Judge John A. Kronstadt: Counsel shall confer and file a Joint Trial Report no later than June 12, 2024, which shall include the parties' respective and/or collective views on: (i) whether a further mediation session would be productive and, if so, when; (ii) a proposed date for the final pretrial conference and trial; (iii) the trial estimate and whether either party is requesting that the panel be pre-screened and, if so, the basis for such; and (iv) any issues that need to be addressed prior to the commencement of trial. Attached to the joint report shall be the Schedule of Dates for Civil Jury Trials, found in the Standing Order on the Court's procedures and schedules page located at: http:// www.cacd.uscourts.gov/honorable-john-kronstadt. The Court will set dates upon review |

| | | |
|---|---|---|
| | | of the report.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (tj) TEXT ONLY ENTRY (Entered: 05/29/2024) |
| 06/07/2024 | 109 | STIPULATION for Extension of Time to File Joint Trial Report filed by plaintiff and counter-defendant Cher. (Attachments: # 1 Proposed Order)(Anderson, Peter) (Entered: 06/07/2024) |
| 06/12/2024 | 110 | ORDER RE STIPULATION TO CONTINUE DEADLINE TO FILE JOINT TRIAL REPORT (DKT. 109 )by Judge John A. Kronstadt. Based on a review of the Stipulation to Continue the Deadline to File the Joint Trial Report sufficient good cause has been shown for the requested relief. Therefore, the Stipulation is APPROVED, as follows:The Joint Trial Report shall be filed on or before June 28, 2024.IT IS SO ORDERED. (yl) (Entered: 06/12/2024) |
| 06/28/2024 | 111 | TRIAL REPORT of MARY BONO filed by Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono. (Attachments: # 1 Exhibit A - Schedule of Dates for Trial) (Schacht, Daniel) (Entered: 06/28/2024) |
| 06/28/2024 | 112 | PLAINTIFF'S TRIAL REPORT filed by Plaintiff Cher, Counter Defendants Cher, Cher. (Anderson, Peter) (Entered: 06/28/2024) |
| 09/18/2024 | 113 | (IN CHAMBERS) ORDER SETTING PRETRIAL DEADLINES (DKTS. 111 & 112 ) by Judge John A. Kronstadt. The Court has reviewed the parties June 28, 2024 Trial Reports and sets the following deadlines: October 2, 2024- Deadline to file Joint Report as stated in this Order. November 1, 2024- Deadline to file all pretrial documents and direct testimony declarations. November 8, 2024 -Last day to file objections to direct testimony declarations. November 18, 2024- Anticipated ruling on direct testimony declarations. November 18, 2024 at 1:30 p.m.- Final Pretrial Conference, Status Conference re Disputed Exhibits. December 13, 2024 at 9:00 a.m.- Bench Trial (est. 1 day). Counsel shall prepare all pretrial documents consistent with the Local Rules and this Courts Standing Orders. (See document for further details) (yl) (Entered: 09/18/2024) |
| 09/19/2024 | 114 | Notice Disassociation of Counsel filed by Defendant/Counterclaimant Mary Bono(individually and as Trustee of The Bono Collection Trust). (Schacht, Daniel) (Entered: 09/19/2024) |
| 09/19/2024 | 115 | NOTICE of Appearance filed by attorney Andrew Scott MacKay on behalf of Counter Claimant Mary Bono, Defendant Mary Bono (Attorney Andrew Scott MacKay added to party Mary Bono(pty:cc), Attorney Andrew Scott MacKay added to party Mary Bono(pty:dft))(MacKay, Andrew) (Entered: 09/19/2024) |
| 10/02/2024 | 116 | JOINT REPORT of Re Order Setting Pretrial Deadlines filed by Counter Defendant Cher, Plaintiff Cher. (Anderson, Peter) (Entered: 10/02/2024) |
| 10/15/2024 | 117 | ORDER REGARDING JOINT REPORT 116 by Judge John A. Kronstadt. In light of the anticipated motion in limine, the corresponding briefing and a hearing and decision on such a motion prior to the deadline for the filing of direct testimony declarations by the parties, and the trials and other matters presently scheduled with the Court in other cases prior to the current trial date in this action, a modification of the current schedule in this action is necessary. The trial shall be continued from December 13, 2024, to a date in January or February 2025. The parties shall meet and confer regarding their availability during those two months. They shall then communicate those available dates to the Courtroom Deputy Clerk, Ms. Jackson, on or before October 18, 2024, at Noon. They may do so by sending an email to jak_chambers@cacd.uscourts.gov. Based on a review by the Court of the dates on which the parties are available, and the other matters on the Courts calendars in January and February 2025, the Court will set a new trial date through the issuance of an order. That order will also include a revised schedule for the briefing on the anticipated motion in limine, a hearing on the motion in limine, the filing of direct |

| | | |
|---|---|---|
| | | testimony declarations, objections and rulings on those objections, and the Final Pretrial Conference. IT IS SO ORDERED. (yl) (Entered: 10/15/2024) |
| 10/22/2024 | 118 | MINUTE ORDER IN CHAMBERS by Judge John A. Kronstadt. On October 15, 2024, an Order issued stating that a modification of the current trial date in this action was necessary. The parties have since communicated with the Courtroom Deputy Clerk as their availability and preferred dates. Based on that information, as well scheduled proceedings in other cases, the following amended deadlines are adopted: October 30, 2024- Deadline to file Motion(s) in Limine. November 6, 2024- Deadline to file any opposition to Motion(s) in Limine. November 18, 2024 at 1:30 p.m.- Hearing on Motion(s) in Limine. December 20, 2024- Deadline to file all pretrial documents and direct testimony declarations. January 3, 2025- Last day to file objections to direct testimony declarations. January 13, 2025- Anticipated ruling on direct testimony declarations. January 13, 2025 at 1:30 p.m. - (If necessary) Final Pretrial Conference, Status Conference regarding Disputed Exhibits. February 26, 2025 at 9:00 a.m.- Bench Trial (est. 1 day) (SEE DOCUMENT FOR FURTHER DETAILS) (yl) (Entered: 10/22/2024) |
| 10/30/2024 | 119 | NOTICE OF MOTION AND MOTION IN LIMINE (1) to Limit The Use of Evidence at Trial filed by Defendant Mary Bono(individually and as Trustee of The Bono Collection Trust). Motion set for hearing on 11/18/2024 at 01:30 PM before Judge John A. Kronstadt. (Attachments: # 1 Declaration Schacht Decl. in support, # 2 Exhibit A to Schacht Decl., # 3 Exhibit B to Schacht Decl., # 4 Exhibit C to Schacht Decl., # 5 Exhibit D to Schacht Decl., # 6 Exhibit E to Schacht Decl., # 7 Exhibit F to Schacht Decl., # 8 Exhibit G to Schacht Decl., # 9 Exhibit H to Schacht Decl., # 10 Exhibit I to Schacht Decl.)(Schacht, Daniel) (Entered: 10/30/2024) |
| 11/06/2024 | 120 | MEMORANDUM in Opposition to MOTION IN LIMINE (1) to Limit The Use of Evidence at Trial 119 filed by Counter Defendants Cher, Cher, Plaintiff Cher. (Attachments: # 1 Declaration, # 2 Exhibit 1 to Declaration, # 3 Exhibit 2 to Declaration) (Anderson, Peter) (Entered: 11/06/2024) |
| 11/15/2024 | 121 | (IN CHAMBERS) ORDER ADVANCING THE TIME FOR MOTION IN LIMINE NO. 1 CONCERNING DOCUMENTS NOT PRODUCED DURING THE DISCOVERY PHASE REGARDING PLAINTIFF'S SALE AGREEMENT WITH ICONIC CHER LLC HEARING (DKT. 119 ) by Judge John A. Kronstadt: On the Court's own motion, the TIME for the hearing is ADVANCED from 1:30 p.m., to 9:15 a.m., on November 18, 2024. The hearing will proceed in-person at the First Street Courthouse, Courtroom 10C. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (tj) TEXT ONLY ENTRY (Entered: 11/15/2024) |
| 11/18/2024 | 122 | MOTION IN LIMINE NO. 1 (DKT. 119 ) held before Judge John A. Kronstadt. Court Reporter: Debbie Hino-Spaan. Defendant's Motion in Limine No. 1 Concerning Documents Not Produced During the Discovery Phase Regarding Plaintiff's Sale Agreement with Iconic Cher LLC (Dkt. 119): The motion is DENIED; provided, however, Defendant is permitted to take a deposition or further deposition of Iconic Cher LLC or Cher, with respect to any newly produced documents. If there is a dispute as to the propriety or scope of a further deposition, it may be presented to the Court through a joint statement. A further status conference is scheduled for December 9, 2024, at 8:30 a.m., with the precise time to be determined when the calendar for that date is issued. IT IS SO ORDERED. (See document for further details) (yl) (Entered: 11/22/2024) |
| 11/25/2024 | 123 | JOINT REPORT filed by Counter Defendants Cher, Cher, Plaintiff Cher. (Anderson, Peter) (Entered: 11/25/2024) |
| 12/02/2024 | 124 | NOTICE OF LODGING filed re Order on Motion in Limine to Limit,,,, Motion Hearing,,,, Set/Reset Hearing,,, 122 (Attachments: # 1 Proposed Judgment)(Anderson, |

| | | |
|---|---|---|
| | | Peter) (Entered: 12/02/2024) |
| 12/06/2024 | 125 | NOTICE of Change of Attorney Business or Contact Information: for attorney Peter J. Anderson counsel for Plaintiff Cher. Changing address to 350 S. Grand Avenue, 27th Floor, Los Angeles, CA 90071. Filed by Plaintiff Cher. (Anderson, Peter) (Entered: 12/06/2024) |
| 12/06/2024 | 126 | SCHEDULING NOTICE (IN CHAMBERS) ORDER CHANGING THE TIME FOR FURTHER STATUS CONFERENCE by Judge John A. Kronstadt: On the Courts own motion, the TIME for the Further Status Conference is reset from 8:30 a.m. to 9:40 a.m. on December 9, 2024. The hearing will proceed in-person at the First Street Courthouse, Courtroom 10C. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dto) TEXT ONLY ENTRY (Entered: 12/06/2024) |
| 12/09/2024 | 127 | FURTHER STATUS CONFERENCE held before Judge John A. Kronstadt. The Court orders counsel to meet and confer and, on or before December 16, 2024, file a joint report stating their collective and/or respective position(s) as to whether it is productive for them to meet with a neutral. If the parties have determined it is not productive for them to meet with a neutral, in the joint report, they shall state their collective and/or respective position(s) as to a proposed amended schedule, presented in conformance with the Civil Standing Order for how such joint reports are to be filed. The current December 20, 2024 deadline for filing all pretrial documents and direct testimony declarations is vacated. IT IS SO ORDERED. Court Reporter: Deborah Parker. (yl) (Entered: 12/16/2024) |
| 12/16/2024 | 128 | JOINT REPORT of Re Mediation and Proposed Scheduled Dates filed by Counter Defendant Cher, Plaintiff Cher. (Anderson, Peter) (Entered: 12/16/2024) |
| 12/23/2024 | 129 | MINUTE ORDER (IN CHAMBERS) ORDER SETTING SECOND AMENDED PRETRIAL DEADLINES by Judge John A. Kronstadt. Based on the Joint Report, as well scheduled proceedings in other cases,the following amended deadlines are adopted: January 10, 2025 Deadline to file motion to compel before Magistrate Judge Oliver; January 17, 2025 Deadline to file any opposition to motion to compel; February 21, 2025 Deadline for completion of depositions related to Iconic Cher, LLC agreements (if needed); March 14, 2025 Deadline to file all pretrial documents and direct testimony declarations; March 28, 2025 Last day to file objections to direct testimony declarations; April 21, 2025 Anticipated ruling on direct testimony declarations; April 21, 2025 at 1:30 p.m. (If necessary) Final Pretrial Conference, Status Conference re Disputed Exhibits; April 29-30, 2025 at 9:00 a.m. Bench Trial ( est. 2 days). (lom) (Entered: 12/23/2024) |
| 01/10/2025 | 130 | NOTICE OF MOTION AND MOTION to Compel PLAINTIFFS SALE AGREEMENT WITH ICONIC CHER LLC filed by Defendant Mary Bono. Motion set for hearing on 2/5/2025 at 10:00 AM before Magistrate Judge Rozella A. Oliver. (Attachments: # 1 Declaration Schacht Decl. in support, # 2 Exhibit A to Schacht Decl., # 3 Exhibit B to Schacht Decl., # 4 Exhibit C to Schacht Decl., # 5 Exhibit D to Schacht Decl., # 6 Exhibit E to Schacht Decl., # 7 Exhibit F to Schacht Decl., # 8 Exhibit G to Schacht Decl., # 9 Exhibit H to Schacht Decl., # 10 Exhibit I to Schacht Decl., # 11 Exhibit J to Schacht Decl., # 12 Exhibit K to Schacht Decl., # 13 Exhibit L to Schacht Decl., # 14 Exhibit M to Schacht Decl.)(Schacht, Daniel) Modified on 1/13/2025 (yl). (Entered: 01/10/2025) |
| 01/15/2025 | 131 | STIPULATION for Extension of Time to File Opposition to Motion to Compel filed by Plaintiff/Counterdefendant Cher(individually and as Trustee of The Veritas Trust). (Attachments: # 1 Proposed Order)(Lamm, Eric) (Entered: 01/15/2025) |
| 01/16/2025 | 132 | ORDER REGARDING STIPULATION TO PROPOSED ORDER EXTENDING BY ONE WEEK THE DEADLINE TO FILE ANY OPPOSITION TO MOTION TO COMPEL (DKT. 131 ) by Judge John A. Kronstadt. Based on a review of the Stipulation to Order Extending by One Week the Deadline to File any Opposition to Motion to |

| | | |
|---|---|---|
| | | Compel, sufficient good cause has been shown for the requested relief. Therefore, the Stipulation is APPROVED, as follows: The deadline to file any opposition to the Motion to Compel Plaintiff's Sale Agreement with Iconic Cher LLC (Dkt. 130 ), is continued from January 17, 2025 to January 24, 2025. IT IS SO ORDERED. (yl) (Entered: 01/17/2025) |
| 01/24/2025 | 133 | Opposition re: MOTION to Compel PLAINTIFFS SALE AGREEMENT WITH ICONIC CHER LLC 130 filed by Counter Defendant Cher, Plaintiff Cher. (Attachments: # 1 Declaration of Daniel Brescoll, # 2 Declaration of J. Eugene Salomon, # 3 Declaration of Peter Anderson, # 4 Exhibit 1)(Anderson, Peter) (Entered: 01/24/2025) |
| 01/31/2025 | 134 | SCHEDULING NOTICE - Text Only - by Magistrate Judge Rozella A. Oliver re: MOTION to Compel PLAINTIFFS SALE AGREEMENT WITH ICONIC CHER LLC 130 set for 2/5/2025 at 10:00 a.m. will be by video. A Zoom meeting invitation will be emailed to the parties by the clerk. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (edr) TEXT ONLY ENTRY (Entered: 01/31/2025) |
| 02/03/2025 | 135 | TRANSCRIPT for proceedings held on 12/09/2024, 9:59 a.m. Court Reporter: Deborah D. Parker, CSR 10342, phone number transcripts@ddparker.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through DEBORAHDPARKER.COM or PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/24/2025. Redacted Transcript Deadline set for 3/6/2025. Release of Transcript Restriction set for 5/5/2025. (dpa) (Entered: 02/03/2025) |
| 02/03/2025 | 136 | NOTICE OF FILING TRANSCRIPT filed for proceedings 12/09/2024, 9:59 a.m. re Transcript 135 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dpa) TEXT ONLY ENTRY (Entered: 02/03/2025) |
| 02/05/2025 | 137 | MINUTES OF VIDEO HEARING RE: MOTION TO COMPEL 130 by Magistrate Judge Rozella A. Oliver: The case was called for a hearing by Zoom. Counsel for the parties made their video appearances. The Court and the parties discussed Defendant Mary Bono's ("Defendant") pending Motion to Compel Plaintiff Cher's ("Plaintiff") Sale Agreement with Iconic Cher LLC ("Iconic"). Dkt. No. 130. The Court will take the matter under submission and issue a ruling after it completes the in camera review. IT IS SO ORDERED. (See attached) (edr) (Entered: 02/05/2025) |
| 02/13/2025 | 138 | (IN CHAMBERS) MINUTE ORDER RE: MOTION TO COMPEL PLAINTIFF'S SALE AGREEMENT WITH ICONIC CHER LLC 130 by Magistrate Judge Rozella A. Oliver: Defendant's Motion is granted-in-part. Plaintiff shall produce further unredacted versions of the APA and GA to Defendant's counsel by February 27, 2025, absent an objection from Iconic. If Iconic objects to any of the further redactions, the parties are directed to meet and confer on next steps and to file a joint status report by February 27, 2025. IT IS SO ORDERED. (See attached) (edr) (Entered: 02/13/2025) |
| 02/27/2025 | 139 | PLAINTIFF'S REPORT of Re Magistrate Judge's Order on Defendant's Motion to Compel filed by Counter Defendant Cher, Plaintiff Cher. (Anderson, Peter) (Entered: 02/27/2025) |
| 03/14/2025 | 140 | NOTICE of Appearance filed by attorney Padmini Cheruvu on behalf of Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono (Attorney Padmini Cheruvu added to party Mary Bono(pty:cc), Attorney Padmini Cheruvu added to party Mary Bono(pty:dft), Attorney Padmini Cheruvu added to party Mary Bono(pty:cc))(Cheruvu, Padmini) (Entered: 03/14/2025) |
| 03/14/2025 | 141 | DECLARATION of Jeremy Blietz re Minutes of In Chambers Order/Directive - no proceeding held,,,, Set/Reset Deadlines/Hearings,,,, Terminate Hearings,,, 129 *DIRECT TESTIMONY DECLARATION OF CUSTODIAN OF RECORDS JEREMY BLIETZ* filed |

| | | |
|---|---|---|
| | | by Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono. (Schacht, Daniel) (Entered: 03/14/2025) |
| 03/14/2025 | 142 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Mary Bono(individually and as Trustee of The Bono Collection Trust). (Schacht, Daniel) (Entered: 03/14/2025) |
| 03/14/2025 | 143 | Witness List filed by Plaintiff/Counterclaimant Mary Bono(individually and as Trustee of The Bono Collection Trust).. (Schacht, Daniel) (Entered: 03/14/2025) |
| 03/14/2025 | 144 | JOINT Exhibit List filed by Plaintiff and Counterdefendant Cher.. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 145 | Witness List filed by Plaintiff and Counterdefendant Cher.. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 146 | Joint REQUEST for Pretrial Conference *Proposed Order* filed by Plaintiff and Counterdefendant Cher. Request set for hearing on 4/21/2025 at 01:30 PM before Judge John A. Kronstadt. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 147 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiff and Counterdefendant Cher. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 148 | Witness List filed by Plaintiff and Counterdefendant Cher.. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 149 | DECLARATION of Daniel Brescoll filed by Plaintiff Cher. (Attachments: # 1 Exhibit 101, # 2 Exhibit 102, # 3 Exhibit 103)(Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 150 | DECLARATION of Peter Anderson filed by Plaintiff Cher. (Attachments: # 1 Exhibit 104, # 2 Exhibit 105, # 3 Exhibit 106, # 4 Exhibit 107)(Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 151 | REQUEST FOR JUDICIAL NOTICE filed by Plaintiff Cher. (Anderson, Peter) (Entered: 03/14/2025) |
| 03/14/2025 | 152 | NOTICE OF LODGING filed re Minutes of In Chambers Order/Directive - no proceeding held,,,, Set/Reset Deadlines/Hearings,,,, Terminate Hearings,,, 129 (Attachments: # 1 [Proposed] Findings of Fact and Conclusions of Law)(Anderson, Peter) (Entered: 03/14/2025) |
| 03/28/2025 | 153 | OBJECTIONS to Declaration, 141 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Declaration of Peter Anderson, # 2 Exhibit A)(Anderson, Peter) (Entered: 03/28/2025) |
| 03/28/2025 | 154 | OBJECTIONS to Declaration 149 *OF DANIEL BRESCOLL* filed by Counter Claimants Mary Bono, Mary Bono, Defendant Mary Bono. (Attachments: # 1 Declaration Schacht Decl. in support, # 2 Exhibit A to Schacht Decl.)(Schacht, Daniel) (Entered: 03/28/2025) |
| 04/14/2025 | 155 | Notice of Withdrawal of Approval of [Proposed] Pretrial Conference Order filed by Plaintiff and Counterdefendant Cher. (Anderson, Peter) (Entered: 04/14/2025) |
| 04/14/2025 | 156 | DECLARATION of Peter Anderson re Notice (Other) 155 filed by Plaintiff Cher, Counter Defendant Cher. (Attachments: # 1 Exhibit 109, # 2 Exhibit 110, # 3 Exhibit A) (Anderson, Peter) (Entered: 04/14/2025) |
| 04/14/2025 | 157 | TRIAL BRIEF filed by Plaintiff and Counterdefendant Cher.. (Anderson, Peter) (Entered: 04/14/2025) |
| 04/15/2025 | 158 | (IN CHAMBERS) ORDER CALLING FOR RESPONSE FROM DEFENDANT AND ANY UPDATED PRETRIAL FILINGS by Judge John A. Kronstadt: On April 14, 2025, |

| | | |
|---|---|---|
| | | Plaintiff filed a Notice of Withdrawal of Approval of the Proposed Final Pretrial Conference Order (Dkt. 155 ), a declaration from Plaintiff's counsel Peter Anderson (the "Anderson Declaration" (Dkt. 156 )), and a trial brief ("Plaintiff's Trial Brief" (Dkt. 157 )). Based on a review of these filings, on or before April 17, 2025, at 10:00 a.m., Defendant shall file a response to the April 14, 2025 filings and/or any additional or updated pretrial filings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (nle) TEXT ONLY ENTRY (Entered: 04/15/2025) |
| 04/16/2025 | 159 | Amended MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiff and Counterdefendant Cher. (Anderson, Peter) (Entered: 04/16/2025) |
| 04/16/2025 | 160 | Witness List filed by Plaintiff and Counterdefendant Cher.. (Anderson, Peter) (Entered: 04/16/2025) |
| 04/16/2025 | 161 | NOTICE OF LODGING filed re Minutes of In Chambers Order/Directive - no proceeding held,,,, Set/Reset Deadlines/Hearings,,,, Terminate Hearings,,, 129 (Attachments: # 1 [Proposed] Findings of Fact and Conclusions of Law)(Anderson, Peter) (Entered: 04/16/2025) |
| 04/17/2025 | 162 | RESPONSE filed by Defendant Mary Bonoto Text Only Scheduling Notice,, 158 *Response to Plaintiff's Notice of Withdrawal of Approval of Proposed Pretrial Conference Order* (Attachments: # 1 Declaration of Daniel Schacht ISO, # 2 Exhibit A to Schacht Declaration, # 3 Exhibit B to Schacht Declaration, # 4 Exhibit C to Schacht Declaration, # 5 Exhibit D to Schacht Declaration)(Schacht, Daniel) (Entered: 04/17/2025) |
| 04/18/2025 | 163 | SCHEDULING NOTICE TEXT ONLY ENTRY by Judge John A. Kronstadt.(IN CHAMBERS) ORDER CHANGING THE TIME FOR THE PRETRIAL CONFERENCE/STATUS CONFERENCE 129 HEARINGS by Judge John A. Kronstadt: On the Courts own motion, the TIME for the Pretrial Conference/Status Conference re disputed exhibits are ADVANCE from 1:30 p.m. to 10:30 a.m. on April 21, 2025. These hearings will proceed in-person at the First Street Courthouse, Courtroom 10C. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ys) TEXT ONLY ENTRY (Entered: 04/18/2025) |
| 04/21/2025 | 164 | MINUTE ORDER OF FINAL PRETRIAL CONFERENCE; STATUS CONFERENCE RE DISPUTED EXHIBITS (DKT. 129 held before Judge John A. Kronstadt. In light of the parties' statement that the damages amount for Plaintiff's breach of contract claim is the only remaining factual dispute, with the consent of the parties, the bench trial date of April 29, 2025, is vacated. On or before May 12, 2025, the parties shall file a joint report with their collective and/or respective positions as to any remaining issues in the matter. (SEE DOCUMENT FOR FURTHER DETAILS) Court Reporter: Marea Woolrich. (yl) (Entered: 04/30/2025) |
| 05/12/2025 | 165 | JOINT REPORT of RE REMAINING ISSUES AND PROPOSED JUDGMENTS filed by Plaintiff Cher, Counter Defendants Cher, Cher. (Anderson, Peter) (Entered: 05/12/2025) |
| 05/12/2025 | 166 | NOTICE OF LODGING filed *Proposed Judgment With Defendants' Positions* re Pretrial Conference - Final - optional html form,,, Status Conference - optional html form,, 164 (Attachments: # 1 Proposed Order Proposed Judgment)(MacKay, Andrew) (Entered: 05/12/2025) |
| 05/12/2025 | 167 | NOTICE OF LODGING filed re Pretrial Conference - Final - optional html form,,, Status Conference - optional html form,, 164 (Attachments: # 1 Proposed Judgment)(Anderson, Peter) (Entered: 05/12/2025) |
| 11/26/2025 | 168 | JUDGMENT by Judge John A. Kronstadt. IT IS ORDERED AND ADJUDGED that: As to Plaintiff's first claim for relief, it is hereby declared that: As to Plaintiffs second claim |

| | | |
|---|---|---|
| | | for relief, Plaintiff is awarded damages against Defendant in the amount of the $187,534.91 in Composition Royalties that Defendant received and retained in breach of the MSA, plus prejudgment interest at the rate of seven percent per annum, from February 1, 2022, to the date of entry of Judgment. As to Defendants first counterclaim for relief, it is hereby declared that Defendant, subject to the rights of Sonny Bono's four children, has the sole discretion to decide whom to appoint as the royalty administrator pursuant to the MSA, including an entity owned and controlled by the Bono Heirs. Plaintiff is awarded costs incurred, in an amount to be determined by the Court, as to Plaintiff's First Claim for Relief, Plaintiff's Second Claim of Relief, and Defendants Second Counterclaim for Relief; and Defendant is awarded costs incurred, in an amount to be determined by the Court, as to Defendants First Counterclaim for Relief. IT IS SO ORDERED. (SEE DOCUMENT FOR FURTHER DETAILS)(MD JS-6, Case Terminated). (yl) Modified on 12/1/2025 (yl). (Entered: 12/01/2025) |
| 12/08/2025 | 169 | STIPULATION for Order Extending Deadline to File Motions for Attorney's Fees and Bills of Costs filed by Plaintiff and Counterdefendant Cher. (Attachments: # 1 Proposed Order)(Anderson, Peter) (Entered: 12/08/2025) |
| 12/09/2025 | 170 | ORDER RE STIPULATION TO ORDER EXTENDING DEADLINE TO FILE MOTIONS FOR ATTORNEY'S FEES AND BILLS OF COSTS (DKT. 169 ) by Judge John A. Kronstadt. The Stipulation is APPROVED, as follows: The deadline to file any bills of costs and motions for attorney's fees is continued from December 10, 2025, to January 12, 2026. IT IS SO ORDERED. (yl) (Entered: 12/09/2025) |
| 12/22/2025 | 171 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff Mary Bono(individually and as Trustee of The Bono Collection Trust). Appeal of Judgment,,,,, 168 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-41146396.) (Schacht, Daniel) (Entered: 12/22/2025) |
| 12/23/2025 | 172 | TRANSCRIPT ORDER as to Defendant and Cross-Claimant Mary Bono(individually and as Trustee of The Bono Collection Trust) for Court Reporter. Court will contact Melanie Y. Kim at mkim@donahue.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Schacht, Daniel) (Entered: 12/23/2025) |
| 12/23/2025 | 173 | TRANSCRIPT ORDER as to Defendant and Cross-Claimant Mary Bono(individually and as Trustee of The Bono Collection Trust) for Court Reporter. Court will contact Melanie Y. Kim at mkim@donahue.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Schacht, Daniel) (Entered: 12/23/2025) |
| 12/29/2025 | 174 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 25-8085 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 171 as to defendant Mary Bono. (mat) (Entered: 12/30/2025) |
| 01/02/2026 | 175 | DESIGNATION of Record on Appeal by DEFENDANT Mary Bono re 171 (Schacht, Daniel) (Entered: 01/02/2026) |
| 01/12/2026 | 176 | First APPLICATION to the Clerk to Tax Costs against Plaintiff/Counter-Defendant Cher filed by Defendant/Counterclaimant Mary Bono(individually and as Trustee of The Bono Collection Trust). (Schacht, Daniel) (Entered: 01/12/2026) |
| 01/12/2026 | 177 | APPLICATION to the Clerk to Tax Costs against Defendant and Counterclaimant Mary Bono(individually and as Trustee of The Bono Collection Trust) filed by Plaintiff and Counterdefendant Cher. (Anderson, Peter) (Entered: 01/12/2026) |
| 01/12/2026 | 178 | NOTICE OF MOTION AND MOTION for Attorney Fees filed by Plaintiff and Counterdefendant Cher. Motion set for hearing on 2/23/2026 at 08:30 AM before Judge |

| | | |
|---|---|---|
| | | John A. Kronstadt. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Peter Anderson, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Declaration of Samantha Liu) (Anderson, Peter) (Entered: 01/12/2026) |
| 01/26/2026 | 179 | OBJECTIONS to First APPLICATION to the Clerk to Tax Costs against Plaintiff/Counter-Defendant Cher 176 filed by Plaintiff Cher, Counter Defendant Cher. (Anderson, Peter) (Entered: 01/26/2026) |
| 01/29/2026 | 180 | REPLY to Cher's Objection NOTICE OF MOTION AND MOTION for Attorney Fees 178 filed by Counter Claimants Mary Bono, Mary Bono, Defendants Mary Bono, Does. (Attorney Daniel Jochen Schacht added to party Does(pty:dft))(Schacht, Daniel) (Entered: 01/29/2026) |
| 01/30/2026 | 181 | First STIPULATION for Order STIPULATION TO ORDER SETTING BRIEFING SCHEDULE AND CONTINUING HEARING DATE ON PLAINTIFFS MOTION FOR ATTORNEYS FEES filed by Plaintiff Mary Bono(individually and as Trustee of The Bono Collection Trust), Does. (Attachments: # 1 Proposed Order)(Schacht, Daniel) (Entered: 01/30/2026) |
| 01/30/2026 | 182 | NOTICE OF ERRATA filed by Counter Claimants Mary Bono, Mary Bono, Defendants Mary Bono, Does. correcting Reply (Motion related), 180 (Schacht, Daniel) (Entered: 01/30/2026) |
| 01/30/2026 | 185 | ORDER RE STIPULATION TO ORDER SETTING BRIEFING SCHEDULE AND CONTINUING HEARING DATE ON PLAINTIFF'S MOTION FOR ATTORNEY'S FEES (DKT. 181 )by Judge John A. Kronstadt. Based on a review of the Stipulation to Order Setting Briefing Schedule and Continuing Hearing Date on Plaintiff's Motion for Attorney's Fees, sufficient good cause has been shown for the requested relief. Therefore, the Stipulation is APPROVED IN PART, as follows: Defendant shall file any opposition to Plaintiffs Motion for Attorney's Fees (the (Dkt. 178)) on or before February 2, 2026. Plaintiff shall file any reply in support of the Motion on or before February 16, 2026. The hearing on the Motion is continued from February 23, 2026, to March 2, 2026, at 8:30 a.m., with the precise time to be set when the calendar for that date is issued. IT IS SO ORDERED. (yl) (Entered: 02/02/2026) |
| 02/02/2026 | 183 | REPLY filed by Counter Claimant Mary Bono, Defendant Mary Bono to Objection 179 *Cher's Obj. to Bono's First Appl.to the Clerk to Tax Costs and Bill of Costs* (Schacht, Daniel) (Entered: 02/02/2026) |
| 02/02/2026 | 184 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Attorney Fees 178 filed by Counter Claimant Mary Bono, Defendant Mary Bono. (Attachments: # 1 Declaration Kim Decl. ISO Opposition, # 2 Exhibit A to Kim Decl.)(Schacht, Daniel) (Entered: 02/02/2026) |
| 02/02/2026 | 186 | TRANSCRIPT for proceedings held on 11/18/2024. Court Reporter: DEBBIE HINO-SPAAN, CSR 7953, RPR, CRR, RMR, CRC, email dhinospaan@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/23/2026. Redacted Transcript Deadline set for 3/5/2026. Release of Transcript Restriction set for 5/4/2026. (aa) (Entered: 02/03/2026) |
| 02/02/2026 | 187 | NOTICE OF FILING TRANSCRIPT filed for proceedings 11/18/2024 re Transcript 186 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aa) TEXT ONLY ENTRY (Entered: 02/03/2026) |

| | | |
|---|---|---|
| 02/11/2026 | 188 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 171 filed by Mary Bono. CCA # 25-8085. The (9th CCA) Clerk is directed to temporarily close this court's docket for administrative purposes until May 1, 2026. This administrative closure is not a decision on the merits and no mandate will issue in connection with this order. At any time, any party may request that this appeal be reopened. A dial-in telephone conference will be held on April 29, 2026, at 11:00 AM Pacific Time. Each participant will receive an email with dial-in information. (mat) (Entered: 02/12/2026) |
| 02/16/2026 | 189 | REPLY in Support of NOTICE OF MOTION AND MOTION for Attorney Fees 178 filed by Plaintiff Cher, Counter Defendants Cher, Cher. (Attachments: # 1 Declaration of Peter Anderson, # 2 Exhibit 4 to Declaration of Peter Anderson)(Anderson, Peter) (Entered: 02/16/2026) |
| 02/27/2026 | 190 | (IN CHAMBERS) ORDER CHANGING THE TIME FOR THE MOTION HEARING (DKT. 178) by Judge John A. Kronstadt: On the Court's own motion, the TIME for the hearing is CHANGED from 8:30 a.m., to 9:00 a.m., on March 2, 2026. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mal) TEXT ONLY ENTRY (Entered: 02/27/2026) |
| 03/02/2026 | 191 | MINUTE ORDER OF MOTION FOR ATTORNEY FEES (DKT. 178 ) held before Judge John A. Kronstadt. The Court takes the Motion UNDER SUBMISSION, and a ruling will be issued. The parties shall each file a brief, not to exceed five (5) pages, regarding the potential apportionment of attorney's fees by March 13, 2026. IT IS SO ORDERED. (See document for further details) Court Reporter: Maria Bustillos. (yl) (Entered: 03/04/2026) |
| 03/13/2026 | 192 | MEMORANDUM in Support of NOTICE OF MOTION AND MOTION for Attorney Fees 178 filed by Plaintiff Cher, Counter Defendant Cher. (Anderson, Peter) (Entered: 03/13/2026) |
| 03/13/2026 | 193 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Attorney Fees 178 *(SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES)* filed by Counter Claimant Mary Bono. (Schacht, Daniel) (Entered: 03/13/2026) |
| 04/23/2026 | 194 | BILL OF COSTS. Costs Taxed in the amount of $ $3,871 in favor of DEFENDANT and against PLAINTIFF. RE: First APPLICATION to the Clerk to Tax Costs against Plaintiff/Counter-Defendant Cher 176 (rh) (Entered: 04/23/2026) |
| 04/23/2026 | 195 | BILL OF COSTS. Costs Taxed in amount of $ $8,003.82 in favor of PLAINTIFF and against DEFENDANT. RE: APPLICATION to the Clerk to Tax Costs against Defendant and Counterclaimant Mary Bono(individually and as Trustee of The Bono Collection Trust) 177 (rh) (Entered: 04/23/2026) |
| 07/17/2026 | 196 | MINUTE (IN CHAMBERS) ORDER RE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES (DKT. 178 ) by Judge John A. Kronstadt. For the reasons stated in this Order, the Motion is DENIED. (SEE DOCUMENT FOR FURTHER DETAILS) (chk) (Entered: 07/20/2026) |
| 07/30/2026 | 197 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by plaintiff and counterdefendant Cher. Appeal of Order on Motion for Attorney Fees 196 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-42926659.) (Attachments: # 1 Order from which appeal is taken)(Anderson, Peter) (Entered: 07/30/2026) |
| 07/31/2026 | 198 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 26-4919 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 197 as to Plaintiff Cher. (san) (Entered: 08/02/2026) |

| | | |
|---|---|---|
| 08/04/2026 | 199 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 171 filed by Mary Bono, Notice of Appeal to 9th Circuit Court of Appeals, 197 filed by Cher. CCA # 25-8085, 26-4919. Appeal No. 25-8085 was administratively closed. The appeal is reopened. These appeals are consolidated. Briefing schedule in Appeal No. 26-4919 shall apply in both consolidated appeals. This case is released from the Mediation Program. (iv) (Entered: 08/05/2026) |